# EXHIBIT 1

Debbie Rankin
1300 NE 70th Street
Oklahoma City, OK  73111

July 11, 2019

Howard K Berry
Berry Law Firm
1350 SW 89th Street
Oklahoma City, OK  73159

RE:  Graves v  Henley, Pennsylvania Manufacturers Indemnity Co, American Claims
Management Inc.
Case No. CJ-2018-2832

Dear Mr. Berry,

I have been retained to review and provide an opinion regarding the claim handling in the
above case by American Claims Management (ACM) and Pennsylvania Manufacturing
Indemnity Co. (PMI) and Old Republic with respect to the claim for underinsured motorist
benefits presented by Janet Graves.  For the purposes of this report, I will consider the
companies as one entity and when referring to them will use ACM when referencing the
insurer.

## QUALIFICATIONS

I have been a licensed adjuster in the state of Oklahoma since 1983.  I was previously employed
by State Farm Insurance and worked there from 1983 until I retired in 2016.  During the course
of my 33 year employment, I handled auto injury claims and was charged specifically with
investigating, evaluating and resolving claims.  For almost half of my career, I evaluated only
UM/UIM claims.  I have evaluated hundreds if not thousands of claims.  I have trained claim
representatives with regard to handling UM/UIM claims.  I have conducted classes in Oklahoma
UM/UIM handling in my capacity with State Farm.  I received a Bachelor of Science degree from
the University of Oklahoma in 1981 in Law Enforcement/Criminal Justice.  See attached CV.

## STATEMENT OF FACTS

### 1.  Coverage and Policy Provisions:

Pennsylvania Manufacturing Indemnity provided a policy of Commercial Insurance to Sac & Fox
Nation of Stroud Oklahoma.  The declaration page notes the policy period from 10-11-2016 to

10-01-2017. The policy provided UM/UIM coverage with a limit of $1,000,000. No coverage issues were raised.

## 2. Facts of the accident:

This accident occurred at approximately 6 am on January 24th, 2017. Nathan Graves was driving a 2014 Chevrolet Tahoe, owned by Sac & Fox Nation, in the course of his employment as a police officer. The accident occurred near Stroud, Oklahoma on state highway 99 near 750 Road. The roadway consisted of two lanes, one northbound and one southbound. The area is a marked "no passing" zone. Driver Nathan Graves was traveling southbound. Drivers Justin Henley, Garrett Hunt and Tony Gann were traveling northbound. Garrett Hunt pulled into the southbound lane to pass Tony Gann. Justin Henley, also pulled into the southbound lane to pass Tony Gann. Garrett Hunt successfully passed Tony Gann and reentered the northbound lane. Justin Henley was unable to successfully pass Tony Gann and hit Nathan Graves, head-on. Eventually, charges were filed against Mr. Henley resulting in a plea of guilty for 2nd degree manslaughter.

## 3. Injuries:

Based on the information provided, Nathan Graves died at the scene.

## 4. Claim Handling and Investigation:

On 2-2-2017, ACM received notice of the accident by way of correspondence from Janet Graves. She requested forms for auto med pay and UM/UIM coverage due to the death of her husband. The claim was assigned to ACM handler Terry Leikam. Mr. Leikam acknowledged that a UIM claim was being made.

On 2-3-17, Leikam sent a letter to Mrs. Graves, through her brother in law, acknowledging the claim and providing the necessary forms as requested, for the med pay and UIM claims. Mrs. Graves provided and Leikam made note of family members of Nathan Graves including several children, siblings and parents. Leikam's action plan included an assets check and a determination of insurance on the tort-feasor, obtaining the police report, verifying details of the loss, confirming liability, tying down damages, and determining whether to pay the liability limits to position the file for subrogation or authorizing the claimant to accept tort limits and waive subrogation. Mention was made that attorney Daniel Gomez has been hired to assist with the evaluation and resolution of the file. Med Pay and UIM coverage is defined and liability is preliminarily assessed on the driver Justin Henley. No comparative negligence was placed on Nathan Graves.

On 2-7-17, Initial reserve set at $25000 with note that the claim has a limits potential. Notes the accident occurred within the policy period and that the involved vehicle is the owned insured vehicle. Asset check for driver Henley indicates no assets found.

On 2-15-17, Leikam spoke with Mrs. Graves. Discussed Nathan's relatives again and other possible sources of insurance for the claim. Mrs. Graves advised Nathan's salary was $28,800/year. Death Certificate was received from Mrs. Graves.

On 2-20-2017, Leikam sent large loss report to superior Matthiessen and Old Republic. Leikam requested the reserves be increased to the policy limit. Matthiessen responded that, with regard to the reserve, they should confirm/deny the existence of any excess coverage first, but he will advise once they round table to the claim. He also mentions obtaining Mr. Graves' employment records. Important to note is that Leikam indicates they are waiting on the police report but that he feels they have enough information to determine liability on Henley, that his is "fully at fault" for attempting to pass when unsafe to do so. He placed no negligence on Graves. Leikam confirms Geico is the liability carrier and they have limits of 100/300/50. Note is made that an asset check has been done and Henley has no subrogatable assets. Lastly, mention is made that Daniel Gomez has been hired to help navigate them through the claim: "He will assist us in assuring we are following Oklahoma UIM law in regards to our duties to the Graves family and protecting the interest of those who have a right to recover from this UIM coverage."

On 2-22-2017, a letter is sent, after approval of Matthiessen, to deny Med Pay due to the Workers Comp exclusion.

On 2-24-17 Leikam spoke with the Graves' personal carrier and confirmed liability.

On 3-9-17, Leikam spoke with Janet Graves to "check in and let her know the file is working."

On 4-13-2017 Leikam spoke with Janet Graves and they agreed to speak the next week.

On 4-18-2017, Leikam provides a status indicating a delay in their investigation of whether or not other liability was available in that the tort-feasor was facing criminal charges. He indicated there may be another source of liability from the driver who successfully passed the slower car first, thereby blocking Mr. Henley's view. Leikam indicated they were continuing to investigate the claim value by obtaining past employment and medical records. Leikam notes the med auth and employment releases were sent.

On 5-2-17, Matthiessen and Leikam discussed the reserves and Matthiessen wanted to wait until the end of May to consider increasing the reserves.

On 5-30-17, medical records and employment records were requested. Leikam spoke with Mrs. Graves and confirmed receipt of the forms and that they are still looking for additional liability insurance. Leikam sent email to Matthiessen asking if they want to increase reserves.

On 6-1-2017, response from Matthiessen to increase reserves to $1,000,000, Notes still looking for additional coverage on the tort-feasor as well as additional tort-feasor who may have liability that would apply. Matthiessen also notes that "Tom [President of Old Republic] has

requested we try to be more aggressive with the investigation. Not sure what we can do but let's discuss".

On 6-7-2017, large report outlining coverage, definitions, exclusions, liability, damages, subrogation, tort carrier information and liability limits of $100,000.  It also provides an action plan listing the following:   - Run assets check and insurance check on tort-feasor
- Obtain the police reports, verify any other loss details, confirm liability and update summary
- work with Janet Graves to tie down economic damages.
- Determine whether to pay tort-feasor's liability limits to position file for subrogation, or authorize claimant to accept tort-feasor's limits and release him from the claim.
- Update reserves and settle claim.

Call from employer wanting to know what is needed.  Leikam explains need employment records and also wants any disciplinary actions taken against Graves.

On 6-28-17, employment information is received.  Notes Graves started the job in December 2013.  Also notes life insurance was available from Hartford and Allstate, $250,000 and 40,000 respectively.

On 7-11-2017 Leikam followed up for medical records.

On 7-13-2017, a large loss report was submitted.  Action Plan includes same items as listed on 6-7-2017.

On 7-20-2017, Janet Graves called and advised Henley is charged with 1st degree Manslaughter.   She advised the final report is ready and is 400 pages and gives the investigating trooper's name and phone number.

On 8-15-2017, Janet Graves called and asked for a copy of the police report which Leikam sent.

On 9-7-2017, Large loss report was submitted.  Action plan remains the same except it notes Janet Graves has not demanded settlement and notes to pursue subrogation upon settlement.

On 9-25-2017 Janet called.  She had some questions regarding Geico contact and wanted to know why Leikam has not found out about other insurance or joint tort-feasors.  Leikam told her that he spoke to the investigator and that his investigation  had stalled due to the criminal charges against the tort-feasor.   Leikam agreed to call back when he knew more from the investigator.

