# A.T. Bates Insurance Consulting, LLC

Arthur T. Bates, SCLA
1325 Smiling Hill Boulevard
Edmond OK  73013
atb.llc@sbcglobal.net
405-990-3482
Tax I.D. #37-1636644

August 5, 2019


Daniel E. Gomez
Conner & Winters, LLP
4000 One Williams Center
Tulsa OK  74172

RE: *Janet Graves, surviving widow and next of kin of Nathan Graves, Plaintiff v. Pennsylvania Manufacturers' Indemnity Co., and American Claims Management, Inc., Defendants, and Alliant Insurance Services d/b/a Tribal First For Hudson Insurance Company, Intervenor*
In The United States District Court for the Western District of Oklahoma
Case No: CIV-19-60-SLP

Dear Mr. Gomez:

You have retained me as an expert to review Pennsylvania Manufacturers' Indemnity Company (hereinafter "PMI") and American Claims Management, Inc.'s (hereinafter "ACM"), claim handling in the above-captioned case as it relates to the uninsured motorist claim presented by Janet Graves. Following is my report setting forth my present opinions and rebuttal of the report of plaintiff's expert. It is my understanding that discovery is ongoing and I reserve the right to supplement this report upon receipt and review of any additional information. This report is submitted pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) in my capacity as an expert witness in this case.

## EDUCATION

I received a Bachelor of Science degree from Fort Hays State University in December of 1971. My degree is in Business Administration with emphasis in Insurance and Accounting.

## EXPERIENCE AND QUALIFICATIONS

My current CV is attached to this report. I retired from Hartford Insurance after thirty-nine years in the Claim Department. While with The Hartford, I held many positions, including Litigation Manager-Supervisor. I accepted multiple assignments in management and/or supervision of all lines of business and actual claim handling experience, including commercial as well as personal lines of business. My duties included review of claim file investigations, coverage analysis,

bodily injury and property damage evaluations, compliance with state mandated reporting, negotiations and determining educational opportunities.

I am a licensed adjuster in the states of Oklahoma and Texas with experience working claims as well as handling litigation files in Oklahoma, Texas, Arkansas, Arizona, New Mexico, Colorado, Wyoming, Montana, Nebraska, Missouri, Illinois, and Kansas for the following lines of business: Medical Malpractice, Automobile (personal and commercial), Uninsured/Underinsured Motorist, Property Damage, Products and Completed Operations, Advertising Injury, Personal Injury, Homeowners, Commercial Property, Ocean Marine, Inland Marine, Motor Truck Cargo, GAP, Livestock, Rain Insurance, Fidelity and Surety Bonds, Completion Bonds and Banker Bonds. The majority of my work and supervision was devoted to personal and commercial automobile insurance bodily injury claims, 1st and 3rd party, but also claims involving excess exposure, i.e., where the value of the damages or injuries claimed exceed any available policy limits. I also handled and supervised commercial and personal liability property damage claims and general liability property damage and bodily injury claims.

I was a member of the Intercompany Arbitration Panel for all lines of business and a Special Arbitrator for property. Thus, I have reviewed a number of other companies' investigation and file handling procedures regarding their handling of different claims. I have also been a member of the Guarantee Association Authority team where claim files were reviewed for the quality of the claim file work up and decisions made in the evaluation and negotiation process. I have firsthand experience as to how numerous companies handle claims, time frames in which investigations are completed, and at what stages they evaluate certain cases. As a member and past president of the local Claim Manager's Council, we had informal discussions about claim handling in general and compared company strategies and philosophies with regard to quality claim handling and evaluation. I am a member of the Oklahoma City Claim Association and a current member of the Senior Claim Law Association.

## COMPENSATION

My compensation rate for review of documents and preparation of my report is $200 per hour. My deposition time and trial time compensation rate is $300.00 per hour.

## DOCUMENTS REVIEWED TO FORMULATE OPINIONS

Documents provided to me by Conner & Winters for my review:
- Joint Status Report and Discovery Plan;
- American Claims Management – Claim File, which includes Complaint, Police Report, Transcript of Preliminary Hearing, Claim Notes and communication between defense counsel and plaintiff counsel  (PMA00001-00479);
- Administrative Order  from Tribal First to Janet Graves dated 06/16/2017;
- Deposition Transcript of Janet Graves, with Exhibits;
- Deposition Transcript of Terry Leikham (sic), with Exhibits;
- Deposition Transcript of David Matthiessen, with Exhibits;
- Expert Report of Debbie Rankin;
- News 9 story regarding trial of Henley.

## GENERAL ACCIDENT FACTS

On January 24, 2017, Nathan Graves (hereinafter "N. Graves"), while in the course and scope of his employment with Sac & Fox Nation, was fatally injured in a motor vehicle accident. Graves was a police officer, on patrol, operating a vehicle owned by Sac & Fox Nation. He was on a two-lane highway when a vehicle operated by Justin Shae Henley (hereinafter "Henley") crossed the center line and struck the N. Graves' vehicle head-on. Both drivers took evasive action just prior to the collision. Unfortunately, they both swerved in the same direction and, as a result, a head-on collision occurred in the ditch.    No other vehicles were involved in the collision. Henley not only crossed the center line, but was also passing a vehicle in a no-passing zone. Henley was prosecuted for manslaughter by the Lincoln County District Attorney. Henley was charged with first-degree manslaughter. The jury could not reach a unanimous verdict. Henley then plead guilty to second- degree manslaughter. The sentencing hearing was set for July 25, 2019.

## INSURANCE POLICY ANALYSIS

PMA Insurance Group ("hereinafter PMA") issued a Commercial Business Auto policy to Sac & Fox Nation, 920883 S. Hwy 99, Bldg. A, Stroud, Oklahoma. The Policy Number is 151601-08-15-99-3 with policy period of 10/01/2016 to 10/01/2017. The named insured is Sac & Fox Nation.

The primary policy coverage endorsement is CA 00 01, 10-13, with the Oklahoma Uninsured Motorists Coverage – Non-Stacked. This coverage designates:

**B. Who Is An Insured**:
2.     A partnership, limited liability company, corporation or any other form of organization, then the following are "insureds":
    **a.** Anyone "occupying" a covered "auto" or a temporary substitute for a covered "auto".
    **b.** Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured".

The premium for this policy was paid by Sac & Fox Nation. N. Graves was an insured under the policy due to the fact that he was "occupying" a covered "auto". Janet Graves (hereinafter "J. Graves") has the right to make a claim under this policy for benefits because of her husband's death.

## TIMELINE OF EVENTS AND ACTIVITIES

An abundance of entries in the claim file notes pertaining to correspondence/communication between ACM, PMA and Conner & Winters have been redacted; therefore, no one reading the claims file notes can make a judgment as to the extent of Conner & Winters investigation and/or evaluation of this UM claim.