On 9-26-2017, attorney Daniel Gomez sent a letter to Garrett Hunt demanding he pay his share of the liability for the claim of Nathan Graves.  Attorney Gomez instructed Mr. Hunt to put his liability carrier and Hunt Welding on notice of the claim being made against them.

On 9-26-2017 Leikam sent a letter to Mrs. Graves to advise her that counsel had sent a letter to Garrett Hunt and Hunt Welding asking them to pay their share of liability. .

On 10-9-2017, Leikam sent another Large loss report with roughly the same action plan.

On 10-20-2017 Janet gave permission to give her contact info to Hunt if they contacted ACM for it. She intended to send her own letter as well to make a claim.

On 12-14-2017, Leikam called Janet. She had flown to OK for preliminary hearing which was postponed until March 2018

On 12-29-2017 Large Loss report sent to management. Action Plan remains the same.

On 1-11-2018 Large loss report sent to additional names.

On 1-18-2018, Geico sent a letter to Mrs. Graves address offering their $100,000 policy limit of liability. Geico asked for proof of executorship and a list of heirs to conclude settlement.

On February 21st, 2018 American Mercury wrote to attorney Gomez and advised they were investigating any potential liability their insured Hunt may have had for the accident. Adjuster Stephen Denk requested any information Mr. Gomez had that would assist in the investigation.

On 2-27-2018 a letter was written by Tonya Flewellen with National American Insurance Company denying liability on behalf of Hunt's Welding Service. She stated Garrett Hunt is not employed with Hunt Welding. He is a family member of the owner, not an employee.

On 3-13-2018 Attorney Berry called. Leikam called and left a voicemail.

On 3-15-2018 Berry made a demand for $1,000,000 policy limit in 7 days. Leikam asked that he submit his letter of representation and demand in writing.

On 3-16-2018, Berry sent letter of representation to Leikam. Leikam responded asking Berry to submit what he wanted in writing.

On 3-19-18 attorney Howard Berry sent a letter to Leikam confirming their phone conversation. He confirmed Leikam was to respond back to him after speaking with attorney Gomez to determine what had been done to resolve the claim after the September letters that Gomez sent to Hunt. Berry confirmed his request for the $1million policy limit delivered to his office within 7 days. He closes by advising he is sure there is some reason that the $1million has not been paid and he would like to hear it.

On 3-28-2018 a letter from attorney Berry was faxed and mailed to Mr. Gomez. The letter regarded subrogation. It also confirms Mr. Berry's understanding that Mr. Gomez and his client

are not offering $1,000,000 as they believe the value of the claim is less than the $1.1million available through Geico and the UIM carrier. Attached was a copy of the letter from Geico offering the liability limits.

On 4-3-2018 Leikam wrote to supervisor Matthiessen asking for authority to pay $100,000 underlying limits to the plaintiff to preserve company's subrogation claim. Also requested reserve be set at $1.1 million. Notes Geico had sent a letter offering their $100,000 limits

On 4-4-2018 a letter was sent by attorney Gomez to attorney Berry. Mr. Gomez stated ACM has been actively evaluating its coverage and the accident including the role of several possible tort-feasors. Mr. Gomez denied ACM waived their right of subrogation. Mr. Gomez stated that no final determination of value of the UIM claim has been made as whether the claim has a value less or more than the policy limit. He goes on to say it has not been determined whether or not there is other liability coverage available for the accident. He states an expert has been retained to help evaluate the claim. He stated the expert required a significant amount of information and that ACM worked with Mrs. Graves to obtain the information. He indicates that information is being considered by ACM as they continue their evaluation.

On 4-10-18 Attorney Berry responded and confirmed what Mr. Gomez had stated that he has 60 days to waive subrogation or substitute payment and that the evaluation is nearing completion and a good faith offer will be forthcoming.

On 4-12-2018, Leikam sent a follow up letter to Matthiessen regarding authority to pay.

On 4-19-2018 noted case is pending in Lincoln county. Arraignment is 4-24-2018 for Manslaughter 1st degree.

On 5-24-2018 Leikam wrote to Matthiessen to confirm he was to do two things: 1. contact Geico and confirm they made an offer of $100,000 limits to Graves' attorney. 2. Contact Daniel Gomez, redacted.

On 6-13-2018 email to Patel from unknown regarding new lawsuit. Asked if ACM did anything outside the guidelines here. wanting to know if ACM will be defended.

On June 15-2018 Leikam sent email to Matthiessen confirming and authorizing Daniel Gomez to defend PMI and ACM.

On 6-25-2018 Leikam again sends an email to Matthiessen to ask for authority to increase reserves and asked for a response to his request regarding subrogation.

On 7-18-2018 a large loss report appears. The issues of additional coverage seems to be resolved in that the case against another tort-feasor is weak. Also indicates they confirmed Henley was not in the course of employment. Mentions make-whole doctrine in Oklahoma

which would give the insured right to any subrogation recovery if the family is not made whole. Action plan is updated.

On 8-1-2018, Matthiessen responds to Leikam and provides authority to tender $1,000,000 and waive subrogation. He discusses the need for appropriate releases or an interpleader.

On 9-5-2018 Attorney Gomez sent a letter to Attorney Berry by certified mail.  The letter begins in a confusing manner with Mr. Gomez indicating PMA has no obligation to substitute liability payment of $100,000. He then indicates PMA would substitute payment to retain its subrogation rights and requested information to do that. He then stated PMA was served with this lawsuit which ended any possible subrogation claim. He then waives subrogation on behalf of PMA.  He then states he has waited several months for information to know who to pay. He indicates he needs to have an agreement regarding each heirs ' portion of the settlement. He also stated he needed a waiver of sub from any personal UIM carrier and a determination that the made whole doctrine is applicable. He then states he believes the $1,000,000 fully satisfies the claim. He states if an agreement cannot be reached, he will interplead the limits. He states he will request, as part of the interpleader, to be released from all liability including the bad faith allegations.

## 5. Insurance Standards

**Policies and Procedures:**

1. Insurers are charged, in UIM/UM cases, with conducting an appropriate investigation by utilizing evidence in a timely manner to arrive at a fair and reasonable conclusion. They must proactively pursue the facts of the accident through the utilization of tools available. They may include police reports, officers' statements, interviews with parties involved and witnesses, scene investigations and so on. Then, in order to establish damages, other tools are available for use, such as medical authorizations and medical bills and records.   In the case of a fatality, Oklahoma law provides for the damages that should be included and outlines who is entitled to receive the benefits.  This is, by no means, a complete list of available tools  to establish liability and damages.  Clearly each case is different and would require tools appropriate for the resolution of the claim.

2. Insurers are obligated to be proactive in investigating and resolving claims. The insurer cannot wait for the insured or counsel to provide the needed information.  The insurer cannot simply wait for the insured to demand payment but must be proactive in investigating, evaluating and making an offer to settle the claim.  Insurers are charged with pursuing information with a sense of urgency.

3. Insurers are charged with advising the insured of all available coverage applicable to the claim. The available coverage should be explained to the insured including the applicable limit of coverage.  In some cases, such as fatality claims, elements of damage and who can recover

for damages should be explained. The insurer should assist the insured in navigating through the claim process.

4. The insurer is obligated to keep the insured informed of developments in a timely manner. Any delay after 60 days should be explained fully to the insured in writing. Delays in getting information and moving a claim forward must be reasonable.

5. Insurers are charged with a duty to create a fair and accurate evaluation of the claim for damages. It is not considered fair and reasonable to under-evaluate or over-evaluate a claim. In order to complete a fair evaluation of damages, the insurer must know what is payable and to whom benefits are due. In the case of a fatality claim, Oklahoma law provides guidelines for what is payable and who can receive benefits under the Oklahoma Wrongful Death Statute. The insurer must proactively pursue information to determine the value of each claim rather than waiting for the insured to make the claim and provide the needed information.

6.    The insurer is obligated to be familiar with the state specific laws and procedures for handling an Underinsured Motorist claim in that state. While in some cases, it may be reasonable to hire state-specific assistance, the insurer maintains a non-delegable duty of good faith and fair dealing and is ultimately responsible for the handling and outcome of the claim.