02/02/17
Terry Leikam (hereinafter "Leikam"), ACM supervisor,   receives email from Robert Keene (hereinafter "Keene"), sent on behalf of J. Graves, requesting pertinent forms for auto medical

coverage and uninsured/underinsured coverage (hereinafter "UM") from Sac & Fox Nation due to the death of Officer N. Graves.  (PMA 00095)

Upon receipt of this email, a UM and Automobile Medical Payments (hereinafter "Medpay") claim was set up under the Sac & Fox Nation policy assigning claim number 112000011. (PMA00095)

02/03/17
Leikam notes that asset check is needed on Henley.  He identifies Henley's insurance carrier as GEICO, the claim number and the claim handler.  Leikam notes in the claim file that GEICO believes full liability is on their insured, Henley; there are no limits issue with property damage; GEICO does not know if Henley was in the course and scope of employment or was employed by a company; vehicle may have been used for commercial use, but that does not void GEICO's personal lines coverage; Henley is mentally shaken up, but seems to be physically alright. GEICO's insured's vehicle is a 2011 GMC Sierra.  (PMA00094)

Leikam comments:  "Was tortfeasor in the scope of his employment?  If so, who is his employer and a policy of liability insurance from the employer that would be primary or secondary to Henley's policy?" (PMA00094)

Leikam telephones Vickie at Sac & Fox Nation to advise her that a UM claim is being made. (PMA00094)

Email from Leikam to Keene acknowledging that Keene will be communicating with ACM on behalf of J. Graves.  He attaches the insurance forms necessary for Medpay and UM coverage and states that the insuring company, PMA, has not formally affirmed that coverage is afforded. He further states PMA does not waive any rights, terms and/or conditions contained within the insuring policy by discussion of the policy forms.  Leikam offers his assistance, if needed. (PMA00093)

Leikam notes in claim file information he receives from Keene, as follows:
"Nathan had the following children or is legal guardian of:
Malachi Rupert DOB 11/20/12 – Guardian, lived with Nathan
Serenity Rupert DOB 12/27/10 – Guardian, lived with Nathan
Jonathan Graves DOB 4/30/99 and twin Jacob Graves DOB 4/30/99 – Biological father, lived with Nathan
Caleb Graves DOB 11/18/91 – legally adopted, lived with Nathan
Annie Morrill (age 19) DOB unknown, address – 1104 Murrow St, Waynoka OK 73860.  Nathan was her biological father but not listed on birth certificate.  Nathan paid child support and had visitation rights.  She was legally adopted by her now step-father."

"Nathan had 3 vehicles and a motorcycle.  Wife is considering pursuing their personal auto insurance for UM and Medpay coverage." (PMA00093)

4

02/07/17

Leikam receives a comprehensive CLEAR report for Henley from Christina Brady, investigation assistant at Investigation Solutions, Inc., verifying data base information on Henley.

Leikam receives first report from Oklahoma Highway Patrol and reviews this PRS Report Claim #113000221.

Leikam's setting of reserve rationale and assessment is that the claim potentially has liability limit value; however, he is setting the initial reserve at the reporting threshold of $25,000, which includes $24,000 for indemnity and $1,000 for loss adjustment expense.

Summary Report by Leikam as to facts and his Plan of Action: He comments on the insurance policy and its application, as well as notes the applicable definitions contained within the insurance policy as to UM and Medpay. He notes a coverage position is needed regarding Medpay coverage. He also notes that N. Graves had 3 vehicles and a motorcycle. J. Graves is considering their personal auto insurance for UM and Medpay. He also details the accident and notes the preliminary assessment is that Henley attempted to pass in a no-passing zone and was the proximate cause of the accident. He also notes both vehicles attempted to avoid the accident but could not and notes there is no comparative negligence found on N. Graves. Leikam reports that, although the claim is not in litigation, he has engaged Conner & Winters to assist with the evaluation and resolution of the claim.

Leikam notes Action Plan in claim file:
- Issue coverage position on Medpay coverage;
- Run assets and insurance check on tortfeasor;
- Work with relatives of J. Graves during the initial stages of this claim until she is mentally ready to handle;
- Obtain police reports, verify any other loss details, confirm liability, and update summary;
- Tie down damages. Determine whether to pay tortfeasor's liability limit to position file for subrogation, or authorize claimant to accept tortfeasor's limit and release him from the claim;
- Update reserves as needed;
- Settle claim;
- Send large loss reports as appropriate. (PMA00089-PMA00093)

02/10/17

Leikam receives email from J. Graves attaching a copy of N. Graves' Death Certificate; she thanks him for his help. Leikam calls J. Graves and "Confirms dependents already mentioned. She has two grown children from a previous marriage: Matthew Thomas Rupert and Wendy Ann Rupert. Nathan has his biological mother and father still living. He has one sister. No other ciblings (sic) are living. We discussed sources of possible recovery including her own personal auto insurance, the tortfeasor's policy and possibly his employers, WC, and our policy. We will stay in contact."

Death Certificate mentions cause of death is multiple blunt force trauma. It mentions that the approximate interval: onset of death is undetermined. (PMA00088)

02/17/17
Leikam receives and reviews ISO Claim Search Match Report. (PMA00087)

02/20/17
Leikam prepares Large Loss Report #1 and sends to PMA. This Large Loss Report outlines the motor vehicle accident, the fact that N. Graves was a tribal police officer in the course and scope of his employment and lost his life when involved in a head-on collision. The report provides information known to date about the accident and damages to the insured vehicle. The report also puts PMA on notice that the estate of the decedent is pursuing Medpay coverage and UM coverage. The report request reserve authority and prepares PMA for a coverage position on the Medpay coverage. He also requests they advise him of any suggestions for the investigation and approval of the requested reserves.

The report is responded to by Dave Matthiessen (hereinafter "Matthiessen") with PMA, who advises Leikam they will be discussing the reserve internally and he requests that Leikam confirm or deny the existence of any excess coverage. He will advise Leikam once the roundtable of the claim is completed. He also suggests Leikam try to obtain the employment records of N. Graves. (PMA00086)

02/22/17
Via email, Leikam responds to Matthiessen thanking him for his response and informing he will continue his pursuit of information as to whether or not the tortfeasor has additional liability insurance. He will also ask for N. Graves' employment records. He attaches a drafted coverage position letter for Medpay and suggests that, since N. Graves was in the course and scope of his employment at the time of the accident, exclusion 4 would apply. He requests approval to send the letter to J. Graves.

Matthiessen reviews the coverage declaration letter and gives approval for it to be sent. (PMA 00085)

02/24/17
Leikam telephones Graves' personal insurance carrier and speaks with Kari Pearson and is told UM coverage is $50/$100, non-stackable, no Medpay, Claim Number 64701GE. She also states she heard that tortfeasor's boss was in front of the tortfeasor and, at a high rate of speed, passed a vehicle described as a 2002 Ford F250 driven by Tony Gann, insured by State Farm. He was successful in passing the vehicle. Tortfeasor then tried to pass Gann's vehicle and was not successful. (PMA00084)

03/09/17
Leikam telephones J. Graves to touch base and let her know that he is still working on the file. (PMA00084)

04/13/17

Leikam telephones J. Graves and she informs him that her sister is not well and she is going to be with her. Leikam suggests they talk the following week and she agrees. (PMA00082)

04/18/17

Leikam sends a status update report to Matthiessen advising of the current status of the file and reminding them that he issued a proposed Large Loss Report on 02/20/17 in which he requested authority to post indemnity reserves at $1,000,000, policy limit. Approval of the reserves was put on hold pending additional investigation into whether or not the tortfeasor had additional policies of liability insurance. The investigation continues, but is being hampered by the tortfeasor facing criminal charges. In the interim, he will continue his investigation of the value of the UM claim, including requests of the decedent's past medical history and employment history.