7. An insurer cannot place its interests ahead of that of its insured. In Oklahoma, the handling of a UM/UIM claim is not an adversarial process. When an insurer is more concerned about its financial position than in fairness to its insured, it creates an adversarial situation. Oklahoma law outlines the relationship between the insurer and the insured. The insurer, with its unequal bargaining power had the potential to exert that power when the insured is most vulnerable. When the insurer exerts this power, it creates an adversarial process. Oklahoma law creates a nondelegable duty of good faith and fair dealing on the part of the insurer. An insurer cannot put its own interest ahead of its insured nor can it treat its insured as an adversary.

8. An insurer should not force its insured to file suit to recover the benefits owed. It is the obligation of the insurer to proactively move the claim forward by investigating, evaluating and making a good faith offer to settle the claim.   The insured is not required to make a demand to receive an offer under UM/UIM.

## Opinions:

1.   ACM failed to perform a reasonable investigation of the accident to determine liability promptly. A review of ACM's own guidelines state: "a timely and thorough investigation into the facts of the loss should be conducted throughout the life of the claim. Investigation activities should be planned, diaried, documented and carried out with an appropriate sense of urgency". In reviewing liability, very little investigation was done and in no sense of the word

would a sense of urgency be used in describing the pace of the investigation.  It appears liability was not adequately, nor timely investigated.

- In his deposition, Mr. Matthiessen, when asked about Mr. Leikam contacting the investigating officer for information replied,   " It's not something that's routinely done.  Usually police officers won't cooperate with us anyway.  That's the purpose of the police report."  In my 33 years of experience, I contacted hundreds of police officers for information and statements.  Very rarely were they non-cooperative.  In fact, most went out of their way to be helpful.  My experience established that contacting police officers as part of an investigation is a routine practice in the insurance industry.  In July 2017, six months after the accident, Mrs. Graves indicated a 400 page report was complete and provided the name of the investigating officers and phone numbers to Mr. Leikam.  We know that the police were not contacted until Mr. Snorf contacted them in May 2018, over 16 months after the accident. With regard to this claim, a conversation with the investigating officer would be considered essential.  If contact had been make months earlier, ACM might have found out that Hunt passed in a legal passing zone and therefore any liability case against him would be weak.  Contact with the officer could have resolved all of the pending questions that ACM states were necessary to resolve before paying the claim.  The fact that ACM did not contact the police, even after being given the contact information by the insured, was not reasonable and resulted in months of delay.  It is examples such as this that indicate the insured did more to move the claim forward than the claim handler.

- I found no mention of any conversations with any of the involved drivers or witnesses.  Mr. Matthiessen was asked, in his deposition, if anyone contacted witness Gann.  He responded that he did not know.  Leikam testified he never made an attempt to reach Hunt.  The evidence reflects the first contact to Mr. Hunt, was the letter sent by attorney Gomez in September of 2017, almost 9 months after the accident.  It does not appear any follow up was made after the letters sent to Hunt and his insurer and months go by with no activity by ACM to resolve whether or not Hunt could bear negligence and whether he was in the course of his employment.  In his deposition testimony, Leikam testified he never placed a call to driver Hunt.

- I found no documentation in the file that anyone with ACM contacted the heirs to evaluate their claims.  In my opinion, this is a key failure on the part of ACM.  ACM spent months trying to find additional insurance, additional liability coverage to pay or contribute to the claim.   They spent much time concerned about subrogation. They suspected, early-on, that the value of the claim for the death of Nathan Graves alone was worth the limits.  Had they evaluated the claims of the heirs, they would have quickly seen that, in all probability, the value of the wrongful death claim of Nathan Graves far exceeded all available coverage.  The insured could not be "made whole" and so ACM likely had no viable subrogation claim and would have been aware of that early-on had they properly evaluated the claim.  Months of delay could

have been avoided. In his deposition, Leikam states one of the reason's they were not able to pay the claim after the fall of 2017 is that they had an obligation to protect the heirs in regards to the coverage they could pursue against ACM. We know that no one with ACM contacted any of the heirs regarding their claims. It would appear ACM was more concerned with protecting the carrier rather than resolving the heirs' claims.

- The extent of an investigation and its reasonableness is contingent, in part, on the circumstances of a claim. Certainly a fatality claim with clear liability and very small limits would merit far less investigation that a case involving a fatality and large limits. ACM's investigation of this claim was insufficient at even a minimal standard and not reasonable under the circumstances. This is a fatality claim with $1,000,000 in coverage. No attempts were made to contact witnesses. No calls were made by ACM to driver Hunt or Henley. No one with ACM contacted the investigating officer until Mr. Snorff did so almost a year and a half after the accident. ACM blamed the delay of their investigation on the filing of criminal charges against Mr. Henley. Had ACM contacted the investigating officer, they would have found out that Mr. Henley was not in the course of his employment but on his way to work in Tulsa at Tank Farms. The question as to additional commercial liability on a potential employer for Henley could have been resolved with minimal effort months earlier.

- As stated, ACM continued to delay any resolution of this claim by looking for additional coverage and tort-feasors. The Plan of Action was "cut and pasted" over and over again with no evidence of attempts to resolve the issues. Another example, in April of 2017, 3 months after the accident, ACM questioned whether or not Mr. Hunt could be considered negligent for obstructing the view of Mr. Henley. It was not until September of 2017, a full 5 months after the mention and a full 8 months after the accident that Mr. Hunt was contacted by attorney Gomez who sent a letter demanding payment of Mr. Hunt's liability for the accident. Again, minimal effort would have yielded the information that Mr. Hunt was not an employee of Hunt Welding but a family member. A contact with the investigating officer would have resulted in documenting that placing any liability on Mr. Hunt was weak, at best. A working knowledge of Oklahoma law would have indicated that any additional liability available would have been related to the insurer's subrogation claim only and had no bearing on when the UIM coverage becomes primary and owed.

- In April of 2018, Leikam requested authority from Matthiessen to pay the liability limits of $100,000 and the UIM limits of $1M. After two additional requests, Leikam received authority in August of 2018, almost 4 months later.

- Geico's offer of $100,000 limit of liability was made prior to January of 2018. Geico's letter of 1-11-2018 indicates their $100,000 "remains available" to Mrs. Graves. ACM failed to make routine follow ups with Geico for a status of any liability offer. Mr. Gomez denied knowledge of the tender until April 2018 when Mr. Berry advised Mr.

Gomez of the offer.    Mr. Gomez in his letter of April 4, 2018 acknowledged ACM had, by law, 60 days to substitute the limit or waive their subrogation. Gomez wrote to Mr. Berry on September 5th, 2018, almost 5 months after that and waived ACM's subrogation.

- Gomez, in his letter of April 4, 2018 states that "valuation of wrongful death claims can be difficult" On that basis, he indicates ACM has hired an expert consultant to assist them. It is of note that the claim is 15 months old when the decision is made to hire someone to evaluate the claim is communicated to the insured.

- The investigation certainly lacked any  sense of urgency and is not consistent with Oklahoma law or even ACM's own standards.  ACM appeared in no hurry to do anything for Mrs. Graves or her family.  The pattern displayed by ACM would, in my opinion, not meet the standard of good faith and fair dealing that an insurer owes its insured.  Although stated as such several times, Mrs. Graves is not a "claimant" but an insured.   No reasonable insurer would treat an insured the way the Graves family was treated especially after the loss of a husband, a father, an only surviving son.  The issues that needed to be resolved were not unreasonable in and of themselves.  The departure from good faith claim handing was in ACM's failure to make even minimal efforts to do anything to resolve those issues month after month after month.  This claim could have reasonable been resolved within a couple of months by simply making an offer contingent on protecting subrogation, determining liens and obtaining information on how to write the check.   At that point the insurer and the insured could work together to resolve the issues and lack of effort that delayed the resolution of this claim .

2.  ACM failed by keep Mrs. Graves informed.  Early on, Mrs. Graves provided her cooperation. She provided the death certificate, the information on family members and authorizations ACM requested.  She contacted ACM to supply them with the names and numbers of the investigating officers.  She provided the carrier with information regarding the criminal charges against Mr. Henley.  She was told on multiple occasions that ACM was looking for other coverage and tort-feasors.  In September, she contacted ACM wondering what was taking so long.  She was told the reason for the delay was the still pending information, and  the investigator's delay due to the criminal charges.  In Leikam's deposition, he denied knowledge of an investigator.  ACM was less than candid in advising Mrs. Graves that an attorney had been hired to assist ACM with navigating through the claim.