Leikam reports that, while the investigation is in its infancy, a potential tortfeasor has been identified and it has been alleged that he was following his boss who had entered the oncoming lane to pass a slower moving vehicle. His boss could be considered negligent if he, too, passed in a no passing zone. His obstruction of tortfeasor's view could be found to be negligent and contributing to the accident. Leikam will continue to keep them apprised of any substantive findings. (PMA00080)

05/02/17

Leikam discusses claim with Matthiessen and receives permission to pay the collision claim, but he wants to wait until the end of May before making a decision as to increasing the UM reserves. As was discussed earlier, Matthiessen wants to know if any additional or excess coverage is available before establishing the reserve. (PMA00079)

05/30/17

Leikam speaks with J. Graves and confirms that he has received the medical and employment record releases and is requesting those records. She confirms that no charges have yet been made against the tortfeasor driver. She spoke with the Chief of the Sac & Fox Tribal Police and was told that the State Patrol has not released their final report. Leikam advises her that he is still looking into the possibility of additional liability insurance. (PMA00078)

Leikam speaks with Matthiessen and discusses increasing reserves on the file at this time as they previously agreed to wait until the end of May. Leikam continues to investigate the possibility of additional liability insurance for the tortfeasor driver and/or the possibility of additional tortfeasors. He advises that the investigation has slowed and the Oklahoma State Patrol has not issued their final report. (PMA00077)

06/01/17

Email from Matthiessen to Leikam requesting Leikam increase the reserve to $1,000,000. He requests Leikam call him as Tom has requested they try to be more aggressive with the investigation. Not sure what we can do, but Matthiessen wants to discuss.

Leikam increases indemnity reserve and notes that the exposure is dependent upon no other policy of liability insurance available to the tortfeasor or other joint tortfeasors; evaluation of the medical records to determine pre-existing health conditions that could have compromised his work life or life expectancy; work history confirming salary and prospective future employment compensation, etc. (PMA00077)

06/07/17
Leikam prepares updated Large Loss Report Summary.
ACTION PLAN:
- Run assets and insurance check on tortfeasor;
- Obtain police reports, verify any other loss details, confirm liability, and update summary;
- Work with J. Graves to tie down economic damages. Determine whether to pay tortfeasor's liability limit to position file for subrogation, or authorize claimant to accept tortfeasor's limit and release him from the claim;
- Update reserves as needed;
- Settle claim;
- Send large loss reports as appropriate. (PMA00074-00076)

Leikam returns a telephone call to Carol Thompson at Sac & Fox HR Department to explain to her what records he has requested.  In essence, he needs a copy of N. Graves' employment file showing dates of employment, progression of compensation, fringe benefits he received, including, but not limited to, health insurance, other insurance, retirement plans, etc.  He also requests copies of any disciplinary action(s) taken against N. Graves.  (PMA00073)

06/23/17
Email from Sac & Fox HR providing the following information as requested:
    Employment started 12/13/2013 thru 01/26/2017: $95,127.89
    Benefits:    Hartford Life Insurance: $250,000.00
                    Allstate Life Insurance:  $ 40,000.00    (PMA00071)
Attached was a copy of the last pay stub.

07/11/17
Leikam attempts contact with J. Graves; leaves a message updating her on status of the claim.

Leikam calls office of Gary Griffin, D.O., and faxes a copy of his request for records, along with Medical Authorization and Certificate of Death.  (PMA00070)

Leikam sends updated Large Loss Report #2 to Matthiessen and reports there are no reserve changes requested and, if he has questions or suggestions, to let him know.        (PMA00069)

07/13/17
Matthiessen acknowledges receipt of updated Large Loss Report #2 with no comments or suggestions.    (PMA00068)

07/20/17
Leikam receives telephone call from J. Graves and she advises him that Henley was charged with first degree manslaughter last week. She also reports that the Oklahoma Highway Patrol has issued their final report which is in excess of 400 pages. She advises that the trooper's name is James Lowe, #507, and his work number is 405-425-2323. She also advises she has moved to Georgia. (PMA00068)

08/10/17
Leikam prepares Large Loss Summary Report - It appears the only changes are as follows:
The tortfeasor has been charged with 1st degree manslaughter.

ACTION PLAN:
- We continue to pursue police report to verify any other loss details; confirm liability; obtain additional information on the tortfeasor so we can complete: an assets check; investigation into additional policies or insurance for the tortfeasor and his employer; identify potential joint tortfeasors;
- Work with Janet Graves and Sac and Fox Nation to tie down economic damages;
- Determine whether to pay tortfeasor's liability limit to position file for subrogation, or authorize claimant to accept tortfeasor's limit and release him from the claim;
- Update reserves as needed;
- Settle claim;
- Send LLRs as appropriate. (PMA00067)

08/15/17
Leikam speaks with J. Graves. She advises that she was contact by the Victim's Advocate. Evidentiary Hearing is set for 09/07/17. She requests a copy of the Police Report and it was sent to her. (PMA00064)

08/17/17
Automated ISO process run. (PMA00064)

09/07/17
Leikam updates Large Loss Summary Report.
ACTION PLAN:
- We continue our investigation to identify joint tortfeasor(s) and other policies of liability insurance available to them;
- An asset check on Henley finds no subrogation assets. Once other tortfeasor(s) are identified, we will complete our assets check;
- Continue to communicate with widow Janet Graves of our progress. She has not demanded settlement;
- Determine whether to pay tortfeasor's liability limit to position file for subrogation, or authorize claimant to accept tortfeasor's limit and release him from the claim;
- Update reserves as needed;
- Settle claim and pursue subrogation as necessary;
- Send LLRs as appropriate. (PMA00059-00061)

09/25/17
Leikam speaks with J. Graves and she reports she received a letter from GEICO which is addressed to the executor of the estate; she will email the letter to Leikam. J. Graves confirms N. Graves did not have a will. As such he died intestate. Leikam lets J. Graves know that GEICO likely wants to confirm who they should negotiate with and who to pay. She asks Leikam what she should do and he explains to her that he is not an attorney and that she needs to do those things that are in the best interest of her and her family. He mentions to her that maybe she should consider talking with an attorney to help her navigate through the things that she has questions on as he is limited in directing her. She also wants to know why we have not found out about other insurance or joint tortfeasors. She was informed that Leikam spoke to their investigator and that the investigation of other insurance and joint tortfeasors has stalled due to the criminal adjudication against the tortfeasor driver. He advises her he will call her back with an update once he learns more from his investigator. (PMA00058)

09/26/17
Leikam receives copy of letters from Conner & Winters directed to Hunt's Welding Service, LLC, and Garrett Hunt; letters sent Certified Mail, Return Receipt Requested. (PMA00297-00298 and PMA00300)

Leikam sends email to J. Graves and encloses copies of letters Conner & Winters sent to Garrett Hunt and Hunt's Welding Service, LLC, that request they pay their share of liability. He asks her if he has her approval to provide them with her contact information in the event it is requested. (PMA00057)