3.   ACM failed to prepare a prompt and fair evaluation of the claim.   The file reflects an income loss of over $600,000.  In order to pay its limit of UIM benefits, the claim need only be valued at an additional $400,000 more or $500,000,  if the liability limits are substituted or sub waived.  The Wrongful death statute spells out what damage are compensable:  grief and loss of consortium for the surviving spouse, grief and loss of companionship of the parents, and children as well as their financial losses.  Certainly, to arrive at a fair value for all of the claims

involving Mrs. Graves, Mr. Graves parents and his children would involve, investigations of their relationships with Nathan Graves would be necessary. Based on the evidence we have it seems fairly reasonable to opine the value would well exceed $400,000. It would seem likely that there would be some mention of the Statute and some accounting for the values assigned to each of the relatives followed by evidence to document those values. Minimal effort would have revealed that Mrs. Graves was a loving wife and that she and Mr. Graves had a good relationship. ACM would have learned that Mr. Graves' three children had good relationships with him and that two were minors and still lived at the residence. An effort would have let ACM know that Mr. Graves' parents had lost one of their two sons to cancer and that the loss of Nathan Graves meant the loss of their only other son.

The file reflects Leikam saw a claim value in excess of the policy limits within weeks of the accident. The economist notes the income loss at $600,000 and Leikam indicated the non-economic damages would exceed the income loss. Yet, months go by as ACM tried to find some other source to pay the claim they had due and owing within weeks of the accident.

5. It appears ACM and PMI placed their interests ahead of their insured's.

- In this claim, Matthiessen, in his deposition indicates one of the reasons for delay was that they must "protect my insured from any other claims that may be brought. Mr. Matthiessen was talking about Sac and Fox Nation as his insured. This might give some insight into the appearance that ACM did not consider Nathan Graves or wife or family insureds.

- Throughout the claim, ACM remains concerned with finding other sources of liability and protecting its subrogation interests. These two concerns appear to slant the focus away from Mrs. Graves and the family's claim and toward the insurer creating an adversarial process.   Sadly, for all involved, neither other liability nor a valid subrogation claim existed and only resulted in months of delay.


6. Throughout the handling of this claim, inexperience in handling Oklahoma claims, specifically UM/UIM claims was apparent.

- On 1-11-2018 Leikam indicates Mrs. Graves and the heirs have not made a demand to settle the UIM claims. He indicates defense counsel will research whether the UIM carrier has an obligation to make an offer of settlement in the absence of a demand from the "claimant". In Oklahoma, there is no requirement for the insured to make a demand. Once the claim is reported and the duties under the policy are met, it is the insurer's duty to promptly investigate, evaluate and make a good faith offer to settle the claim. It appears neither ACM nor Mr. Gomez knew that the insured is not obligated to make a demand for payment.

- Oklahoma law is very clear on when a UIM claim becomes primary insurance. The insurer is charged with evaluating the claim and when the value of the claim exceeds the available liability limits, UIM becomes the primary coverage. The UIM carrier must handle the claim from "first dollar" and can maintain its right of subrogation against the liability carrier. In this case, once the ACM determined Geico had $100,000 in coverage, ACM became the primary coverage applicable to the claim.

- On 2-20-2017, Matthiessen indicates ACM should verify liability and look for excess coverage. Under Oklahoma law, credit cannot be taken for any excess liability policy. The exposure under UIM is triggered from any primary limit of liability and does not consider any excess or Umbrella coverage.

- The failure to evaluate the claim properly resulted in a prolonged pursuit of subrogation that did not reasonable exist. Had the claims been evaluated properly and timely, it would have become very apparent that ACM had no viable subrogation claim. The claim value was most probably well in excess of all coverage early-on. Due to this and the handlers' failure to educate themselves with regard to Oklahoma law, months of delay took place and were, in my opinion, inexcusable in this case.

- No mention was made of the Wrongful Death Statute in Oklahoma, which should have been the basis for evaluating this claim.

- The insurer's own standards for claim handing indicate, "it shall be an unfair act through not attempting in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonable clear." It also indicate that it should treat "all interested parties fairly in every facet of the claim". There is no mention in the file that any of the heirs were ever contacted or that their losses were even acknowledged, except from the standpoint of potential claims against the Sac & Fox Nation after settlement with Mrs. Graves.

- Under Oklahoma Law, ACM could have "tendered" or offered the $1,000,000 limits at least a year before they did. It would have been reasonable and within the parameters of good faith handling to offer the limits of $1,000,000, and retain subrogation, as the investigation moved forward, with regard to any additional liability sources, and contingent on who and how to make the payment and what liens were to be protected.   To insist on preserving subrogation and knowing who to pay before making an appropriate offer is placing the insurer's interests ahead of the insured's interest and is not considered good faith handling in Oklahoma.

- ACM indicated one delay in issuing the check to the insured was how to protect the worker's compensation lien. Ultimately, ACM provided a check written to Graves and the comp carrier by simply putting the comp carrier on the check to resolve the $1

million contract claim.  The common practice in Oklahoma to protect liens was not known to ACM.

- In their depositions, both Leikam and Matthiessen testified they had no experience in handling Oklahoma UIM claims.  Due to that fact, they hired Attorney Gomez to help them navigate through Oklahoma UIM law.  They presumably thought Attorney Gomez had a working knowledge of the insurer's duties under the law.  While we are not aware of attorney Gomez' activities, the pattern of delay after delay as well his letters seem to indicate he was not familiar with Oklahoma law.  Be that as it may, ACM retains responsibility for its handling of a UIM claim in Oklahoma.  The insurer has a nondelagatable duty of good faith and fair dealing.  An insurer who sells insurance in the state of Oklahoma and collects a premium in Oklahoma is obligated to  know the law in the state of Oklahoma and so cannot claim ignorance of the law as a defense to poor handling of a claim.   Oklahoma has many qualified, Oklahoma licensed adjusters and attorneys who are available to evaluate just this type of claim.

7.  An insurer cannot force and insured to file suit to collect benefits they are owed.  In reviewing the pattern of handling in this claim, it seems obvious that no real resolution began until Mrs. Graves sought legal counsel.  Initially,  Mr. Berry agreed to write a letter for Mrs. Graves without compensation as it seemed clear the UIM limits were owed.  When no offer was forthcoming, Mrs. Graves retained Mr. Berry officially in May of 2018.  Had ACM made the offer in March, April or early May after Mr. Berry's initial letter, Mrs. Graves would not have been forced to incurr the legal fees.  No offer was made prior to the lawsuit; coincidentally, an offer of limits was made just after the lawsuit was filed.

In Summary, ACM's handling of this case is far below the required standard of good fair and fair dealing outlined in Oklahoma Law. ACM failed  to investigate the claim at an even minimal standard.  They failed to exhibit any sense of urgency in bringing the claim to conclusion. They failed to make even minimal contacts with all of the parties involved. They did not prepare a reasonable evaluation of this wrongful death claim.  While some of their issues / questions claimed were valid initially, ACM failed to make any reasonable attempts to resolve those issues and used them  to delay a payment that was owed for months before it was offered. They placed their own interests ahead of their insureds' interest creating an adversarial situation. The situation created by ACM lead the insured to believe she needed to hire counsel and eventually to file a lawsuit. ACM seemed to know little about the standard for handling a UIM claim in Oklahoma.   They made excuses for poor handling rather than attempting to work with the insured and move the claim forward promptly.  The pattern of handling seems to shows minimal interest in taking care of Mrs. Graves and more interest in the insurer's subrogation claim and finding someone else to be responsible for payment.  Mr. Matthiessen, in his deposition, saw nothing wrong with the handling of the claim nor did he believe there was any delay.  Unfortunately, for all involved, I strongly disagree.

**DOCUMENTS REVIEWED:**
claim file

depositions of Terry Leikam and Matthiessen.
**Old Republic Best Practices**
**ACM Best Practices**
**Police Report**
**Attorney letters**

**TESTIMONY:** I have not testified at trial or by deposition in the last 4 years.

**PUBLICATIONS:** I have not published articles in the last 10 years.

**COMPENSATION:** I am compensated at a rate of $150 per hour for review and testimony.


Sincerely,

Debbie Rankin

# Deborah C Rankin

_____

1300 NE 70th Street, Oklahoma City, OK  73111 /  405 831-2893 / drank12@cox.net

**Experience**

**Injury Claim Specialist / State Farm Insurance / 1983 - 2016**

Extensive claim experience handling complex injury claims, litigation claims, first party injury claims including bad faith litigation claims.  Specialized in handing first party Uninsured Motorist claims primarily in Oklahoma.  Prepared material and instructed other State Farm claim personnel in handling Oklahoma Uninsured/Underinsured Motorist claims.