10/09/17
Leikam sends updated Large Loss Report #3 to Matthiessen stating no reserve changes requested. (PMA00056)

10/20/17
Leikam receives telephone call from J. Graves giving permission to disclose her contact information to the potential joint tortfeasors, if they ask for it. He confirms that neither she nor ACM has had a response to ACM's 09/26 letters to the tortfeasors. She is drafting her own letters to the tortfeasors to let them know she is pursuing them for damages. (PMA00055)

12/14/17
Leikam calls J. Graves who advises him that she flew to Oklahoma on this date for the Preliminary Hearing against the tortfeasor, only to learn the defense requested the hearing be moved to 03/09/18. She also advises that she has not sent letters to the tortfeasors. Leikam advises that, once he receives Conner & Winters' letters sent 09/26/17 in word format, he will email those to her so she can cut and paste and send them to the tortfeasors. (PMA00054)

12/29/17
Leikam updates Large Loss Summary Report.
ACTION PLAN:
- We continue our investigation to locate joint tortfeasor(s) and other policies of liability insurance available to them;

- Continue to communicate with widow Janet Graves of our progress. She has not demanded settlement;
- Determine whether to pay tortfeasor's liability limit to position file for subrogation, or authorize claimant to accept tortfeasor's limit and release him from the claim;
- Update reserves as needed;
- Settle claim and pursue subrogation as necessary;
- Send LLRs as appropriate. (PMA00050-00053)

01/11/18
Leikam sends updated Large Loss Report #4 to Matthiessen as a 90 day update to report what has been done and what remains to be done. (PMA00049)

01/17/18
Automated ISO process run. (PMA00048)

01/18/18
GEICO sends letter addressed to "Mr. The Executor Of Nathan Graves" advising they have not heard from anyone since 11/17/2017. They offer their policy limit of $100,000 and they request again a copy of the Marriage Certificate as proof of Executorship over N. Graves' affairs. They also request a list of heirs so that they can finalize the settlement. (PMA00323)

02/13/18
Automated ISO process run. (PMA00044)

02/21/18
Stephen Denk, American Mercury Insurance Company, sends letter to Conner & Winters on behalf of their insured, Bobby Hunt, to advise that they are continuing to investigate any potential liability that their insured may have in this loss. They request that, if Conner & Winters has any evidence or information that would assist them in their investigation, it be forwarded to them. Letter indicates that Garrett Hunt and Bobby Hunt received a copy of this letter. (PMA00318)

02/27/18
Tonya Flewellen, National American Insurance Company, sends letter to Conner & Winters advising their investigation does not reveal any negligence on their insured, Hunt's Welding Service or of the insured driver, Garrett Hunt. They further advise that Garrett Hunt was not an employee of Hunt's Welding, but he is a family member that has permissive use of a vehicle. They decline to make any voluntary payments or contribute in any way to share in the liability of this accident.(PMA00319)

03/13/18
Leikam attempts telephone contact with Howard Berry (hereinafter "Berry"), who is purporting to represent J. Graves. Leikam speaks with Berry who asks where he was in attempting to identify additional policies of liability insurance. He also wants to know if ACM has done anything to value the UM claim, to which Leikam responds that he has done an evaluation. Berry then makes a demand of the $1,000,000 in UM coverage to be paid within seven days.

Berry was asked to send Leikam a letter of representation and his demand in writing. (PMA00042)

03/16/18
Leikam receives email from Berry, via Carol Bybee (hereinafter "Bybee"), confirming their telephone conversation in which he states that he represents J. Graves and the Estate of N. Graves.   Berry requests the information he inquired about in his telephone call.

Leikam responds to email from Bybee acknowledging Berry's representation of J. Graves and the Estate of N. Graves and again requests that Berry specify the information in writing so that he can fully understand what he is seeking and can then respond appropriately.  (PMA00041)

03/19/18
Letter from Berry to Leikam summarizing their prior telephone conversation regarding the letter of representation of J. Graves and his $1,000,000 demand. (PMA00320-00321)

03/28/18
Letter from Berry to Conner & Winters advising that he is gathering information from the workers' compensation carrier to see how much they have paid and whether or not they are asserting workers' compensation subrogation.  He states it is his understanding that PMA waived its subrogation right against the tortfeasor's $100,000 policy.  He also states that you and/or your client are evaluating this case and are prepared to make an offer, but it is his understanding that your evaluation is less than the $1,100,000 in insurance.   He encloses "something" that he received from the tortfeasor's insurance company indicating their willingness to pay the $100,000 that they contend is their policy limit.  (PMA00322)

04/03/18
Email from Leikam to Matthiessen requesting authority to issue a check to J. Graves for the tortfeasor's underlying liability limit of $100,000 to preserve PMA's subrogation claim.  Leikam advises Matthiessen that GEICO has tendered their limit of $100,000 to J. Graves.  Leikam also requests Matthiessen consider increasing the indemnity reserve to $1,100,000 to cover the $100,000 check to be issued to preserve subrogation as there is a chance this claim is a policy limit claim.   (PMA00037)

04/04/18
Letter to Berry from Conner & Winters acknowledging receipt of his letter of 03/28/18 and his letter to Leikam of 03/19/18 concerning a UM claim on the death of N. Graves.

ACM has been in contact with J. Graves for some time and has been actively evaluating its coverages and the traffic accident that killed N. Graves, including the possible role of several tortfeasors.  ACM further has been actively evaluating the potential value of a wrongful death claim which would be the value of a UM claim against the subject policy.  He discusses some difficulties ACM, as well as Conner & Winters, have encountered working with the person believed to be the primary tortfeasor, Henley, and his liability insurer.  As of the last contact, the liability insurer informed Leikam that their evaluation of coverage was ongoing and was delayed due to a criminal charge that had been brought against Henley.

Berry's letter is the first time ACM was made aware of a tender by Henley's liability carrier for its policy limit. Under the statute, ACM now has 60 days to waive subrogation against Henley or to substitute payment. ACM has begun its evaluation of the tender and will make a timely notice to Berry informing him in writing of a subrogation waiver, or by paying $100,00 as substitute payment.

Conner & Winters further advises no final decision has been made as to whether or not the UM claim was above or below the $1,000,000 UM policy limit, or if it has been finally determined what other liability coverages may be available for this accident. ACM has engaged an expert consultant to assist in valuing the wrongful death claim. The consultant required a significant amount of information and ACM worked with J. Graves to obtain that information. ACM continues their investigation. Conner & Winters further states with confidence that ACM's evaluation is nearing completion and a good faith offer to resolve UM coverage is forthcoming. (PMA00324-00325)

04/10/18
Berry responds to Conner & Winters and acknowledges receipt of their letter of 04/04/18 and expresses thanks for continuing toward resolution of the claim. (PMA00326)

04/12/18
Email from Leikam to Matthiessen reporting new information from Conner & Winters – the rest of the entry has been redacted. (PMA00036)

05/24/18
Leikam sends email to Matthiessen and Bob Gambell acknowledging their discussion of the file and verifying that he is to contact GEICO to confirm that they have offered their policy limit of $100,000 to Berry and he is to have a discussion with Conner & Winters. The rest of this entry is redacted. (PMA00026)

05/29/18
Conner & Winters sends a letter to Berry as a follow-up to their conversation of 05/25/18 and advises that a formal offer to resolve the claim is forthcoming, but he again advises that PMA wants to substitute payment for the $100,000 liability limit offers by GEICO and retain their subrogation rights against Henley and other possible tortfeasors.