Licensed adjuster in the state of Oklahoma, with previous licenses in Arkansas, Louisiana, Kansas, Missouri, Wyoming and New Mexico.  Experience handling claims in Arkansas and Kansas.

Member of Intercompany Arbitration Panel and Special Arbitration dealing with Auto claims from various Oklahoma insurers.

**Skills & Abilities**

**Critical Thinking**

- Experience collecting and analyzing many types of data including insurance policies and coverage, medical reports, police reports and other evidence pertinent to liability and damage investigations.

**Customer Service**

- Experience with daily customer contact resulting in the building of professional relationships with insureds, claimants, medical providers and attorneys resulting in timely and fair claim settlements.

**Jurisdictional Knowledge of Oklahoma Law**

- through handling of first party and litigation claims, attending depositions, mediations, arbitrations, internal instruction and working extensively with defense counsel,

developed an understanding of Oklahoma law dealing with UM and the proper application of the law to claims.

- handled the most complex litigation claims with defense counsel

**Leadership**

- conducted  in house presentations to instruct other claim representatives in UM/UIM law and its application.
- trained multiple new employees throughout my career
- utilized as a resource for claim handlers and claim management with regard to Oklahoma Uninsured Motorist law and claims handling.

**Efficiency**

- proactive in looking for efficiency opportunities in workflow, time and task management and prioritizing to increase service and timely claim settlement.

**Education**

**Bachelor of Science / 1981 / University of Maryland/ Auburn University / University of Oklahoma**

- Major:  Criminal Justice / Foreign language

**Summary**

I am passionate regarding Oklahoma Insurance law and its handling. Through years of experience, I have development expertise and a reputation of competence, honesty and fairness in the legal community.  I wish to continue in an active role in the community assisting the insurance community and utilizing my talents.

# 2 0 1 7

| **LARGE LOSS REPORT:**<br>HENLEY "FULLY AT FAULT"<br>HENLEY $100,000 INS<br>GRAVES NOT NEGLIGENT<br>GRAVES – 46<br>GRAVES $28,000 PER YEAR<br>WIFE OF 18 YEARS<br>2 LIVING PARENTS<br>3 CHILDREN<br>$1,000,000 IN UM INS IS<br>AVAILABLE | FEBRUARY | MARCH | APRIL | MAY | JUNE |
|---|---|---|---|---|---|
| | 1 LEIKAM PHONE CALL<br>2 LEIKAM E-MAILS<br>1 LEIKAM LETTER<br><br>PMIC OPENS FILE<br><br>PMIC HIRES GOMEZ<br><br>< LARGE LOSS REPORT<br>_COMPLETED_ _____ | 1 LEIKAM PHONE CALL | 1 LEIKAM PHONE CALL<br>1 LEIKAM E-MAIL<br>1 LEIKAM LETTER | 2 LEIKAM PHONE CALLS<br>1 LEIKAM E-MAIL<br>2 LEIKAM LETTERS<br><br>1 MATTHEISSEN E-MAIL<br><br>ECOMOMIST HIRED | 1 LEIKAM PHONE CALL<br><br><br>1 MATTHEISSEN E-MAIL |
| JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER |
| 2 LEIKAM PHONE CALLS<br><br><br>LEIKAM - REPORT | 1 LEIKAM PHONE CALL | 1 LEIKAM PHONE CALL<br><br>GOMEZ – HUNT LETTER<br><br>ECONOMIST - $660K | LEIKAM NOTE IN<br>REPORT:<br>NON-ECONOMIC | | 1 LEIKAM PHONE CALL |

# 2 0 1 8

| JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE |
|---|---|---|---|---|---|
| LEIKAM - REPORT | | 1 LEIKAM PHONE CALL<br>(TO BERRY)<br><br>1 GOMEZ PHONE CALL | 2 LEIKAM E-MAILS<br>1 GOMEZ LETTER | 1 LEIKAM E-MAIL<br>1 GOMEZ LETTER | 1 LEIKAM E-MAIL<br><br>PMIC HIRES SNORFF<br><br><br>LEIKAM – REPORT |
| JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER |
| PMIC DECIDES TO<br>OFFER $1 MILLION | 1 MATTHEISSEN E-MAIL | GOMEZ ACTUALLY OFFERS<br>$1 MILLION | | | |

**KEY:**   PHONE CALL (GREEN)    E-MAIL (RED)    LETTER (BLUE)    NOTE (PURPLE)

# January 2017

| | January 2017 | | | | | | | February 2017 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa | Su | Mo | Tu | We | Th | Fr | Sa |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | | | | 1 | 2 | 3 | 4 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 29 | 30 | 31 | | | | | 26 | 27 | 28 | | | | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Jan 1, 17 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 NATHAN GRAVES ACCIDENT | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | Feb 1 | 2 | 3 | 4 |

# February 2017

| February 2017 | | | | | | | | March 2017 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa | | Su | Mo | Tu | We | Th | Fr | Sa |
| | | | 1 | 2 | 3 | 4 | | | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 | | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 | | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 | | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | | | | | | 26 | 27 | 28 | 29 | 30 | 31 | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Jan 29 | 30 | 31 | Feb 1 | 2 <br> ASSET CHECK <br> P M I OPENS FILE | 3 <br> GOMEZ HIRED <br> LEIKAM - LETTER TO GRAVES | 4 |
| 5 | 6 | 7 <br> LEIKAM SUMMARY | 8 | 9 | 10 <br> LEIKAM SPOKE TO JANET GRAVES RE: DEATH CERTIFICATE | 11 |
| 12 | 13 | 14 | 15 <br> LEIKAM SPOKE TO JANET GRAVES | 16 | 17 | 18 |
| 19 | 20 <br> LARGE LOSS REPORT TO MATTHEISSEN WITH PLAN OF ACTION | 21 <br> MATTHEISSEN - E-MAIL TO LEIKAM | 22 <br> LEIKAM / MATTHEISSEN E-MAILS | 23 | 24 <br> LEIKAM CALLED NATIONWIDE | 25 |
| 26 | 27 | 28 | Mar 1 | 2 | 3 | 4 |

# March 2017

| | March 2017 | | April 2017 | |
|---|---|---|---|---|

| | Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 | 4 |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| | 26 | 27 | 28 | 29 | 30 | 31 | |

| | Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|---|
| | | | | | | | 1 |
| | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| | 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| | 30 | | | | | | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Feb 26 | 27 | 28 | Mar 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9<br>LEIKAM CALLED JANET GRAVES | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | Apr 1 |

# April 2017

**April 2017**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    |    |    | 1  |
| 2  | 3  | 4  | 5  | 6  | 7  | 8  |
| 9  | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 |    |    |    |    |    |    |

**May 2017**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    | 1  | 2  | 3  | 4  | 5  | 6  |
| 7  | 8  | 9  | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |    |    |    |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| Mar 26 | 27 | 28 | 29 | 30 | 31 | Apr 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 LEIKAM SPOKE TO JANET GRAVES | 14 | 15 |
| 16 | 17 | 18 LEIKAM E-MAIL LEIKAM LETTER TO JANET GRAVES | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | May 1 | 2 | 3 | 4 | 5 | 6 |

# May 2017

| | May 2017 | | | | | | | June 2017 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa | Su | Mo | Tu | We | Th | Fr | Sa |
| | 1 | 2 | 3 | 4 | 5 | 6 | | | | | 1 | 2 | 3 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 28 | 29 | 30 | 31 | | | | 25 | 26 | 27 | 28 | 29 | 30 | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Apr 30 | May 1 <br> ECONOMIST HIRED | 2 <br> LEIKAM / MATTHEISSEN E-MAIL & DISCUSSION | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 <br> JANET GRAVES CALLED LEIKAM <br> LEIKAM E-MAIL TO MATTHEISSEN | 31 | Jun 1 | 2 | 3 |

# June 2017

**June 2017**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    | 1  | 2  | 3  |
| 4  | 5  | 6  | 7  | 8  | 9  | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 |    |

**July 2017**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    |    |    | 1  |
| 2  | 3  | 4  | 5  | 6  | 7  | 8  |
| 9  | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 |    |    |    |    |    |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| May 28 | 29 | 30 | 31 | Jun 1<br>MATTHEISSEN E-MAIL TO LEIKAM | 2 | 3 |
| 4 | 5 | 6 | 7<br>LEIKAM CALLS SAC & FOX H.R. | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | Jul 1 |