Berry is reminded that several weeks ago he was asked whether or not an estate has been opened for N. Graves and if J. Graves has been appointed Executor or Administrator. Berry confirms that there is no probate nor is there an Executor or Administrator and that he would prefer to resolve payment by insuring that all of N. Graves family members agree to their share of recovery and, if no agreement can be reached, have the recovery apportioned by district court.

Berry was also reminded of a request made several weeks ago to confirm what Nationwide Mutual Fire Insurance has paid under their personal UM coverage and also what death benefits have been paid through the workers' compensation policy. PMA understands that these amounts do not lessen or offset its own obligation, but in light of the size of the claim valuation, it is

relevant to determine the overall recoveries that will be made in this claim.  It is requested that this information be sent as soon as possible.  (PMA00406-00407)

06/07/18
Berry sends letter to Conner & Winters, in which he informs that J. Graves contacted him some time ago and told him she thought your client owed her $1,000,000, which he agrees with.  He expresses that he told her he would make a few telephone calls, write a couple of letters and he was quite certain that whatever was causing PMA to refuse to pay would be cured by "my lawyerly presence" in the case.  (PMA00407)

06/14/18
Leikam receives lawsuit – ACM - Janet Graves (Nathan Graves) v. Justin Henley, et al.
(PMA00019)

06/15/18
Leikam sends email to Matthiessen confirming their telephone conversation this date authorizing ACM to retain current counsel, Conner & Winters, to defend PMI and ACM and confirming that the costs of the defense will be paid from the current claim file.  (PMA00018)

06/25/18
Leikam's updated Large Loss Report #5.
ACTION PLAN:
- We have requested the widow attorney present confirmation that he represents the entire estate.  He has not;
- We are answering the complaint with our defense that the claimant attorney does not have standing to bring the bad faith suit;
- We are determining whether we make payment of settlement to a trust.  The estate can distribute the funds to the heirs as agreed upon by them and release the carrier from the suit and further coverage;
- Update reserves as needed;
- Send LLRs as appropriate.

Within this email to Matthiessen, Leikam requests authority to increase reserves and asks whether or not he should continue to pursue subrogation. (PMA00016)

07/31/18
Leikam sends email to Matthiessen to inquire if updated Large Loss Report #5 is approved.
(PMA00007)

08/01/18
Email from Matthiessen to Leikam that Large Loss Report #5 is approved.  Matthiessen confirms to Leikam that he agrees to waive subrogation and tender the $1,000,000 UM limit for settlement with the appropriate proof and releases or an interpleader. (PMA00007)

08/08/18

Pignato, Cooper, Kolker & Roberson (hereinafter "Pignato") sends letter to Conner & Winters advising them that suit has been filed; inquiry made as to who will be defending PMA; that GEICO made an offer of their policy limit on 01/18/18; the 60-day time limit has run; subrogation was waived by statute. He encloses a copy of the 01/18/18 offer letter from GEICO to J. Graves. (PMA00421-00423)

08/13/18

Automated ISO process run. (PMA00006)

09/05/18

Letter from Conner & Winters to Berry acknowledging receipt of his recent communication and confirming that PMA will pay the policy's $1,000,000 UM limit to resolve the claim. It is further stated and reiterated that PMA cannot simply write a check to J. Graves for the $1,000,000 limit and information that is necessary to make the payment has been requested from you for several months. Conner & Winters had been informed that no estate has been or will be opened for N. Graves nor has an Executor been appointed to accept the payment.

Conner & Winters was informed that Berry intends to obtain an agreement from N. Graves' heirs on their share of the UM insurance proceeds. PMA will need documentation of each heirs agreement to their share of the UM policy proceeds because each can sue PMA directly if they are not satisfied with your proposed distribution.

Conner & Winters has also inquired as to whether or not J. Graves received any death benefits from a workers' compensation carrier, but have received no response. Berry was advised that Conner & Winters received a telephone call from an attorney representing the workers' compensation carrier and was informed that they will, in fact, assert a subrogation right and intervene in the pending lawsuit.

Conner & Winters advises Berry that N. Graves had personal UM coverage and that it is likely that the policy includes a contractual subrogation or apportionment right and that PMA will need documentation that the other UM carrier has waived this right or has agreed to an amount, including a determination of whether the made whole doctrine is applicable.

Conner & Winters also states a previous offered was made to have the UM limit interpleaded into the existing lawsuit for a judicial determination of allocation and distribution.

Berry is informed that, if he is unable or unwilling to provide the requested information, Conner & Winters will pursue an interpleader in the existing lawsuit and join all necessary parties. Conner & Winters further states they believe the payment of the $1,000,000 UM limit fully satisfies the claim and PMA strongly denies Berry's allegations of bad faith.

Conner & Winters informs that if an agreement cannot be reached on distribution and allocation, PMA will request as part of the interpleader that it be released from further liability, including Berry's unsupportable allegations of bad faith. (PMA00424-00425)

Conner & Winters responds to Pignato's letter of 08/08/18 informing Pignato that PMA was not informed of GEICO's tender until 03/28/18.  In a letter to Berry on 05/29/18, PMA sought to substitute payment and preserve subrogation and requested additional required information, which was not provided.

Shortly thereafter, PMA was served with the lawsuit which effectively terminated any subrogation right PMA could have preserved.  (PMA00426)

10/17/18

Letter from Pignato to Berry informing him that GEICO has offered its $100,000 limit for Henley and it is his understanding that the UM carrier has offered its $1,000,000.  He goes on to say that, considering the intervention of the workers' compensation carrier, it is obvious no checks can be written until an agreement is reached between the Plaintiff and the workers' compensation carrier, unless Berry wants the workers' compensation carrier listed as a payee on the check.  (PMA00453)

10/23/18

Letter from Conner & Winters to Berry acknowledging his letter wherein he requests a revision in the privilege log and attaches cases relied upon.  Conner & Winters states the basis of the bad faith claim is not bad faith denial or a "low ball" offer.  Conner & Winters states PMA never denied the claim and at no time made any offer less than policy limits.  PMA has, in fact, tendered the $1,000,000 policy limit.  Thus, the only plausible allegation for J. Graves' bad faith claim is unreasonable delay.  The claims file as produced with privilege materials withheld or redacted provide complete information on how the claim was handled, and the privilege log identifies the subject of each privilege communication as required by the discovery code.

PMA has not asserted "good faith reliance on advice of counsel" as a defense.   PMA's defenses include that there was no unreasonable delay, and that any delay in payment is due to its inability to pay J. Graves in her individual capacity based on the lack of an open estate for N. Graves and lack of joinder of persons who would be entitled to UM proceeds.  Additionally, like any tort, bad faith requires showing of damages and as recently confirmed by the workers' compensation carrier, J. Graves has received substantial death benefits and; therefore, lacks damages, even if unreasonable delay could be established.