# July 2017

| | July 2017 | | | | | | | August 2017 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa | Su | Mo | Tu | We | Th | Fr | Sa |
| | | | | | | 1 | | | 1 | 2 | 3 | 4 | 5 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 | 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 | 27 | 28 | 29 | 30 | 31 | | |
| 30 | 31 | | | | | | | | | | | | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Jun 25 | 26 | 27 | 28 | 29 | 30 | Jul 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 Large Loss Report / Leikam called Dr. Griffin & Janet Graves / Leikam considers suing | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 JANET GRAVES TOLD LEIKAM OF TROOPER LOWE 405-425-2323 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | Aug 1 | 2 | 3 | 4 | 5 |

# August 2017

| | August 2017 | | | | | | | September 2017 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa | Su | Mo | Tu | We | Th | Fr | Sa |
| | | 1 | 2 | 3 | 4 | 5 | | | | | | 1 | 2 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 27 | 28 | 29 | 30 | 31 | | | 24 | 25 | 26 | 27 | 28 | 29 | 30 |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Jul 30 | 31 | Aug 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 JANET GRAVES CALLED LEIKAM | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | Sep 1 | 2 |

# September 2017

**September 2017**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    |    | 1  | 2  |
| 3  | 4  | 5  | 6  | 7  | 8  | 9  |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

**October 2017**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
| 1  | 2  | 3  | 4  | 5  | 6  | 7  |
| 8  | 9  | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 |    |    |    |    |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| Aug 27 | 28 | 29 | 30 | 31 | Sep 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 LEIKAM SPOKE TO JANET GRAVES RE: INVESTIGATOR | 26 ECONOMIST REPORT IN GOMEZ WROTE LETTER TO HUNT LEIKAM E-MAIL | 27 | 28 | 29 | 30 |

# October 2017

| | October 2017 | | | | | | | November 2017 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa | Su | Mo | Tu | We | Th | Fr | Sa |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | | | | 1 | 2 | 3 | 4 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 29 | 30 | 31 | | | | | 26 | 27 | 28 | 29 | 30 | | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Oct 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 <br> LARGE LOSS REPORT <br> LEIKAM NOTES <br> $600,000 ECONOMIC <br> NOTE: GEICO OFFERED <br> LIMITS/ HUNT IS | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 <br> JANET GRAVES CALLED | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | Nov 1 | 2 | 3 | 4 |

# November 2017

**November 2017**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    | 1  | 2  | 3  | 4  |
| 5  | 6  | 7  | 8  | 9  | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 |    |    |

**December 2017**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    |    | 1  | 2  |
| 3  | 4  | 5  | 6  | 7  | 8  | 9  |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 |    |    |    |    |    |    |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| Oct 29 | 30 | 31 | Nov 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | Dec 1 | 2 |

# December 2017

| | December 2017 | January 2018 |
|---|---|---|
| | Su Mo Tu We Th Fr Sa | Su Mo Tu We Th Fr Sa |
| |             1  2 |   1  2  3  4  5  6 |
| | 3  4  5  6  7  8  9 | 7  8  9 10 11 12 13 |
| | 10 11 12 13 14 15 16 | 14 15 16 17 18 19 20 |
| | 17 18 19 20 21 22 23 | 21 22 23 24 25 26 27 |
| | 24 25 26 27 28 29 30 | 28 29 30 31 |
| | 31 | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Nov 26 | 27 | 28 | 29 | 30 | Dec 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 LEIKAM CALLED JANET GRAVES | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | Jan 1, 18 | 2 | 3 | 4 | 5 | 6 |

# January 2018

**January 2018**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

**February 2018**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | | | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Dec 31 | Jan 1, 18 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 <br> INCREASING OUR EFFORTS TO LOCATE LARGE LOSS REPORT LEIKAM ASKS GOMEZ IF DEMAND IS | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | Feb 1 | 2 | 3 |

# February 2018

| | February 2018 | | March 2018 |
|---|---|---|---|

**February 2018**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | | | |

**March 2018**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Jan 28 | 29 | 30 | 31 | Feb 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | Mar 1 | 2 | 3 |

# March 2018

| | March 2018 |
|---|---|
| Su Mo Tu We Th Fr Sa | |

**March 2018**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

**April 2018**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| Feb 25 | 26 | 27 | 28 | Mar 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 <br> LEIKAM TALKS TO BERRY | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 <br> GOMEZ PHONE CALL TO BERRY | 27 | 28 | 29 | 30 | 31 |

# April 2018

**April 2018**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

**May 2018**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| Apr 1 | 2 | 3 LEIKAM E-MAIL TO MATTHEISSEN REQUESTING LIMITS | 4 GOMEZ LETTER RE: OFFER FORTHCOMING | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 LEIKAM E-MAIL TO MATTHEISSEN | 13 P M I C HIRES ATTORNEY SNORFF | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | May 1 | 2 | 3 | 4 | 5 |

# May 2018

| | May 2018 | | | | | | | | June 2018 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa | | Su | Mo | Tu | We | Th | Fr | Sa |
| | | 1 | 2 | 3 | 4 | 5 | | | | | | | 1 | 2 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 | | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 | | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 | | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 27 | 28 | 29 | 30 | 31 | | | | 24 | 25 | 26 | 27 | 28 | 29 | 30 |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Apr 29 | 30 | May 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 — LEIKAM E-MAIL RE: DISCUSSION WITH BOB GAMBELL | 25 — GOMEZ TELLS BERRY OFFER FORTHCOMING | 26 |
| 27 | 28 | 29 | 30 | 31 | Jun 1 | 2 |

# June 2018

**June 2018**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    |    | 1  | 2  |
| 3  | 4  | 5  | 6  | 7  | 8  | 9  |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

**July 2018**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
| 1  | 2  | 3  | 4  | 5  | 6  | 7  |
| 8  | 9  | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 |    |    |    |    |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| May 27 | 28 | 29 | 30 | 31 | Jun 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 LEIKAM E-MAIL TO MATTHEISSEN | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 BERRY NOW INVOLVED LARGE LOSS REPORT SNORFF SAYS HUNT CASE IS NO GOOD SUIT FILED | 26 | 27 | 28 | 29 | 30 |

# July 2018

**July 2018**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

**August 2018**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Jul 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 LEIKAM STATES HUNT CLAIM IS WEEK AND CLAIM VALUE P M I C DECIDES TO OFFER $1 MILLION | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | Aug 1 | 2 | 3 | 4 |

# August 2018

**August 2018**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    | 1  | 2  | 3  | 4  |
| 5  | 6  | 7  | 8  | 9  | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 |    |

**September 2018**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    |    |    | 1  |
| 2  | 3  | 4  | 5  | 6  | 7  | 8  |
| 9  | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 |    |    |    |    |    |    |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| Jul 29 | 30 | 31 | **Aug 1** <br> MATTHEISSEN E-MAIL TO LEIKAM CONFIRMING $1 MILLION TO BE OFFERED | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | Sep 1 |

# September 2018

| | September 2018 | | | | | | | | October 2018 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa | | Su | Mo | Tu | We | Th | Fr | Sa |
| | | | | | | 1 | | | 1 | 2 | 3 | 4 | 5 | 6 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 | | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 | | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 | | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 | | 28 | 29 | 30 | 31 | | | |
| 30 | | | | | | | | | | | | | | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Aug 26 | 27 | 28 | 29 | 30 | 31 | Sep 1 |
| 2 | 3 | 4 | 5 GOMEZ LETTER - $1 MILLION OFFERED | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | Oct 1 | 2 | 3 | 4 | 5 | 6 |

# October 2018

| | October 2018 | | | | | | | November 2018 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa | Su | Mo | Tu | We | Th | Fr | Sa |
| | 1 | 2 | 3 | 4 | 5 | 6 | | | | | 1 | 2 | 3 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 28 | 29 | 30 | 31 | | | | 25 | 26 | 27 | 28 | 29 | 30 | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Sep 30 | Oct 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | Nov 1 | 2 | 3 |

# November 2018

| | November 2018 | | | | | | | December 2018 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa | Su | Mo | Tu | We | Th | Fr | Sa |
| | | | | 1 | 2 | 3 | | | | | | | 1 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 25 | 26 | 27 | 28 | 29 | 30 | | 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| | | | | | | | 30 | 31 | | | | | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Oct 28 | 29 | 30 | 31 | Nov 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | Dec 1 |