Conner & Winters requests, as they have many times over the last several months, that Berry either inform them of an open estate and personal representative for N. Graves for payment of the UM proceeds, or provide them with information that every person and insurance company that is entitled to such proceeds agree in writing for their share of the UM proceeds.  The information is imperative for PMA to make payment to avoid exposure to competing claims and additional liability.  It is requested this information be forwarded by 11/02/18 so that PMA can resolve the policy limit payment.  (PMA000454-000455)

10/24/18

Letter from Berry to Conner & Winters and to Pignato wherein Berry acknowledges that PMA and GEICO want to pay their policy limits.  Berry is prepared to give Henley a full release of all claims.  As for PMA and ACM he will only give a release on the contractual claims.  Berry is of

the belief that there was bad faith since PMA knew in October 2017 there were extensive economic and non-economic damages and no offer was made.  Berry reserves the bad faith claim.

Berry requests the checks be made out to Janet Graves as next of kin of Nathan Graves. He further states that, if they are unwilling to do that and have authority requiring a probate, to advise of their position.  It is Berry's belief that this conversation should have taken place before he got involved in the case.  (PMA00456)

10/29/18
A facsimile from Attorney V. Ronald Frangione to Conner & Winters with a print-out of expenditures as of 10/10/18 for death benefits related to the estate of N. Graves and Administrative Order dated 06/16/17 of the Sax & Fox Nation for Alliant Insurance Services d/b/a Tribal First for Hudson Insurance Company, the workers' compensation insurance carrier, that sets forth total workers' compensation carrier death benefit liability.
(PMA00457-00462)

10/31/18
Conner & Winters acknowledges Berry's letter of 10/24/18 directed to them and to Pignato concerning how the checks should be written.  Over the last several months, Conner & Winters has cited the relevant authorities and explanation of how the checks should be written.  Conner & Winters emphasizes that to insure everyone is compensated, the UM carrier will require that a duly appointed personal representative represent the entire estate of N. Graves or by an agreement between all persons eligible for distribution under the wrongful death statute.  The UM carrier cannot prudently pay only J. Graves in her individual capacity.  Pignato has pointed out, and as Conner & Winters has mentioned in each of the preceding letters, the workers' compensation carrier has paid benefits and that carrier holds a lien on UM proceeds under Oklahoma statutes.  Conner & Winters again states a payment to J. Graves "as next of kin" is not feasible.  The UM carrier remains ready, willing and able to make payment to a duly appointed personal representative (with satisfaction of the worker's compensation lien), or based on written agreement from each person entitled to UM proceeds under the wrongful death and workers' compensation subrogation statutes.  (PMA00463-00464)

11/05/18
Letter from Berry to Conner & Winters in which he revisits the reasons he contends the bad faith claim is justified and mentions taking Leikam's deposition in the near future.  (PMA00465-00466)

11/06/18
Letter from Berry to Conner & Winters in which he says he understands their need to protect PMA on the workers' compensation subrogation.  He also states J. Graves does not need to file a probate action to settle the contractual part of this claim.  He asks if PMA insists on probate and, if so, then demonstrate that by writing a check to the estate.  He urges Conner & Winters to carefully consider this decision and urges PMA to follow the law.  (PMA00467)

12/24/18

Conner & Winters sends letter via email, facsimile and mail to Berry attaching a draft agreement for the beneficiaries to sign which he believes will provide adequate protection to the carrier since Berry has informed Conner & Winters that N. Graves has no minor children who would be eligible to receive UM wrongful death proceeds. It is requested that Berry clarify the status of Malachi Rupert and Serenity Rupert as both are minor children and the file reflects N. Graves as their legal guardian and that they lived with N. Graves and J. Graves at the time of N. Graves' death. Conner & Winters asks for confirmation as to whether or not they were ever legally adopted by N. Graves.   In addition, Conner & Winters requests clarification as to Annie Rose Graves-Morrill as N. Graves' natural child, but who may have later been adopted by a step-father. Conner & Winters asks if Berry has any factual or legal basis to disagree. (PMA00468-00469)

01/04/19

Email from Berry to Conner & Winters explaining the relationship of Malachi Rupert and Serenity Rupert and Annie Rose Graves-Morrill. He again states that it is not necessary to have a personal representative appointed. (PMA00470)

01/07/19

Berry sends Conner &Winters the agreement covering those who have an interest in the recovery of the proceeds of the wrongful death lawsuit as filed by J. Graves as next of kin and widow of N. Graves. (PMA00471-00472)

01/09/19

Conner & Winters sends letter to Berry acknowledging receipt of the one-page contract (PMA00472) signed by all of the parties and states they are comfortable that this resolves their concern about payment to J. Graves for later allocation among those parties and the workers' compensation carrier. A one-page Payment Agreement is enclosed to be signed by Berry and J. Graves that includes a hold harmless provision which is consistent with the telephone discussion. It also assures that a partial dismissal of the contract claim will be filed leaving only the bad faith claim for further litigation. (PMA00473-00474)

Copy of signed Payment Agreement. (PMA00475)

04/15/19

Email from Berry to Conner & Winters advising he has a signed agreement with the workers' compensation carrier and with all the Graves' beneficiaries. All that is lacking is the $1,000,000 check. (PMA00477-00478)

Email from Conner & Winters to Berry advising him the replacement check is being processed and their office hopes to have it later in the week. (PMA00477)

04/16/19

Email from Conner & Winters to Berry advising him the check is in process; the return on the first check is non-issue on timing and PMA is aware of his requested urgency. (PMA00476)

04/18/19
Email from Conner & Winters to Berry advising the check is being sent FedEx and, if no delays, should be hand-delivered to Berry's office the following afternoon. He asks if someone from the firm will be there to accept it. (PMA00476)

04/22/19
Email from Berry to Conner & Winters advising they are bringing the voided check to their office and the replacement check is being deposited. (PMA00479)

## OPINIONS

My opinions in this case are intended to apply only in the context of how an adjuster should handle claims for an insurer and compare those standards to the insurance industry claim standards, as well as their own internal standards of operation. My report covers the bad faith allegation of J. Graves, surviving wife of N. Graves, in the handling of this claim by PMA and ACM.

My opinions are based upon review of documents previously listed, my knowledge of insurance customs and practices and my thirty-nine years of handling claims, supervising a staff involved in handling claims, and evaluating many different types of clams including fatality claims as well as my exposure to claim handling procedures by other insurance companies and my experience over the past eight years as an insurance consultant and expert witness.

In my own experience of handling, supervising and managing claims, the investigation and adjustment process includes various claim activities. Some of the elements to claim investigation include coverage verification, adjuster assignment and action plan(s), interviews and statements, attorney allegations and use of experts, if needed. Documents to be considered can include, but are not limited to, claim forms, contracts, official reports, and authorizations to obtain employer/employee records, medical records, to include billing records, diagnostic films, hospital records and photographs. One or all of these elements enter into being able to perform a competent, reasonable, thorough investigation and evaluation of a claim.