# December 2018

| | December 2018 | | | | | | | January 2019 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa | Su | Mo | Tu | We | Th | Fr | Sa |
| | | | | | | 1 | | | 1 | 2 | 3 | 4 | 5 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 | 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 | 27 | 28 | 29 | 30 | 31 | | |
| 30 | 31 | | | | | | | | | | | | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Nov 25 | 26 | 27 | 28 | 29 | 30 | Dec 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | Jan 1, 19 | 2 | 3 | 4 | 5 |

# January 2019

**January 2019**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    | 1  | 2  | 3  | 4  | 5  |
| 6  | 7  | 8  | 9  | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |    |    |

**February 2019**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    |    | 1  | 2  |
| 3  | 4  | 5  | 6  | 7  | 8  | 9  |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 |    |    |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| Dec 30 | 31 | Jan 1, 19 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 $ 1 MILLION CHECK ISSUED LISTING NATHAN GRAVES AS PAYEE | 31 | Feb 1 | 2 |

# February 2019

| | February 2019 | | | | | | | March 2019 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa | Su | Mo | Tu | We | Th | Fr | Sa |
| | | | | | 1 | 2 | | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | | | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| | | | | | | | 31 | | | | | | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Jan 27 | 28 | 29 | 30 | 31 | Feb 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | Mar 1 | 2 |

# March 2019

| | March 2019 | April 2019 |
|---|---|---|

| | March 2019 | | | | | |
|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

| | April 2019 | | | | | |
|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Feb 24 | 25 | 26 | 27 | 28 | Mar 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | Apr 1 | 2 | 3 | 4 | 5 | 6 |

# April 2019

| | April 2019 | | | | | | | | May 2019 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Su** | **Mo** | **Tu** | **We** | **Th** | **Fr** | **Sa** | | **Su** | **Mo** | **Tu** | **We** | **Th** | **Fr** | **Sa** |
| | 1 | 2 | 3 | 4 | 5 | 6 | | | | | 1 | 2 | 3 | 4 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 | | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 | | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 | | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 28 | 29 | 30 | | | | | | 26 | 27 | 28 | 29 | 30 | 31 | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Mar 31 | Apr 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18<br>**$1 MILLION CHECK ISSUED AND NEGOTIABLE** | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | May 1 | 2 | 3 | 4 |

# LAW SUMMARY

BURCH V. ALLSTATE

"AN UNINSURED MOTORIST CARRIER IS LIABLE FOR THE ENTIRE AMOUNT OF ITS INSURED'S LOSS FROM THE FIRST DOLLAR UP TO THE UM POLICY LIMITS WITHOUT REGARD TO THE PRESENCE OF ANY OTHER INSURANCE."

BURCH V. ALLSTATE

"A UM CARRIER IS DIRECTLY AND PRIMARILY LIABLE TO ITS INSURED FOR THE ENTIRE LOSS TO BE INDEMNIFIED: IT MUST SEEK RECOVERY OF PAID INDEMNITY THROUGH AN EXERCISE OF ITS RIGHT TO SUBROGATION".

BUZZARD V. FARMERS  &  BURCH V. ALLSTATE

"THE UM CARRIER MUST PROMPTLY INVESTIGATE, PLACE A VALUE ON THE DAMAGE CLAIM AND PAY UM BENEFITS WITHOUT REGARD TO WHETHER LIABILITY BENEFITS HAVE BEEN PAID."

BUZZARD V. FARMERS 1991

"WHEN THE PRECONDITIONS FOR THE LOSS UNDER UNINSURED MOTORIST COVERAGE EXISTS, AN UNINSURED MOTORIST CARRIER IS OBLIGATED TO PAY THE ENTIRE LOSS OF ITS INJURED INSURED FROM THE FIRST DOLLAR UP TO THE POLICY LIMITS."

"IF THE CLAIM EXCEEDS THE AMOUNT AVAILABLE UNDER THE LIABILITY POLICY, THE UNDERINSURED MUST TAKE PROMPT ACTION TO DETERMINE WHAT PAYMENT IS DUE AND MAY NOT DELAY THE PAYMENT OF BENEFITS UNTIL EXHAUSTION OF LIABILITY LIMITS"

BUZZARD V. FARMERS 1991

"THE UNDERINSURER MAY NOT SAFELY AWAIT SETTLEMENT BETWEEN THE LIABILITY INSURER AND THE INSURED.  INSTEAD THE INSUROR MUST GO ABOUT THE BUSINESS OF INVESTIGATING AND EVALUATING THE CLAIM.  AN INSUROR IS READILY EQUIPT TO MAKE SUCH A DETERMINATION AND TO ASSIGN A DOLLAR VALUE TO THE CLAIM".

BUZZARD V. FARMERS 1991

"HOWEVER, IF THE UNDERINSURED DOES NOT CONDUCT AN INVESTIGATION, OR AFTER INVESTIGATION, DETERMINES THAT THE LIKELY WORTH OF THE CLAIM EXCEEDS THE LIABILITY LIMITS, PROMPT PAYMENT MUST BE OFFERED".

BUZZARD V. FARMERS 1991

"OUR RULING FURTHERS THE PURPOSE OF UNDERINSURANCE BY PROVIDING QUICK PAYMENT FOR AN INSURED'S LOSSES WHILE ALSO PROTECTING THE STATUTORY RIGHTS OF THE INSUREROR TO BE RESPONSIBILITY ONLY FOR THE AMOUNT ABOVE THE LIMITS OF LIABILITY."

BARNES V. OKLAHOMA FARM BUREAU MUTUAL INS CO

"IT IS SIMPLY NOT ENOUGH THAT THE CARRIER FOR THE CARRIER TO SAY IT RELIED ON THE ADVICE OF COUNSEL, HOWEVER UNFOUNDED, AND THEN EXPECT THAT VALID CLAIMS FOR COVERAGE CAN BE DENIED WITH IMPUNITY PURSUANT TO SUCH ADVICE".

TIMMONS V. ROYAL GLOBE (SEE FOOTNOTE 5 OF BARNES V. OKLAHOMA FARM BUREAU)

"AN INSUROR CANNOT AVOID LIABILITY FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING BY DELEGATING ITS RESPONSIBILITY TO AN INDEPENDENT CONTRACTOR".

BUZZARD V. FARMERS 1991

"THE CLAIM MUST BE PAID PROMPTLY UNLESS THE INSURER HAS A REASONABLE BELIEF THAT THE CLAIM IS LEGALLY OR FACTUALLY INSUFFICIENT."

MUSTAIN V. U S FIDELITY AND GUARANTEE COMPANY

"THE INJURED UM INSURED IS ENTITLED TO SWIFT PAYMENT FROM THE UM INSURER AND, IN THE ABSENCE OF A REASONABLE DISPUTE AS TO THE COVERAGE OR THE AMOUNT OF DAMAGES, THE UM INSURER MAY NOT WITHHOLD PAYMENT TO ITS INSURED ON THE SOLE BASIS THAT THE LIABILITY INSURANCE HAS NOT BEEN EXHAUSTED."

OKLAHOMA
State Courts Network

# 🏛Oklahoma Statutes Citationized
### 🏛Title 36. Insurance
#### 🏛Chapter 1 - Insurance Code
##### 🏛Article Article 12A-1 - Unfair Claims Settlement Practices Act
###### 📄Section 1250.5 - Acts by an Insurer Constituting an Unfair Claim Settlement Practice

Cite as: O.S. §. __ __

---

Any of the following acts by an insurer, if committed in violation of Section 1250.3 of this title, constitutes an unfair claim settlement practice exclusive of paragraph 16 of this section which shall be applicable solely to health benefit plans:

1. Failing to fully disclose to first party claimants, benefits, coverages, or other provisions of any insurance policy or insurance contract when the benefits, coverages or other provisions are pertinent to a claim;

2. Knowingly misrepresenting to claimants pertinent facts or policy provisions relating to coverages at issue;

3. Failing to adopt and implement reasonable standards for prompt investigations of claims arising under its insurance policies or insurance contracts;

4. Not attempting in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear;

5. Failing to comply with the provisions of Section 1219 of this title;

6. Denying a claim for failure to exhibit the property without proof of demand and unfounded refusal by a claimant to do so;