In my opinion, there was appropriate supervision of the handling of this claim and redirection of the activity in this claim. This was a fatality motor vehicle accident with several potential responsible parties. Due to possible legal complications, Conner & Winters was retained by PMA within one week of receiving the assignment to assist with the evaluation and resolution of the claim. The PMA supervisor worked with the ACM claim handler and Conner & Winters to develop any and all theories of recovery, not only on behalf of J. Graves, but also on behalf of PMA.

In my opinion, ACM and PMA, did conduct a fair, reasonable and timely investigation into the accident in determining coverage. PMA concluded after their initial liability investigation that UM coverage was afforded, that there was no liability on behalf of N. Graves, and this was potentially a policy limit case. PMA went above and beyond in explaining all potential coverages to J. Graves, as well as her right to file claims against Henley. At no point did PMA ever deny the UM claim of J. Graves. PMA acted in good faith and fair dealing.

In my opinion, ACM and PMA's claim handling does not violate the duty of good faith and fair dealing because the actions of the insurer were not biased and their investigation was reasonable, fair and timely. Several issues  needed to be investigated, i.e., possible excess liability coverage, possible other persons responsible for the damages to N. Graves, possible joint ventures involved which can shift liability responsibilities, other UM insurance policies that would be apportioned to the UM claim, possible other insurance that would not decrease the responsibility of PMA under the UM policy coverage but could apply to the overall value of the claim as to J. Graves and all the different heirs that would have a claim against the responsible parties if the allocation of monies is not accounted for in settlement. ACM and PMA did a reasonable and thorough investigation in order to answer all the questions that needed to be asked and answered in order to comply with the claim standards of Oklahoma and within insurance industry claim standards and the insurance company's practices and procedures.

In my opinion, ACM and PMA did not place their financial interests ahead of J. Graves' interests. ACM and PMA did not seek out a reason to deny the claim. PMA committed to an early coverage decision and communicated all applicable coverages to J. Graves. PMA timely adjusted the reserves to policy limit and assisted fully in their capacity as claims representatives to answer questions from J. Graves. They did communicate all possible scenarios that could apply to the recovery of all monies that J. Graves and the estate of N. Graves would be entitled to under the law.

It is my opinion that the handling of this claim by the claims staff of ACM and PMA was reasonable. In my opinion, ACM and PMA were justified in their decision to evaluate and pay the claim after all the potential responsible and contributing parties were identified and their legal liability assessed and determined.

In my opinion, and in my review of the information provided, I do not find a practice of intentionally delaying the investigation of this claim.  There are entries in the claim file notes pertaining to correspondence/communication between ACM, PMA and Conner & Winters. By merely reading the claims file notes, one cannot make a judgment as to the extent of Conner & Winters investigation and/or evaluation of this UM claim.

In my opinion, relevant and necessary information was obtained by ACM and PMA and they sought legal advice to assist them in determining whether or not there were other responsible or contributing parties. There is reference in the report of Ms. Rankin that the Plan of Action was "cut and pasted" over and over again with no evidence or attempts to resolve the issue. It is obvious she does not understand that the design of a living document is that the document contains the same information continuously unless circumstances dictate changes; therefore, you have to read and interpret those changes. The Plan of Action is only a portion of this living document.

Ms. Rankin's comment and criticism regarding the letter that Conner & Winters sent to Garrett Hunt and Bobby Hunt, owner of Hunt's Welding Service, is without merit.  Making a formal demand on a party is an excellent investigative technique that Ms. Rankin obviously does not understand.  Demanding payment for their share of the liability to contribute to payment of N. Graves' estate was an effort on the part of Conner & Winters to get Garrett Hunt and Bobby

Hunt/Hunt's Welding Service to contact him directly or through their legal counsel to discuss their liability. He also requested they notify their liability insurance carriers and requested a representative call him to discuss further, not only the facts of the accident, but also to determine if there is legal liability either as a joint venture or as an agent of another party or simply on a mission for another party which would benefit J. Graves to the extent of determining and finding more liability coverage that could have enhanced a claim against Hunt.

In reviewing the material I have been provided, J. Graves has legally obtained monetary benefits of:

- $1,000,000 of UM to be apportioned to her and the other heirs entitled to receive those benefits;
- life insurance in the amount of approximately $315,000;
- Workers' Compensation lump sum benefit of $100,000, plus $1,625.56 monthly until her death. This Workers' Compensation benefit ceases upon her remarriage allowing a lump payment of two years of indemnity benefits in one lump sum;
- $50,000 from her own UM insurance carrier;
- $100,000 from Henley's insurance carrier.

Workers' Compensation benefits payable to the minor children are not included in these payments.

It is my opinion that any delay in the actual payment of the claim of J. Graves and the estate lies partially with Berry and his inability to provide the apportionment of the parties in order that releases could be obtained to finalize all claims. On 09/05/18, PMA offered the policy limit of $1,000,000 to Berry and his client and requested the necessary information to issue a check. Eight months later, on 04/15/19, Berry advised that he had an agreement with the workers' compensation carrier, as well as an agreement with all the Graves beneficiaries and was awaiting a final check.  (PMA00478)

Oklahoma law and insurance industry claim standards require an insurance company to conduct a fair and reasonable investigation so that a fair, reasonable and timely evaluation can be determined.  In my opinion, based on my review of documents presented to me, and all the issues in this claim both controllable and uncontrollable, this claim was fairly and timely investigated, evaluated and paid.

Respectfully submitted,

A. T. Bates, SCLA
Attachments

# ARTHUR T. BATES, SCLA

1325 SMILING HILL BOULEVARD
EDMOND OK   73013
(405) 990-3482

---

**CREDENTIALS**

Since 1972, I have been involved in insurance, insurance coverage, and insurance claims handling as an adjuster, supervisor and claims operation manager in multi-lines of insurance.

I have extensive experience in handling claims involving automobile (personal and commercial), uninsured/underinsured motorist, property damage, products and completed operations, commercial general liability, advertising injury, personal injury, homeowners, farm owners, commercial property, ocean marine, inland marine, motor truck cargo, GAP, livestock, rain insurance, fidelity and surety bonds, completion bonds, and bankers bonds.

**EDUCATION**
- B.S. degree in Business Administration from Fort Hays State University in 1971, emphasis in accounting, insurance and industrial arts

**PROFESSIONAL ASSOCIATION MEMBERSHIPS**

- Senior Claim Law Associate Association
- Member of the Oklahoma City Claim Association
- Past President of Oklahoma Claim Managers Counsel
- Oklahoma Guaranty Association Authority Committee
- Intercompany Arbitration Panel
- Special Arbitration (Intercompany)

**LICENSES**
- **Current Licenses**
  - **Oklahoma Insurance License #170770**
    - Property
    - Casualty
    - Crime & Fidelity Bonds
    - Workers' Compensation

- o **Texas Insurance License #543925**
    - Property
    - Casualty
    - Crime & Fidelity Bonds
    - Workers' Compensation

- **Past Licenses**
    - o New Mexico #55167
    - o Wyoming #32102

## PROFESSIONAL EXPERIENCE

### From 1972 – 1973, Multi-line Claim Representative Trainee with Hartford in Salina, Kansas

- Serviced nine counties in central Kansas
- Claim training and servicing
- Handled auto bodily injury and property damage claims
- Handled various policy types, including property, personal and commercial general liability, products and completed operations, workers' compensation, fidelity and surety bonds, livestock, crop-hail, medical malpractice, and specialty line risk of special events, rain losses, and GAP.
- Accompanied marketing representatives on agency and account visits to promote claim handling service and claim products