7. Except where there is a time limit specified in the policy, making statements, written or otherwise, which require a claimant to give written notice of loss or proof of loss within a specified time limit and which seek to relieve the company of its obligations if the time limit is not complied with unless the failure to comply with the time limit prejudices the rights of an insurer;

8. Requesting a claimant to sign a release that extends beyond the subject matter that gave rise to the claim payment;

9. Issuing checks or drafts in partial settlement of a loss or claim under a specified coverage which contain language releasing an insurer or its insured from its total liability;

10. Denying payment to a claimant on the grounds that services, procedures, or supplies provided by a treating physician or a hospital were not medically necessary unless the health insurer or administrator, as defined in Section 1442 of this title, first obtains an opinion from any provider of health care licensed by law and preceded by a medical examination or claim review, to the effect that the services, procedures or supplies for which payment is being denied were not medically necessary. Upon written request of a claimant, treating physician, or hospital, the opinion shall be set forth in a written report, prepared and signed by the reviewing physician. The report shall detail which specific services, procedures, or supplies were not medically necessary, in the opinion of the reviewing physician, and an explanation of that conclusion. A copy of each report of a reviewing physician shall be mailed by the health insurer, or administrator, postage prepaid, to the claimant, treating physician or hospital requesting same within fifteen (15) days after receipt of the written request. As used in this paragraph, "physician" means a person holding a valid license to practice medicine and surgery, osteopathic medicine, podiatric medicine, dentistry, chiropractic, or optometry, pursuant to the state licensing provisions of Title 59 of the Oklahoma Statutes;

11. Compensating a reviewing physician, as defined in paragraph 10 of this subsection, on the basis of a percentage of the amount by which a claim is reduced for payment;

12. Violating the provisions of the Health Care Fraud Prevention Act;

contracts by offering substantially less than the amounts ultimately recovered in suits brought by them, when the policyholders have made claims for amounts reasonably similar to the amounts ultimately recovered;

14. Failing to maintain a complete record of all complaints which it has received during the preceding three (3) years or since the date of its last financial examination conducted or accepted by the Commissioner, whichever time is longer. This record shall indicate the total number of complaints, their classification by line of insurance, the nature of each complaint, the disposition of each complaint, and the time it took to process each complaint. For the purposes of this paragraph, "complaint" means any written communication primarily expressing a grievance;

15. Requesting a refund of all or a portion of a payment of a claim made to a claimant or health care provider more than twenty-four (24) months after the payment is made. This paragraph shall not apply:

a. if the payment was made because of fraud committed by the claimant or health care provider, or

b. if the claimant or health care provider has otherwise agreed to make a refund to the insurer for overpayment of a claim;

16. Failing to pay, or requesting a refund of a payment, for health care services covered under the policy if a health benefit plan, or its agent, has provided a preauthorization or precertification and verification of eligibility for those health care services. This paragraph shall not apply if:

a. the claim or payment was made because of fraud committed by the claimant or health care provider,

b. the subscriber had a preexisting exclusion under the policy related to the service provided, or

c. the subscriber or employer failed to pay the applicable premium and all grace periods and extensions of coverage have expired; or

17. Denying or refusing to accept an application for life insurance, or refusing to renew, cancel, restrict or otherwise terminate a policy of life insurance, or charge a different rate based upon the lawful travel destination of an applicant or insured as provided in Section 4024 of this title.

### Historical Data

Laws 1986, HB 1983, c. 251, § 16, eff. November 1, 1986; Amended by Laws 1989, SB 13, c. 238, § 1, eff. November 1, 1989; Amended by Laws 1991, SB 171, c. 134, § 9, emerg. eff. July 1, 1991; Amended by Laws 1993, SB 92, c. 24, § 1, eff. September 1, 1993; Amended by Laws 1994, SB 1033, c. 342, § 5, eff. September 1, 1994; Renumbered from 36 O.S. § 1254 by Laws 1994, SB 1033, c. 342, § 20, eff. September 1, 1994; Amended by Laws 1997, SB 223, c. 156, § 2, eff. November 1, 1997; Amended by Laws 1997, SB 761, c. 404, § 3, eff. November 1, 1997; Amended by Laws 1997, SB 327, c. 418, § 52, eff. November 1, 1997 Amended by Laws 1997, SB 761, c. 404, § 8, eff. November 1, 1997 (superseded document available); Amended by Laws 1999, HB 1745, c. 256, § 1, eff. November 1, 1999 (superseded document available); Amended by Laws 2000, SB 108, c. 353, § 7, eff. November 1, 2000 (superseded document available); Amended by Laws 2009, HB 1055, c. 323, § 2, eff. July 1, 2010 (superseded document available); Amended by Laws 2012, HB 1968, c. 105, § 1 (superseded document available).

### Citationizer© Summary of Documents Citing This Document

| Cite Name | Level | |
|---|---|---|
| **Oklahoma Court of Civil Appeals Cases** | | |
| Cite | Name | Level |
| 2005 OK CIV APP 16, 108 P.3d 5, | WORLDLOGICS CORP. v. CHATHAM REINSURANCE CORP. | Cited |
| 2010 OK CIV APP 99, 241 P.3d 285, | BEERS v. HILLORY | Discussed |

### Citationizer: Table of Authority

| Cite Name | Level | |
|---|---|---|
| **Title 36. Insurance** | | |
| Cite | Name | Level |
| 36 O.S. 1250.5, | Actions That Violate the Unfair Claims Settlement Practice Act | Cited |


**OKLAHOMA**
State Courts Network

# Oklahoma Statutes Citationized
## Title 36. Insurance
### Chapter 1 - Insurance Code
#### Article Article 12A-1 - Unfair Claims Settlement Practices Act
##### Section 1250.7 - Acceptance or Denial of Claim

Cite as: 36 O.S. § 1250.7 (OSCN 2019)

A. Within sixty (60) days after receipt by a property and casualty insurer of properly executed proofs of loss, the first party claimant shall be advised of the acceptance or denial of the claim by the insurer, or if further investigation is necessary. No property and casualty insurer shall deny a claim because of a specific policy provision, condition, or exclusion unless reference to such provision, condition, or exclusion is included in the denial. A denial shall be given to any claimant in writing, and the claim file of the property and casualty insurer shall contain a copy of the denial. If there is a reasonable basis supported by specific information available for review by the Commissioner that the first party claimant has fraudulently caused or contributed to the loss, a property and casualty insurer shall be relieved from the requirements of this subsection. In the event of a weather-related catastrophe or a major natural disaster, as declared by the Governor, the Insurance Commissioner may extend the deadline imposed under this subsection an additional twenty (20) days.

B. If a claim is denied for reasons other than those described in subsection A of this section, and is made by any other means than writing, an appropriate notation shall be made in the claim file of the property and casualty insurer until such time as a written confirmation can be made.

C. Every property and casualty insurer shall complete investigation of a claim within sixty (60) days after notification of proof of loss unless such investigation cannot reasonably be completed within such time. If such investigation cannot be completed, or if a property and casualty insurer needs more time to determine whether a claim should be accepted or denied, it shall so notify the claimant within sixty (60) days after receipt of the proofs of loss, giving reasons why more time is needed. If the investigation remains incomplete, a property and casualty insurer shall, within sixty (60) days from the date of the initial notification, send to such claimant a letter setting forth the reasons additional time is needed for investigation. Except for an investigation of possible fraud or arson which is supported by specific information giving a reasonable basis for the investigation, the time for investigation shall not exceed one hundred twenty (120) days after receipt of proof of loss. Provided, in the event of a weather-related catastrophe or a major natural disaster, as declared by the Governor, the Insurance Commissioner may extend this deadline for investigation an additional twenty (20) days.

D. Insurers shall not fail to settle first party claims on the basis that responsibility for payment should be assumed by others except as may otherwise be provided by policy provisions.

E. Insurers shall not continue or delay negotiations for settlement of a claim directly with a claimant who is neither an attorney nor represented by an attorney, for a length of time which causes the claimant's rights to be affected by a statute of limitations, or a policy or contract time limit, without giving the claimant written notice that the time limit is expiring and may affect the claimant's rights. Such notice shall be given to first party claimants thirty (30) days, and to third party claimants sixty (60) days, before the date on which such time limit may expire.

F. No insurer shall make statements which indicate that the rights of a third party claimant may be impaired if a form or release is not completed within a given period of time unless the statement is given for the purpose of notifying a third party claimant of the provision of a statute of limitations.

G. If a lawsuit on the claim is initiated, the time limits provided for in this section shall not apply.

***Historical Data***