### From 1973 – 1975, Multi-line Field Claim Adjuster with Hartford in Salina, Kansas

- Serviced eleven counties in central and southeast Kansas
- Handled multiple types of claims made under various types of policies
- Accompanied marketing representatives on agency and account visits to promote claim handling service and claim products

### From 1975 – 1981, Claim Manager with Hartford in Salina, Kansas

- Supervised claim representatives and support staff servicing eleven counties in central and southeast Kansas
- Directly handled large loss claims under personal and commercial policies
- Accompanied marketing representatives on agency and account visits to promote claim handling service and claim products

**From 1981 – 1985, Quality Control Supervisor with Hartford in Hartford, Connecticut**

- Visit claim offices in United States and Canada to evaluate compliance with Hartford's internal corporate operating procedures and the relevant state law and administrative regulations for claims handling
- Identified root cause problems in claims handling process and detailed how to improve

**From 1985 – 1986, Claim Manager with Hartford in Oklahoma City, Oklahoma**

- Managed office that serviced multi-line claims handling for western Oklahoma

**From 1986 – 1989,   Assistant Regional Claim Manager for Oklahoma City Regional Claim Operations with Hartford in Oklahoma City, Oklahoma**

- Supervised four claim operations in Oklahoma and Arkansas
- Supervised medical malpractice claims for Oklahoma
- Supervised the agency check program
- Confirmed coverage for Oklahoma City Regional produced business
- Co-supervised office closings and down-sizing
- Supervised CAS (computer system) implementation
- Served as liaison between the Underwriting Department and the Claim Department for the resolution of any service or claim problems
- Handled account or agency claim service issues.

**From 1989 – 1993, Claim Manager with Hartford in Oklahoma City, Oklahoma**

- Managed full-service, multi-line claim operation in Oklahoma and Arkansas

**From 1993 – 1996, Quality Assurance Leader with Hartford in Oklahoma City, Oklahoma**

- Identified individual development needs of claim handling staff
- Trained claim handling staff on claim service standards
- Developed educational programs to address claim handling staff needs

**From 1996 – 2011, Litigation Consultant with Hartford in Oklahoma City, Oklahoma**

- Handled and supervised litigated and non-litigated claims in Arkansas, Arizona, New Mexico, Colorado, Nebraska, Montana, Wyoming, Missouri, Kansas, Oklahoma, and Texas
- Monitored trials and attended mediations, arbitration hearings, and settlement conferences
- Responsible for mentoring claim adjusters to obtain their individual coverage certification and analysis for all lines of business
- Supervised all arbitration submissions and arguments
- Served on the Authority Team for the Oklahoma Guaranty Association
- Intercompany arbitration committee member for automobile and a special arbitrator for products and property submissions

**From May 2011 to present, Owner and Sole Member of A.T. Bates Insurance Consulting, LLC, in Oklahoma City**

- I have assisted 72 parties with consultation or expert testimony on matters relating to insurance coverage, insurance claims handling, and the tort of bad faith.
- Services offered: adjuster representation for insurance companies and self-insureds, attend mediations, trial monitor, property damage assessment, insurance policy appraisal, expert witness in claims handling, and coverage analysis

**ARTHUR T. BATES**
**1325 Smiling Hill Boulevard**
**Edmond OK 73013**

**PRIOR DEPOSITION TESTIMONY**

I have given a deposition as an expert in the following cases:

*Parrish v Shelter Mutual Insurance Company*, pending in Tulsa County District Court, Case No. CJ-2010-7067;

*Progressive Northern Insurance Company v. Brandon Shaw*, United States District Court for the District of Kansas, Case No. 6-14-CV-01249;

*Kidzone Learning Center, Inc. v. Capital Indemnity Corporation,* United States District Court, Western District of Oklahoma, Case No. 5:14 CV 00870-R;

*Wade Lavoy v. United Services Automobile Association and USAA General Indemnity Company,* District Court of Jackson County, State of Oklahoma, Case No. CJ-2014-131;

*Bob Poole, et al v. Ozarks Electric Cooperative Corp. v. Bituminous Casualty Corp. et al.,* District Court of Adair County, State of Oklahoma, Case No. CJ-2011-100;

*Brenton Wayne Trotter, an Individual and Door Tech, LLC, an Oklahoma Limited Liability Company, f/k/a Trotter Doors, LLC, an Oklahoma Limited Liability Company, Plaintiffs v. American Modern Select Insurance Company, a corporation,* United States District Court, Western District of Oklahoma, Case No. 5:15-CV-00024-L;

*Damann Properties LLC v. United States Liability Insurance Company and Berryhill & Associates,* District Court of Cleveland County, State of Oklahoma Case No. CJ-2015-686;

*Talbot 2002 Underwriting Capital Ltd, White Mountains Re Sirius Capital Ltd and Markel Capital Limited v. Old White Charities, Inc.,* United States District Court, Southern District of West Virginia, Beckley Division, Case No. 5:15-CV-12542;

*Kenya D. Rudzik and Chance R. Rudzik, TLC Trucking, LLC, and Reymundo Estrada Garcia v. Star Insurance Company, Custard Insurance Adjusters, Inc., and Donald Seward,* District Court of Grant County, Kansas, Case No. 14-CV-39;

*Calvary Baptist Church v. Church Mutual Insurance Company,* United States District Court, Western District of Oklahoma, Case No. CIV-12-1115-L;

*UZMA Investments, LLC. v. Essex Insurance Company,* United States District Court, Northern District of Georgia, Atlanta Division, Civil Action No. 1:16-cv-01432-ODE;

26

*BNSF Railway Company v. Morrison Grain & Ag Services, Inc. and Mid-Continent Casualty Company,* United States District Court, Western District of Oklahoma, Case No.  CIV-15-1055-F;

*Massachusetts Bay Insurance Company v. Curtis Scott Langager,* United States District Court, Northern District of Oklahoma, Case No. 16-cv-685 JED;

*Greenway Park, LLC v. Nautilus Insurance Company and Alexander & Strunk, Inc.,* District Court of Cleveland County, State of Oklahoma, Case No. CJ-16-754;

*Hiland Partners Holdings LLC, as successor-in-interest to Hiland Partners, LP, Hiland Operating, L.L.C. and Hiland Partners GP Holdings, L.L.C. v AIG Claims, Inc.* District Court of Garfield County, State of Oklahoma, Case No. CJ-2016-178;

*Employers Mutual Casualty Company v. Civil Werx LLC,* District Court, Clark County, Nevada Case No.  A- 18-773982-C.

*Christy and Payton Dodd Mather v CSAA Insurance Companies d/b/a AAA Oklahoma,* District court of Tulsa County, Case No: CJ-2017-3954

## PRIOR TRIAL TESTIMONY

*Larry W. Thomas and Judith A. Thomas v. Farmers Insurance Company, Inc.,* In the United States District Court for the Northern District of Oklahoma, Case No. 16-CV-17-TCK-PJC.