# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JANET GRAVES, surviving widow and next of kin of NATHAN GRAVES, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. CIV-19-60-SLP |
| PENNSYLVANIA MANUFACTURERS' INDEMNITY CO., and AMERICAN CLAIMS MANAGEMENT, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND OPENING BRIEF IN SUPPORT

Daniel E. Gomez, OBA No. 22153
CONNER & WINTERS, LLP
4000 One Williams Center
Tulsa, OK  74172-0148
Phone: (918) 586-8984
Fax: (918) 586-8311
Email: dgomez@cwlaw.com

*Attorney for Defendants, Pennsylvania Manufacturers Indemnity Co. and American Claims Management, Inc.*

September 3, 2019

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ......................................................................................... ii

TABLE OF AUTHORITIES................................................................................... iv

INTRODUCTION AND SUMMARY.................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS...................................... 2

STANDARD OF REVIEW................................................................................... 12

ARGUMENT & AUTHORITIES ......................................................................... 13

    I.     THE UM LIMITS PAYMENT HAS RESOLVED PLAINTIFF'S
          BREACH OF CONTRACT CLAIM AS A MATTER OF LAW .............. 13

    II.    PLAINTIFF MUST PRESENT SIGNIFICANT EVIDENCE OF
          TORTIOUS CONDUCT TO SUBMIT A BAD FAITH CLAIM TO
          A JURY ...................................................................................................... 13

    III.   PLAINTIFF CANNOT ESTABLISH SUFFICIENT EVIDENCE
          OF AN "UNREASONABLE" DELAY TO WITHSTAND
          SUMMARY JUDGMENT ........................................................................ 15

          A.    The Insurance Defendants Acted Reasonably in Evaluating
                 the Claim ........................................................................................ 15

          B.    Plaintiff Did Not Trigger Oklahoma's Statutory "Speedy
                 Payment Mechanism" Until 14 Months After the Accident ........... 16

          C.    Plaintiff Was Uncooperative Regarding The Insurance
                 Defendants' Reasonable Inquiries About Heirs and Workers
                 Compensation Liens........................................................................ 18

          D.    Lack of Cooperation Is Properly Considered in Defense of
                 Bad Faith ........................................................................................ 20

IV.    PLAINTIFF CANNOT ESTABLISH SUFFICIENT EVIDENCE OF AN "INADEQUATE INVESTIGATION" TO AVOID SUMMARY JUDGMENT ........................................................................ 22

V.    PLAINTIFF HAS NOT ESTABLISHED SUFFICIENT EVIDENCE OF BAD FAITH DAMAGES TO WITHSTAND SUMMARY JUDGMENT ...................................................................... 25

    A.    Attorney Fees are Not Recoverable as an Element of Financial Loss ................................................................................ 25

    B.    Mrs. Graves Otherwise Lacks Financial Loss.................................. 26

    C.    Plaintiff Has Not Supported Noneconomic Damages Directly Attributable to Any Alleged Bad Faith ............................................ 27

VI.    PLAINTIFF HAS FAILED TO ESTABLISH ANY EVIDENCE TO SUPPORT A JURY QUESTION ON PUNITIVE DAMAGES ................ 28

CONCLUSION ....................................................................................... 30

CERTIFICATE OF SERVICE........................................................................ viii

APPENDIX OF EXHIBITS ............................................................................. ix

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AAA Nevada Ins. Co. v. Chau*, 880 F. Supp. 2d 1282 (D. Nev. 2010) ........................ 18, 19

*Aderhold v. Stewart*, 46 P.2d 346 (Okla. 1935) ..................................................... 24

*Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664 (10th Cir. 1998) ........................................ 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1996) ........................................... 12

*Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080 (Okla. 2005) ........................................... 14

*Ball v. Wilshire Ins. Co.*, 221 P.3d 717 (Okla. 2009) ........................................... 13

*Barnes v. Okla. Farm Bureau Mut. Ins. Co.*, 11 P.3d 162 (Okla. 2000) .............. 15, 25, 26

*Beers v. Hillory*, 241 P.3d 285 (Okla. Civ. App. 2010) ............... 13, 14, 15, 16, 20, 25, 28

*Blakley v. Magic Lube*, CJ-2009-512, 2010 WL 4085547 (Dist. Ct. Cherokee Cnty., Okla.) ................................................................................................. 24

*Buzzard v. Farmers Ins. Co., Inc.*, 824 P.2d 1105 (Okla. 1991) ........................................ 14

*Cal. Cas. Gen. Ins. Co. v. Superior Court*, 173 Cal. App. 3d 274 (Cal. Ct. App. 1985) ......................................................................................................... 21

*Caughron v. Liberty Mut. Fire Ins. Co.*, No. 11-CV-206-GKF-TLW, 2014 WL 11531560 (N.D. Okla. Mar. 6, 2014) ............................................................ 13, 14, 26

*Christian v. Am. Home Assurance Co.*, 577 P.2d 899 (Okla. 1977) ......................... 13, 14

*Errahmouni v. Progressive N. Ins. Co.*, No. CIV-12-1380-HE, 2013 WL 6410985 (W.D. Okla. Dec. 9, 2013) ............................................................................ 16

*Fargo v. Hays-Kuehn*, 352 P.3d 1223 (Okla. 2015) ........................................... 24

*First Bank of Turley v. Fid. & Deposit Ins. Co. of MD*, 928 P.2d 298 (Okla. 1996) .. 20, 21

*Forbes* v. *Shelter Mut. Ins. Co.,* 904 P.2d 159 (Okla. Civ. App. 1995) ............... 6, 7, 8, 18

*Garnett v. Gov't Employees Ins. Co.*, 186 P.3d 935 (Okla. 2008) .................................... 14

*Inks v. USAA Gen. Indem. Co.*, No. 17-CV-210-GKF-FHM, 2018 WL 3583116
(N.D. Okla. June 27, 2018) ........................................................................................ 16

*Kransco v. Am. Empire Surplus Lines Ins. Co.*, 2 P.3d 1 (Cal. 2000) ............................. 21

*Lewis v. Farmers Ins. Co., Inc.*, 681 P.2d 67 (Okla.1983) ................................................ 20

*Manis v. Hartford Fire Ins. Co.*, 681 P.2d 760 (Okla. 1984) ........................................... 14

*McCorkle v. Great Atl. Ins. Co.*, 637 P.2d 583 (Okla. 1981) ........................................... 14

*Meadow Gold Dairies v. Oliver,* 535 P.2d 290 (Okla. 1975) ......................................... 8, 9

*Peters v. Am. Income Life Ins. Co.*, 77 P.3d 1090 (Okla. Civ. App. 2002) ...................... 16

*Phillips v. New Hampshire Ins. Co.*, 263 F.3d 1215 (10th Cir. 2001) ....................... 16, 17

*Porter v. Farmers Ins. Co., Inc.*, 505 Fed. Appx. 787 (10th Cir. 2012).......... 14, 16, 20, 23

*Shoopman v. Winningham*, No. CJ-2011-1185, 2001 WL 35739076 (Dist. Ct.
Tulsa Cnty., Okla.) ...................................................................................................... 25

*Shotts v. GEICO*, No. CIV-16-1266-SLP, 2018 WL 4832626 (W.D. Okla., June 1,
2018) ..................................................................................................... 28, 29, 30

*Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870 (10th Cir. 2006) .................... 22, 23, 25, 29

*Timberlake Const. Co. v. U.S. Fid. and Guar. Co.*, 71 F.3d 335 (10th Cir. 1995) ..... 22, 23

*Tran v. Nationwide Mut. Ins. Co.*, No. 11-CV-374-CVE-FHM, 2012 WL 380359
(N.D. Okla. Feb. 6, 2012), *aff'd* 524 Fed. Appx. 391 (10th Cir. 2013) ................ 14, 16

*Vickers v. Progressive N. Ins. Co.*, 353 F. Supp. 3d 1153 (N.D. Okla. 2018) ................. 26

*Wade v. EMCASCO Inc. Co.*, 483 F.3d 657 (10th Cir. 2007) ........................................... 21

*Watson v. Farmers Ins. Co., Inc.*, 23 F. Supp. 3d 1342 (N.D. Okla. 2014) ...................... 13

*Williams v. Hartford Cas. Ins. Co.*, 83 F.Supp.2d 567 (E.D. Pa. 2000) ........................... 27

## Statutes, Regulations & Rules

Fed. R. Civ. P. 56...................................................................................................... 1, 12

Okla. State. tit. 12, § 1053 ............................................................................................ 18

Okla. Stat. tit. 23, § 9.1 ................................................................................................ 28

Okla. Stat. tit. 36, §3636............................................................................................... 16

Okla. Stat. tit. 85A, § 43 ........................................................................................... 6, 19

Okla. Unif. Jury Instr. 22.4........................................................................................... 25

Okla. Unif. Jury Instr. 22.5........................................................................................... 28

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND OPENING BRIEF IN SUPPORT

The defendants, Pennsylvania Manufacturers' Indemnity Company ("PMA") and American Claims Management, Inc. ("ACM") (collectively the "Insurance Defendants"), pursuant to Fed. R. Civ. P. 56, move for summary judgment on all claims brought against them by the plaintiff, Janet Graves, surviving widow and next of kin of Nathan Graves ("Mrs. Graves" or "Plaintiff"). In support, the Insurance Defendants state as follows:

### INTRODUCTION AND SUMMARY

On January 24, 2017, Officer Nathan Graves died in an automobile accident while on duty as a law enforcement officer for the Sac and Fox Nation. His widow—Janet Graves—made a claim for uninsured/underinsured motorist ("UM") coverage under a commercial policy issued by PMA to the Sac and Fox Nation with a limit of $1 million. The claim was processed by ACM and the full $1 million limit was paid to Mrs. Graves on January 31, 2019. ACM never disputed coverage or liability and never offered less than the full limit. Mrs. Graves nevertheless claims that the Insurance Defendants acted in bad faith by unreasonably delaying payment and performing an inadequate investigation.

Under the record of undisputed facts, Mrs. Graves cannot make a sufficient showing of bad faith conduct to submit the matter to a jury. Among these undisputed facts is that ACM investigated for months after the accident, but that Mrs. Graves did not trigger the "speedy payment mechanism" of Oklahoma UM law until fourteen months after the accident when she retained counsel. Thereafter, the Insurance Defendants repeatedly asked

1

for an agreement among Mrs. Graves and her family members for distribution of the UM proceeds—but for nine months there was no response. It was not until December of 2018 that an agreement was reached, and the $1 million limit was then promptly paid.

A bad faith plaintiff bears the burden of establishing unreasonable conduct by an insurer that can be "reasonably perceived as tortious" and must also—as with any tort—establish damages directly attributable to the alleged bad faith conduct. Oklahoma law also places obligations on the insured to act reasonably in supplying necessary information to process a claim. The Insurance Defendants are entitled to judgment as a matter of law because Mrs. Graves cannot establish any tortious conduct, nor has she presented sufficient evidence of damages attributable to the timing involved with her UM claim.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On January 24, 2017, Ofc. Graves was on duty as a law enforcement officer for the Sac and Fox Nation and was killed in an automobile accident when he was struck head-on by another vehicle. The driver of the other vehicle was Justin Henley who acted negligently. Ofc. Graves was not negligent. (Doc. 11, at 3 (Stipulations b. and d.)).

2.      PMA issued a commercial insurance policy to the Sac and Fox Nation that was in effect on the day of the accident and included a UM limit of $1 million. Ofc. Graves was an "insured" under the policy for purposes of this case. (Doc. 11, at 3 (Stipulation c.)).

3.      Ofc. Graves was survived by his wife, his parents Pamela Graves and Dwayne Graves, and three biological children Caleb Graves, Johnathon Graves, and Jacob Graves. (Doc. 11, at 3 (Stipulation e.)).

2

4.      PMA accepted the claim and fulfilled its contractual obligation by making payment of the $1 million limit on January 30, 2019, which was received by Mrs. Graves' counsel on February 1, 2019. (Doc. 11, at 3 (Stipulation h.)).

5.      The UM claim was initiated a few days after the accident when a family member of Mrs. Graves was put in contact with ACM. Terry Leikam was assigned the claim and handled the matter for ACM. (Ex. 1, at 5-8 (Claims Notepad (Excerpts))).

6.      In the following months, Mr. Leikam spoke with Mrs. Graves by telephone and e-mail and obtained preliminary information. Among the items requested were medical and employment releases which Mrs. Graves returned on May 30, 2017. (Ex. 1, at 2-4).

7.      In June of 2017, ACM retained an expert economist to help value the claim. His report was completed September 29, 2017, which estimated economic damages "in the range of $500K to $600K." (Ex. 2, at 17 (Large Loss Reports)).

8.      The police reports indicate that another driver, Garrett Hunt, may have contributed to the accident by passing in a no-passing zone. Ofc. Graves was traveling southbound on a two-lane highway. In the northbound lane were three vehicles driven, respectively, by Tony Gann, Mr. Hunt, and Mr. Henley. Mr. Hunt passed Mr. Gann and Mr. Henley followed. Mr. Hunt returned to his lane without striking Ofc. Graves' vehicle but Mr. Henley hit Mr. Graves head-on. (Ex. 3, 32-38 (Police Reports and Affidavit)).

9.      As part of its investigation, ACM's counsel in September 2017 sent letters to Mr. Hunt and his possible employer demanding that they inform their insurers and that they pay their share, if any, of the liability. Responses were received from the respective insurers

3

five months later, in February of 2018, denying an employment relationship and denying personal responsibility by Mr. Hunt. (Ex. 4 (Demand Letters and Responses)).

10.    Based on statements from the only objective eyewitness, the Oklahoma Highway Patrol believed Mr. Hunt passed in a no passing zone. (Ex. 3, at 32-38). At her deposition, Mrs. Graves acknowledged that Mr. Hunt may bear some responsibility for possibly passing in a no-passing zone. (Ex. 5. (Graves Dep. 28:4-32:19)).

11.    Mrs. Graves retained counsel in March of 2018, fourteen months after the accident. (Ex. 1, at 1). She previously told Mr. Leikam that she would prefer to not hire an attorney to avoid paying attorney fees. (Ex. 2, at 22; Ex. 5 (Graves Dep. 48:10-49:20)). She also testified that years earlier she made a UM claim on a personal policy and hired counsel right away for that claim. (Ex. 5 (Graves Dep. 35:9-37:11)).

12.    Mrs. Graves' counsel's first correspondence to ACM's counsel was March 28, 2018 and included a written tender from GEICO, Mr. Henley's liability insurer, of its $100,000 limit. (Ex. 6, at 3-2 (Counsel Letters)).

13.    ACM's counsel responded on April 4, 2018, correcting several fact misstatements, asserting that the March 28, 2018 letter was the first time ACM had received written notice of GEICO's limits tender, and stating that under Oklahoma statute the UM carrier had 60-days to waive subrogation or substitute payment. (Ex. 6, at 5-6).

14.    On April 10, 2019, Mrs. Graves' counsel responded acknowledging some of the factual misunderstandings, acknowledging that the tender was required to be in writing, and agreeing that the letter triggered the 60-day statutory window. He wrote:

4

> I am certain that you said your client would waive your subrogation right against the tortfeasor's $100,000.00 policy. Perhaps you were talking about a future course of action but I took it to mean that you were waiving your subrogation right. It was clear to me but it doesn't matter anyway because it has to be in writing. I did not do anything to rely upon your representation so there is no harm done in this misunderstanding.
>
> You are correct in recitation of the statute and how you have 60 days now to determine whether you want to waive your subrogation rights and either tender a substitute $100,000.000. Let us know if we need to do anything to assist you and your client in your active endeavors.

(Ex. 6, at 7).

15.     Although subrogation research had already begun, including the demand letters to the Hunt parties, additional legal counsel was retained during the 60-day statutory window to analyze the strength of a possible subrogation claim. (Ex. 2, at 32).

16.     On May 29, 2018,[1] ACM's counsel wrote that it wanted to preserve subrogation and make substitute payment but needed instructions. Counsel wrote:

> Several weeks ago, I asked if an estate had been open for Mr. Graves and if Mrs. Graves had been appointed as an executor or administrator. On our Friday call, you confirmed that there is no probate, nor is there an executor or administrator, and that you would prefer to resolve payment by ensuring that all of Mr. Graves' family members agree to their share of recovery, and if no agreement can be reached, having the recovery apportioned by a district court. In this situation, it is unclear how to direct payment of the $100,000 substitute payment since it cannot be paid to "The Estate of Nathan Graves." Please let me know as soon as possible how you would like for the substitution payment to be processed.

(Ex. 6, at 8-9). ACM's counsel also inquired about workers' compensation death benefits

---

[1]     The 60th day was Sunday, May 27, 2018, and due to Memorial Day, the first business day thereafter was Tuesday, May 29, 2018.

which Mrs. Graves and her family members might have received. (Id.)

17.    It was later found that Mrs. Graves had filed a lawsuit against Mr. Henley and against the Insurance Defendants on May 24, 2018, before expiration of the 60-day window granted by Oklahoma's UM statute for the Insurance Defendants to make their subrogation determination. (Doc. 11, at 3 (Stipulations f.)). The Insurance Defendants had not been served with the lawsuit when their counsel sent the May 29, 2018 letter.

18.    In a letter dated September 5, 2018, ACM's counsel wrote to Mrs. Graves' counsel confirming that the $1 million limit was available to her and again asked for information on Ofc. Graves' heirs and the workers' compensation lien. Counsel wrote:

> As I have in all my recent letters, I again reiterate that PMA cannot simply write a check to Mrs. Graves for the $1 million limit. I have, for several months, requested information that is necessary to make the payment. You have informed me that no estate has or will be opened for Mr. Graves, nor has an executor been appointed to accept the payment. You have informed me that you intend to obtain agreement from Mr. Graves' heirs on their share of the UM insurance proceeds. PMA will need documentation of each heirs' agreement to their share of the UM policy proceeds because each can sue PMA directly if they are unsatisfied with your proposed distribution. *See Forbes* v. *Shelter Mut. Ins. Co.,* 904 P.2d 159 (Okla. Civ. App. 1995).
>
> I also have asked if Mrs. Graves received any death benefits from a workers' compensation carrier but have received no response. Under Oklahoma statute, 85A O.S. § 43(B)(4), workers' compensation carriers are granted superior subrogation rights against UM benefits. I recently received a call from an attorney for a workers compensation carrier for the Sac and Fox Nation and was informed that they will in fact assert a subrogation right and intervene in the pending lawsuit.

(Ex. 6, 17-18).

19.    On September 18, 2018, Mrs. Graves' counsel responded stating: "I am

6

hopeful that we will be able to get in agreement on how to divide the money that comes from this case now that you have finally offered your $1 Million Dollars." (Ex. 6, at 20).

20.     On October 23, 2018, counsel for the Insurance Defendants wrote to Mrs. Graves' counsel on certain litigation matters and again stated:

> I would finally request, as I have many times over the last several months, that you either inform me of an open estate and personal representative for Mr. Graves for payment of the UM proceeds, or provide me with information that every person and insurance company that is entitled to such proceeds, including Mrs. Graves, Mr. Graves' surviving children and parents, the intervening workers' compensation carrier, and the private UM insurer of Mr. Graves, have agreed in writing for their share of the UM proceeds. This information is imperative for PMA to make payment to avoid exposure to competing claims and additional liability. *See Forbes v. Shelter Mut. Ins. Co.,* 904 P.2d 159 (Okla. Civ. App. 1995); 85A O.S. § 43(B)(4).

(Ex. 6, at 22-23).

21.     On October 24, 2018, Mrs. Graves' counsel wrote to counsel for both ACM and for GEICO and stated:

> I would like the checks made out to Janet Graves as next of kin of Nathan Graves (as the lawsuit has been brought). If you are unwilling to do that and have any authority for requiring a probate, please advise as to your position. I don't know of any authority for you to attach that string to settlement.

(Ex. 6, at 24).

22.     On October 31, 2018, counsel for ACM responded explaining why it was not feasible to write the check as requested and reiterating that the legal citation of *Forbes* had been made in prior letters. (Ex. 6, at 25-26). Counsel also corrected the false suggestion that the Insurance Defendants were "requiring a probate" as a condition to payment:

> To ensure that everyone is compensated, the UM carrier will require that a

duly appointed personal representative represent the entire estate of Mr. Graves, ***or an agreement by and between all persons eligible for distribution under the wrongful death statute.*** The UM carrier cannot prudently pay only Mrs. Graves in her individual capacity.

(Id.) (emphasis added).

23.     On November 6, 2018, Mrs. Graves' counsel responded again falsely suggesting that the Insurance Defendants were "insist[ing] on probate" and further suggested that the check be written "to the Estate." The letter also stated without support that the *Forbes* case did not apply. (Ex. 6, at 29).

24.     In December of 2018, Mrs. Graves settled her claim against Mr. Henley by accepting GEICO's $100,000 limit and dismissed Mr. Henley from the lawsuit. This was nearly two years after the accident. (Doc. 11, at 3 (Stipulation g.)).

25.     On December 24, 2018, ACM's counsel wrote to Mrs. Graves' counsel confirming a telephone conversation in which counsel was finally receptive to an agreement between Mrs. Graves and Ofc. Graves' other heirs on distribution. The letter asked for clarification on additional family members including two minors who had received workers' compensation benefits and a natural daughter of Mr. Graves' who the file indicated was later adopted by another family. The letter cited *Meadow Gold Dairies v. Oliver,* 535 P.2d 290, 295 (Okla. 1975) ("Natural children, even after adoption, are eligible to inherit from both their natural and adopted parents.") (Ex. 6, at 30).

26.     Mrs. Graves' counsel responded by email on January 4, 2019, stating that the minors were Mrs. Graves' grandchildren stating further: "I can't tell you how [the

8

grandchildren] qualified for workers comp benefits, but they clearly don't qualify for wrongful death benefits." The letter provides no citation for this statement. Counsel further disputed, without support, that the *Meadow Gold* case presented any legitimate concerns. (Ex. 6, at 31). Mrs. Graves later testified at her deposition that she and Ofc. Graves were legal guardians over the grandchildren. (Ex. 5 (Graves Dep. 13:20-14:19)).

27.    On January 7, 2019, Mrs. Graves' counsel wrote to ACM's counsel with an agreement signed by Mrs. Graves, Ofc. Graves' parents, and three of his children. The minors and Ofc. Graves' other daughter were not mentioned. (Ex. 6, at 32-33).

28.    On January 9, 2019, ACM's counsel responded discussing the implication of the other possible heirs and proposed a supplemental one-page "Payment Agreement" for Mrs. Graves to sign that included a hold harmless provision which counsel confirmed was "consistent with our telephone discussion." (Ex. 6, at 34-35).

29.    The Payment Agreement was signed shortly thereafter. (Ex. 7 (Payment Agreements)). The $1 million check was issued on January 30, 2019 and received Mrs. Graves' counsel on February 1, 2019.[2] (Doc. 11, at 3 (Stipulation h.)).

30.    At no time during the claims process was an offer made to Mrs. Graves for less than the UM policy limits, nor did Mr. Leikam ever suggest that Ofc. Graves' life was worth less than the policy limit. (Ex. 5 (Graves Dep. 44:8-20)).

31.    Mrs. Graves testified at her deposition that Mr. Leikam was never rude to her

---

[2]    A mistake in the check's payee line was brought to the Insurance Defendants' attention a month and a half later and was promptly remedied. (Ex. 6, at 27-40).

or her family members, and that he never failed to return any calls or answer any questions. (Ex. 5 (Graves Dep. 44:21-25; 52:11-17)).

32.    Mr. Leikam neither insisted on, nor dissuaded Mrs. Graves from, retaining counsel. (Ex. 5 (Graves Dep. 49:15-20)). Mrs. Graves testified that certain aspects of the claim were difficult prior to retaining counsel. For example, when she asked Mr. Leikam why GEICO had addressed its tender letter to an executor of the Nathan Graves estate, she testified that "[Mr. Leikam] informed me that he was not an attorney; and that if I had those questions, I would probably need to discuss it with my . . . own representation." (Ex. 2, at 17; Ex. 5 (Graves Dep. 48:10-18)).

33.    Mrs. Graves testified that she did not have a good understanding of heirship matters before she retained counsel. For example, she did not know that Ofc. Graves' parents were entitled to recovery under the Oklahoma wrongful death statute. She testified:

> Q. And did you have an understanding why [Mr. Leikam] was asking about who Mr. Graves' heirs would be?
>
> A. . . . I have come to understand that obviously there are certain percentages that go to each heir; but at first, no, I didn't really understand exactly.
>
> Q. How recently did you come to understand about these percentages that need to go to different family members?
>
> A. As far as the amounts, not until I hired my own attorney. I knew there would be a division based upon Oklahoma law.
>
> Q. You knew that prior to hiring Mr. Berry or after?
>
> A. I knew that there would be some sort of division with my children only because there have been with a federal policy, so I assumed that there would possibly be. I had no idea about his parents; I'll be honest. I kind of figured

children would fall under that category; but as far as how much division and anything else, not until I hired my own attorney.

(Ex. 5 (Graves Dep. 40:11-41:12; *see also* 91:10-92:25)).

34.     Mrs. Graves also did not fully understand subrogation issues under the

Oklahoma UM statute until she retained counsel. She testified:

> A. I have—since I have an attorney—come to understand that part of [insurance procedure] has to do with the way things are reimbursed based upon what the economist would have told the UM. So if there were other policies out there there's a possibility, you know, they could have been doing that to get reimbursed for part of the money they were going to have to pay on their own policy. And I did not understand that before I, I got my own attorney. I don't deal with insurance so.
>
> Q. So you have some understanding now of the complexities of what you're calling reimbursements between insurers.
>
> A. Yeah.
>
> Q. And that came after you hired Mr. Berry.
>
> A. Yes, sir. I had no knowledge of any of that; never been involved with anything like that.

(Ex. 5 (Graves Dep. 61:2-18)).

35.     Mrs. Graves testified that she did not accept GEICO's tender earlier because she requested that the matter be put "on hold[.]" (Ex. 5 (Graves Dep. 58:4-59:1)). She further testified that Mr. Leikam did not mislead her and never told her that accepting GEICO's tender would imperil her UM claim. (Ex. 5 (Graves Dep. 59:23-60:24)).

36.     At her deposition, Mrs. Graves testified that she received payment from four life insurance policies and other benefits totaling $510,000. All but one of the policies were

11

paid within a few weeks of Ofc. Graves' death. Her two oldest sons also received $42,000 each shortly after the accident. Mrs. Graves and the two grandchildren for whom she was legal guardian also received workers' compensation benefits, and some of those payments continued as of the day of the deposition. (Ex. 5 (Graves Dep. 63:20-68:9; 71:11-79:4)).

37.     Although the check was received on February 1, 2019 (and corrected a month and a half later), Mrs. Graves testified at her deposition on May 7, 2019 that the check had only been deposited a few days before the deposition, and only then also deposited the GEICO check which had been received much earlier. An agreement with the workers' compensation carrier also was not reached until just prior to the deposition. (Ex. 5 (Graves Dep. 79:5-80:24; 88:5-89:14)).

## STANDARD OF REVIEW

Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. An issue is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way, and a fact issue is "material" only if it is essential for proper disposition under the substantive law. *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998). The court must consider the evidence in a light favorable to the nonmoving party, but if the nonmoving party's proffered evidence is "merely colorable" or "is not significantly probative" then summary judgment should be granted to the movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1996).

## ARGUMENT & AUTHORITIES

### I.   THE UM LIMITS PAYMENT HAS RESOLVED PLAINTIFF'S BREACH OF CONTRACT CLAIM AS A MATTER OF LAW.

Mrs. Graves concedes that the limits payment fulfilled the Insurance Defendants' contractual obligation. (Doc. 11, at 3 (Stipulation h.)). As a matter of law, "contract damages to pay money owed on an insurance policy . . . is ordinarily limited to policy limits[.]" *Watson v. Farmers Ins. Co., Inc.*, 23 F. Supp. 3d 1342, 1351 (N.D. Okla. 2014). Summary judgment should therefore be granted on Mrs. Graves contract claim.

### II.   PLAINTIFF MUST PRESENT SIGNIFICANT EVIDENCE OF TORTIOUS CONDUCT TO SUBMIT A BAD FAITH CLAIM TO A JURY.

Oklahoma law recognizes a UM carrier's duty of good faith and fair dealing and an tort claim for breach of that duty (a "bad faith" claim). *See Beers v. Hillory*, 241 P.3d 285, 287-88 (Okla. Civ. App. 2010) (citing *Christian v. Am. Home Assurance Co.*, 577 P.2d 899 (Okla. 1977)). In this case, Mrs. Graves' UM claim was never denied; the sole allegations are "unreasonable delay" and "inadequate investigation." The *Beers* court held:

> The elements of a bad faith claim against an insurer for delay in payment of first-party coverage are: (1) claimant was entitled to coverage under the insurance policy at issue; (2) the insurer had no reasonable basis for delaying payment; (3) the insurer did not deal fairly and in good faith with the claimant; and (4) the insurer's violation of its duty of good faith and fair dealing was the direct cause of the claimant's injury. The absence of any one of these elements defeats a bad faith claim.

*Id*. at 292 (citing *Ball v. Wilshire Ins. Co.*, 221 P.3d 717, 724 (Okla. 2009)).

The *Beers* court further made clear that "the minimum level of culpability necessary for liability against an insurer to attach is more than simple negligence, but less than the

reckless conduct necessary to sanction a punitive damage award against [the insurer]." *Id.* (citing *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1093 (Okla. 2005)). "Insurers are free to make legitimate business decisions (and mistakes) regarding payment, as long as they act reasonably and deal fairly and in good faith with their insureds." *Id.* (citing *Bailey v. Farmers Ins. Co., Inc.*, 137 P.3d 1260, 1264 (Okla. Civ. App. 2006)). "Where an insurer has demonstrated a reasonable basis for its actions, bad faith cannot exist as a matter of law." *Id.* at 293 (citing *Manis v. Hartford Fire Ins. Co.*, 681 P.2d 760, 761–62 (Okla. 1984); *Buzzard v. Farmers Ins. Co., Inc.*, 824 P.2d 1105, 1109 (Okla. 1991)).

The courts have set a high bar for plaintiffs to overcome summary judgment. "The party claiming bad faith has the burden of proof and must make a 'clear showing' that the insurer acted unreasonably and in bad faith[.]" *Porter v. Farmers Ins. Co., Inc.*, 505 Fed. Appx. 787, 791 (10th Cir. 2012) (unpublished) (citing *McCorkle v. Great Atl. Ins. Co.*, 637 P.2d 583, 587 (Okla. 1981); *Christian*, 577 P.2d at 905)). "[B]efore the issue of an insurer's alleged bad faith may be submitted to the jury, the trial court must first determine as a matter of law, under the facts most favorably construed against the insurer, whether the insurer's conduct may be reasonably perceived as tortious." *Beers*, 241 P.3d at 291 (citing *Garnett v. Gov't Employees Ins. Co.*, 186 P.3d 935, 944 (Okla. 2008)).

Important to this case is that "mere delay in the payment of benefits is not enough to establish bad faith." *Tran v. Nationwide Mut. Ins. Co.*, No. 11-CV-374-CVE-FHM, 2012 WL 380359, *5 (N.D. Okla. Feb. 6, 2012), *aff'd* 524 Fed. Appx. 391 (10th Cir. 2013). "A decision to withhold or delay payment, if based on a legitimate dispute or reasonable

14

justification (legal or factual) cannot form the basis of bad faith tort liability." *Caughron v. Liberty Mut. Fire Ins. Co.*, No. 11-CV-206-GKF-TLW, 2014 WL 11531560, *12 (N.D. Okla. Mar. 6, 2014) (citing *Barnes v. Okla. Farm Bureau Mut. Ins. Co.*, 11 P.3d 162, 171 (Okla. 2000)). Thus, if the facts establish any reasonable basis for an alleged delay, summary judgment should be granted. *See Beers*, 241 P.3d at 293 ("Where an insurer has demonstrated a reasonable basis for its actions, bad faith cannot exist as a matter of law.")

### III.   PLAINTIFF CANNOT ESTABLISH SUFFICIENT EVIDENCE OF AN "UNREASONABLE" DELAY TO WITHSTAND SUMMARY JUDGMENT.

The record of undisputed facts shows a lack of tortious or "unreasonable" conduct by the Insurance Defendants. Any alleged delay simply does not rise to the level of "tortious" conduct necessary to submit the question to a jury.

#### A.   The Insurance Defendants Acted Reasonably in Evaluating the Claim.

The record of undisputed facts establishes that ACM investigated and processed the claim promptly upon notice. In the first several months Mr. Leikam worked directly with Mrs. Graves and her family members to obtain basic information. Medical and employment releases were returned by Mrs. Graves in May of 2017. Between June and September of 2017, an expert economist estimated economic damages as "in the range of $500K to $600K." ACM also investigated the role of other possible tortfeasors. The police report that included detailed narratives and which contained information that Mr. Hunt may also have acted negligently by passing in a no passing zone was completed in July of 2017, approximately six months after the accident. ACM made demand on the Hunt parties and

their insurers in September of 2017. Responses were received February of 2018. Mrs. Graves retained counsel shortly thereafter.

The totality of the undisputed facts shows active claim evaluation during these months. Mrs. Graves sole argument for bad faith is essentially that this took too long, but under Oklahoma law "mere delay in the payment of benefits is not enough to establish bad faith." *Tran*, 2012 WL 380359, *5. Mrs. Graves instead must make a "clear showing" of facts that can be "reasonably perceived as tortious." *Porter*, 505 Fed. Appx. at 791; *Beers*, 241 P.3d at 291. Her claim was never denied, and no offer was ever made for less than the full limit. The Insurance Defendants never sought to use economic pressure, nor did they in any way seek to "lowball" the claim. Mrs. Graves, at most, alleges negligence; but negligence is insufficient to support a bad faith claim.[3]

Mrs. Graves has failed to produce sufficient evidence of bad faith conduct by the Insurance Defendants, and summary judgment should therefore be granted.

**B.    Plaintiff Did Not Trigger Oklahoma's Statutory "Speedy Payment Mechanism" Until 14 Months After the Accident.**

In *Phillips v. New Hampshire Ins. Co.*, 263 F.3d 1215 (10th Cir. 2001) a key

---

[3]      *See Inks v. USAA Gen. Indem. Co.*, No. 17-CV-210-GKF-FHM, 2018 WL 3583116, * 8 (N.D. Okla. June 27, 2018) (holding that even if "mistakes" by the insurer are established "internal negligence is insufficient for bad faith liability.") (citing *Peters v. Am. Income Life Ins. Co.*, 77 P.3d 1090, 1098 (Okla. Civ. App. 2002) ("Bad faith and negligence are not synonymous.")); *Errahmouni v. Progressive N. Ins. Co.*, No. CIV-12-1380-HE, 2013 WL 6410985, at *4 (W.D. Okla. Dec. 9, 2013) ("[A] concession ... that 'mistakes were made,' or words to that effect, does not, in and of itself, show bad faith. Bad faith requires more than simple negligence.").

provision of the Oklahoma UM statute—Okla. Stat. tit. 36, §3636(F)—is addressed. The statute states that if a tortfeasor's liability carrier tenders its limits, the UM insured must provide written notice by certified mail to the UM insurer, and the UM insurer then has 60 days to either waive subrogation against the tortfeasor or substitute payment. The court in *Phillips* twice refers to this as a "speedy payment mechanism" for the benefit of the insured which is "triggered" by the written notice. Thus, while Oklahoma law places many obligations on the UM carrier, one obligation placed on the insured is to provide written notice of a limits tender by an insured tortfeasor's liability carrier to provide the UM carrier with time to evaluate its subrogation rights and to determine whether to substitute payment.

Written notice of GEICO's limits tender was not provided until Mrs. Graves hired counsel in March of 2018, approximately 14 months after the accident. (Ex. 6, at 3-4). On April 4, 2018, ACM's counsel wrote a letter to Mrs. Graves' counsel establishing that this was the first time ACM was presented with written notice of the tender and informed him of the 60-day timeline for evaluation under the statute. (Ex. 6, at 5-6). On April 10, 2018, Mrs. Graves' counsel responded by letter acknowledging this fact: "You are correct in recitation of the statute and how you have 60 days now to determine whether you want to waive your subrogation rights and either tender a substitute $100,000.00." (Ex. 6, at 7).

The undisputed fact record establishes that ACM was already evaluating possible subrogation—specifically, possible subrogation against the Hunt parties. (Ex. 4). When written notice of GEICO's tender was received, additional evaluation was performed by an attorney retained by PMA. At the end of the 60-day window, PMA sought to retain its

17

subrogation interests and make a substitute payment but was unable to do so for lack of cooperation regarding heirs and workers' compensation liens (see next section).

Notably, Mrs. Graves sued Mr. Henley and the Insurance Defendants before expiration of the 60-day statutory window. This was done despite counsel's earlier acknowledgement of the statutory 60-day window.

### C.   Plaintiff Was Uncooperative Regarding The Insurance Defendants' Reasonable Inquiries About Heirs and Workers Compensation Liens.

For seven months after the Insurance Defendants notified that it wanted to substitute payment, they asked numerous times how to make payment to multiple heirs who are entitled to recovery under the Oklahoma wrongful death statute, 12 O.S. § 1053. These letters repeatedly cited *Forbes*, a case in which a surviving spouse and surviving child disputed UM wrongful death proceeds. The surviving spouse argued that she alone was entitled to recovery under the terms of the UM policy while the daughter argued that she was entitled to UM proceeds under the wrongful death statute. The court held that the wrongful death statute applied because "UM insurance proceeds represent damages which may be recovered by those entitled by § 1053(B) to bring a wrongful death action[.]" 904 P.2d at 163. The court further held with respect to persons identified in the wrongful death statute that the UM carrier is "liable to those same individuals." Thus, a UM carrier is directly liable to all persons who would be entitled to proceeds under the wrongful death statute, and each therefore can likely sue the UM carrier directly if they are excluded.

A remarkably similar case is *AAA Nevada Ins. Co. v. Chau*, 880 F. Supp. 2d 1282

(D. Nev. 2010), where an insurance claim was based on wrongful death. An attorney wrote to the insurer claiming that she represented two relatives of the deceased and demanded that limits be paid within two weeks. *See id*. at 1284. The Court noted, however, that the letter did not identify all heirs of the decedent or provide releases. *See id*. The insurer attempted several times thereafter to obtain heirship information, but the attorney refused to respond. *Id*. at 1287. When the insurer was sued, the claim was brought not only by the two prior claimants but by seven additional claimants. *See id*. The Court found that the insurer acted reasonably under the circumstances and granted summary judgment. *See id*. The court went so far as to hold that the "demand letter was itself unreasonable and appears to be nothing more than an attempt to set up a potential bad faith claim[.]" *Id*. at 1288.

The same complications arose in this case with respect to the interests of the workers' compensation carrier. In each letter from ACM's counsel, the question of whether an agreement had been reached was asked, but was ignored for several months. The workers compensation carrier, in fact, intervened in this lawsuit to protect its interest. The ability of a workers' compensation carrier to sue a UM carrier directly is set forth in Oklahoma's workers' compensation code, Okla. Stat. tit. 85A, § 43(B)(4), which states: "An employer or carrier who is liable for compensation under this act on account of injury or death of an employee shall be entitled to maintain a third-party action against the employer's uninsured motorist coverage or underinsured motorist coverage."

Under Oklahoma law, the Insurance Defendants' concerns were legitimate and preclude a jury question on bad faith. The concern was the insurer's risk of incurring

multiple liability to either wrongful death beneficiaries heirs or the workers' compensation carrier. In *Porter*, the claimant alleged unreasonable delay where the UM insurer was investigating whether Medicare had an interest in the payment. The court held:

> [Claimant] argues that [Insurer] could have called Medicare at an earlier date to resolve any confusion. But "[t]ort liability may be imposed only if there is a clear showing that the insurer, in bad faith unreasonably withholds payment of the claim." *Lewis v. Farmers Ins. Co., Inc.*, 681 P.2d 67, 70 (Okla.1983). Here, [Insurer] reasonably withheld payment to avoid incurring duplicate—or even triplicate—liability. *See Porter*, 2012 WL 256014, at *19 (discussing extent of [Insurer's] possible liability). The evidence indicates that [Insurer] did so "in order to protect [itself] from potential exposure to double payments." *See Beers*, 241 P.3d at 292. This was a "legitimate" concern, and [Claimant] "did not produce [sufficient] contradictory evidence or any evidence suggesting [Insurer] intentionally delayed payment during this period for an improper purpose."

505 Fed. Appx. at 791 (alterations added).

In this case, ACM's counsel asked repeatedly for necessary information to avoid the possibility of multiple liability but received no response.[4] Under Oklahoma law, the Insurance Defendants' inquiries which went unanswered were reasonable.

### D.   Lack of Cooperation Is Properly Considered in Defense of Bad Faith.

In *First Bank of Turley v. Fid. & Deposit Ins. Co. of MD*, 928 P.2d 298, 308 (Okla.

---

[4]    Even while discussing an agreement, counsel refused to acknowledge the legitimacy of Insurance Defendants' concerns about the minors who received workers' compensation benefits and Ofc. Graves' daughter who was later adopted. Counsel simply responded that he didn't know how his client's grandchildren—over whom it was later determined at deposition that she held legal guardianship—qualified for workers compensation benefits and disputed Oklahoma law that natural children can inherit death benefits. Counsel went so far as to make additional accusations of bad faith. (Ex. 6, at 30-31). The Insurance Defendants made a business decision to release the funds subject to a hold harmless agreement, but this exchange further reveals a lack of cooperation.

1996), the Oklahoma Supreme Court held that an insurer may defend bad faith allegations based on the failure by an insured or their counsel to cooperate in a way that makes it impossible for the insurer to discharge its duty. The Tenth Circuit has further acknowledged situations in which a lack of cooperation is properly considered:

> [T]he justification for bad faith jurisprudence is as a shield for insureds—not as a sword for claimants. Courts should not permit bad faith in the insurance milieu to become a game of cat-and-mouse between claimants and insurer, letting claimants induce damages that they then seek to recover, whilst relegating the insured to the sidelines as if only a mildly curious spectator.

*Wade v. EMCASCO Inc. Co.*, 483 F.3d 657, 669-70 (10th Cir. 2007).

Other courts have addressed this issue more specifically and have held that a plaintiff's contribution to a delay constitutes a valid defense to bad faith claims:

> There can be little question but that an insurer which provides uninsured motorist coverage has a reasonable expectation that if the insured suffers a loss claimed to be covered under the uninsured motorist provisions of the policy, the insured will promptly and accurately furnish it with all the information and evidence pertinent to the claim that is known to the insured. If a failure of the insured to do so results in delaying or impeding the investigation of the claim by the insurer or delays or makes improvident the insurer's payment of the claim, any economic loss and emotional distress caused the insured by virtue of any such nonpayment or delay in investigation or payment will have been caused either wholly or in part by the conduct of the insured.

*Cal. Cas. Gen. Ins. Co. v. Superior Court*, 173 Cal. App. 3d 274, 283 (Cal. Ct. App. 1985).[5]

---

[5]    *Cal. Cas. Gen. Ins. Co.* recognized tort liability for comparative bad faith, but was overruled in *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 2 P.3d 1 (Cal. 2000). The latter court made clear, however, that the insureds conduct "may factually disprove the insurer's liability for bad faith by showing the insurer acted reasonably under the circumstances." This is the rule in Oklahoma. *See First Bank of Turley*, 928 P.2d at 308.

In this case, the record is clear that requests by ACM's counsel for instructions on how to process payment to protect PMA's interests from third-party claims were reasonable and went unanswered for at least seven months.[6] (Ex. 6). This lack of cooperation is relevant in examining Mrs. Graves' bad faith allegations. It was not unreasonable for the Insurance Defendants to request information on heirs and the workers compensation interest and was in fact unreasonable to refuse to respond. These facts support summary judgment for the Insurance Defendants.

## IV.   PLAINTIFF CANNOT ESTABLISH SUFFICIENT EVIDENCE OF AN "INADEQUATE INVESTIGATION" TO AVOID SUMMARY JUDGMENT.

In discovery, Mrs. Graves has alleged that ACM should have interviewed witnesses as opposed to relying on the police reports; but under Oklahoma law, a claimant must show "that a more thorough investigation would have produced relevant information." *Timberlake Const. Co. v. U.S. Fid. and Guar. Co.*, 71 F.3d 335, 345 (10th Cir. 1995). In *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 891 (10th Cir. 2006), a life insurer denied a claim where it found evidence of suicide. The widow sued for breach of contract and bad faith, including an allegation of "inadequate investigation." She argued that the insurer failed to interview family members and others who would have told them that suicide was unlikely. The court quoted the following from *Timberlake Const.*:

---

[6]      Also relevant is that Mrs. Graves filed her lawsuit against Mr. Henley and the Insurance Defendants *before* the end of the 60-day statutory evaluation period for substitute payment, even after counsel acknowledged that the timeframe was in effect. When informed that PMA wanted to substitute payment but needed information on heirs and the workers' compensation interest, this request was repeatedly ignored.

[W]hen a bad faith claim is premised on inadequate investigation, the insured must make a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information. [The insured] made no such showing. For example, while [the insured's] expert, testified that [the insurer] breached the duty of good faith by not questioning [the insured's] representatives [concerning the dispositive issue], *[the representatives'] views on this subject would not have changed the underlying facts already known to [the insurer], facts from which [the insurer] was entitled to form a reasonable belief [about the dispositive issue].*

*Sims*, 469 F.3d at 892 (alterations and emphasis in original). The court found a lack of bad faith in that case because "any additional facts could not have changed the conclusions drawn in the various state officials' reports." *Id*. at 893.

In *Porter*, a claimant similarly alleged that a UM adjusters interviews were "inadequate" but the court held that "there is no indication that further investigation would have changed the underlying facts already known" and that "there is no evidence that further questioning would have revealed anything new." 505 Fed. Appx. at 794. The court reiterated that "Oklahoma does not require an insurer's investigation to be perfect; it need only be "reasonably appropriate under the circumstances." *Id*. The court therefore affirmed summary judgment because "[a] jury could not reasonably conclude on this evidence that [Insurer] acted in bad faith." *Id*.

The same is true in this case. ACM reasonably relied on the police reports to determine that Mr. Graves did not contribute to the accident and that Mr. Henley was liable. The police report also included evidence that Mr. Hunt may have passed in the no-passing zone which warranted further consideration on subrogation. Mrs. Graves agreed that it

23

Case 5:19-cv-00060-SLP   Document 21   Filed 09/03/19   Page 30 of 39

remains unclear whether Mr. Hunt could independently be found negligent. (Ex. 5 (Graves Dep. 28:4-32:19)). Accordingly, the Hunt inquiry was not fact dependent—the question was how strong the claim might be under existing law. In *Fargo v. Hays-Kuehn*, 352 P.3d 1223 (Okla. 2015), the Oklahoma Supreme Court held under a  similar fact pattern that even if a lead vehicle does not make contact the driver can be liable for negligence if they set up a dangerous condition by blocking the view of another vehicle that makes contact. However, the court also held that a full trial would be necessary for a jury to determine whether the actions were sufficiently dangerous. PMA eventually made the business decision to forego this subrogation claim, but there can be no valid argument that the lack of liability by Mr. Hunt was in any way clear or indisputable.

With respect to valuation of the wrongful death claim, that too did not require extensive fact research. Nothing in the record shows that ACM ever doubted that Ofc. Graves was an upstanding citizen, well respected by his peers, with good family relationships. An expert economist determined that economic damages were "in the range of $500K to $600K." But noneconomic damages are much more difficult to discern. *See, e.g., Aderhold v. Stewart*, 46 P.2d 346, 348 (Okla. 1935) (holding that noneconomic damages "are not articles of commerce" and "cannot be weighted or measured."). A review of precedent reveals that a wrongful death claim such as this could be valued less than $1 million dollars.[7] The Insurance Defendants nevertheless paid the full $1 million and never

---

[7]     *See, e.g., Blakley v. Magic Lube*, CJ-2009-512, 2010 WL 4085547 (Dist. Ct. Cherokee Cnty., Okla.) (surviving spouse received approximately $350,000, and each of

24

made an offer of anything less. But to suggest that this determination is simple or straightforward, or that it requires extensive fact research, is simply unwarranted.

The Insurance Defendants' fact investigation was well within the realm of good faith. The factual issues were established in the lengthy police reports or were otherwise never questioned by ACM. Instead, the complex issues were not factual but primarily legal. Additional fact interviews "would not have changed the underlying facts already known[.]" *Sims*, 469 F.3d at 892. Summary judgment should therefore be granted to the Insurance Defendants on Mrs. Graves allegation of "inadequate investigation."

## V. PLAINTIFF HAS NOT ESTABLISHED SUFFICIENT EVIDENCE OF BAD FAITH DAMAGES TO WITHSTAND SUMMARY JUDGMENT.

As with any tort, a bad faith claimant must establish not only liability, but damages. *See Beers*, 241 P.3d at 292. Oklahoma law recognizes three forms of damages recoverable in a bad faith case: (1) financial losses, (2) embarrassment and loss of reputation, and (3) mental pain and suffering. Okla. Unif. Jury Instr. 22.4. Mrs. Graves has not produced sufficient evidence of damages to submit a question to a jury.

### A. Attorney Fees are Not Recoverable as an Element of Financial Loss.

In discovery, Mrs. Graves states that she paid a $115,000 contingency fee to her counsel and that she is entitled to recover this as economic loss. In *Barnes* the Oklahoma

---

four surviving children received $70,000, for a total of $630,000, which likely was inclusive of both economic and noneconomic damages.); *Shoopman v. Winningham*, No. CJ-2011-1185, 2001 WL 35739076 (Dist. Ct. Tulsa Cnty., Okla.) (surviving spouse and three children shared in $500,000 for "loss of services" and "other," which likely represented grief and other intangible loss.)

Supreme Court held that, just like any tort action, attorney fees are not recoverable as an element of damages in an insurance bad faith case. 11 P.3d at 178-82; *see also Caughron*, at *13-14 (citing *Barnes* and rejecting argument for attorney fees as damages in UM bad faith case). Thus, this argument fails as a matter of law.

This argument is also flawed because it assumes that a UM carrier must prevent a claimant from incurring attorney fees. Oklahoma law has expressly held to the contrary. *See Vickers v. Progressive N. Ins. Co.*, 353 F. Supp. 3d 1153, 1165 (N.D. Okla. 2018) (holding "the simple fact that Plaintiff was required to employ counsel in this case does not demonstrate bad faith."). Mrs. Graves also admitted that the matter was more complicated that she initially thought and retaining counsel helped her understanding of the claims. (Ex. 5 (Graves Dep. 58:4-59:1; 59:23-60:24; 61:2-18)).

There simply is no legal basis to support Mrs. Graves' attorney costs as an element of damages and summary judgment should therefore be granted.

### B.    Mrs. Graves Otherwise Lacks Financial Loss.

Mrs. Graves testified that she received payment from four separate life insurance policies and other benefits available to her totaling $510,000. All but one of the policies were paid within a few weeks of Mr. Graves' death. Her two oldest sons also received $42,000 each shortly after the accident. And Mrs. Graves, along with the two minor children, also received workers' compensation benefits shortly after the accident, and some of those payments continued as of May 2019. (Ex. 5 (Graves Dep. 71:11-79:4)).

Courts have held that recovery of other financial benefits can weigh against a finding

of monetary damages due to a delay in payment. *See, e.g., Williams v. Hartford Cas. Ins. Co.*, 83 F.Supp.2d 567, 572-73 (E.D. Pa. 2000) (finding no bad faith and noting that claimant received workers' compensation and benefits under the Heart and Lung Act during the UM insurers' extended investigation). Receipt of other financial benefits can also establish a lack of bad faith economic pressure. *See id.* (holding that because claimant received workers compensation and other benefits "the length of [Insurer's] investigation cannot be construed as an attempt to use economic pressure, such as lack of income and unpaid medical bills, to force a lower settlement."). Thus, these payments can be used to defend liability on bad faith, and further weigh against any finding of financial loss.

Mrs. Graves otherwise has not identified financial loss. She testified that she did not miss any housing, tuition, or car payments. She also admitted that she had no financial difficulties in moving to Georgia and purchasing a home. She did not testify to any struggle that can be properly characterized as "financial loss" based on her allegation of a delayed payment of the UM policy.[8] (Ex. 5 (Graves Dep. 97:1-100:22)). Thus, summary judgment should be granted on her claim for financial loss.

### C. Plaintiff Has Not Supported Noneconomic Damages Directly Attributable to Any Alleged Bad Faith.

Mrs. Graves testified to embarrassment, loss of reputation, and mental pain and suffering, but the items she identified are not sufficient to support a jury question. More

---

[8] Any claim to financial need also is undermined by the fact that Mrs. Graves waited 5 months to deposit the GEICO check and nearly 4 months to deposit the UM check.

importantly, she has not identified how her alleged damages could be directly attributable to the UM claim. *See Beers*, 241 P.3d at 292 (requirement that "the insurer's violation of its duty of good faith and fair dealing *was the direct cause of the claimant's injury*.").

As to embarrassment and loss of reputation, Mrs. Graves' only testimony was that her children would often ask her when the UM payment might be paid. (Ex. 5 (Graves Dep. 100:23-102:5)). With respect to mental pain and suffering, she testified that she has seen a Christian counselor and has been prescribed sleeping pills. (Ex. 5 (Graves Dep. 102:15-103:5)). But there simply is no basis to tie these items *directly* to her UM claim as opposed to general grief. Summary judgment is therefore proper for the Insurance Defendants.

## VI.  PLAINTIFF HAS FAILED TO ESTABLISH ANY EVIDENCE TO SUPPORT A JURY QUESTION ON PUNITIVE DAMAGES.

The standards for punitive damages are set forth at Okla. Stat. tit. 23, § 9.1, and in Okla. Unif. Jury Instr. 22.5. As this Court has described:

> Under Oklahoma law, "[a]n insurer's violation of the implied duty to deal fairly and act in good faith gives rise to an action in tort for which consequential, and in a proper case, punitive damages may be sought." But the recovery of punitive damages is not automatic. "Even where there is evidence to support the recovery of actual damages in a bad faith action against an insurer, submission of the issue of punitive damages to a jury may be improper."

> Pursuant to 23 Okla. Stat. § 9.1, punitive damages may be available where the insurer has either (1) recklessly disregarded its duty to deal fairly and act in good faith with its insured; (2) intentionally and with malice breached its duty to deal fairly and act in good faith with its insured; or (3) intentionally and with malice breached its duty to deal fairly and act in good faith with its insured, and the Court finds that, beyond a reasonable doubt, the insurer acted intentionally and with malice and engaged in life-threatening conduct.
> . . .

28

> An insurer recklessly disregards its duty to deal fairly and act in good faith with its insured if it "was either aware, or did not care, that there was a substantial and unnecessary risk that its conduct would cause serious injury to Plaintiff." Oklahoma Uniform Jury Instruction (OUJI)-CIV 22.5. The insured's conduct "must have been unreasonable under the circumstances, and also there must have been a high probability that the conduct would cause serious harm to Plaintiff."

*Shotts v. GEICO*, No. CIV-16-1266-SLP, 2018 WL 4832626, *11-12 (W.D. Okla., June 1, 2018) (Palk, J.) (some internal citations omitted).

In *Sims*, the court further described the high standard for punitive damages as being available "*only* when the evidence plainly shows oppression, fraud, malice, or gross negligence." 469 F.3d at 894. (emphasis in original). The court continued by outlining conduct that met this level as including falsifying documents, offering to settle if claimant would fire her counsel, denying coverage on "skeletal information," concealing the identity of its investigators, or obtaining confidential information. *Id*. At issue in *Sims* was a life insurance claim which was denied for suspicion of suicide and a jury award of bad faith and punitive damages. On the issue of punitive damages, the court held "the [insurer's] conduct does not demonstrate the elements of fraud or evil intent to which punitive damages are directed." *Id*. The courts have therefore made clear that punitive damages are only available in limited cases of extreme culpable conduct.

In *Shotts*, the dispute concerned a UM policy issued by GEICO, and GEICO's alleged failure to "promptly" make a substitute payment where the tortfeasor's liability carrier had tendered its limit but not yet paid. This Court granted summary judgment on plaintiff's claim for punitive damages with a focus on the "substantial and unnecessary

risk" of "serious injury" requirement.

> There is no evidence before the Court to show that Geico's handling of
> Plaintiff's claim, including any failure to comply with the *Burch* prompt
> payment requirement, posed a "substantial and unnecessary risk" of "serious
> injury" to Plaintiff. Accordingly, the Court finds Geico is entitled to
> summary judgment on the issue of punitive damages.

*Id*. at * 11.

Nothing in Mrs. Graves' deposition testimony, nor anything else in the record, indicates any risk of serious injury based on an alleged delay in UM payment. To the contrary, the allegations establish that Mrs. Graves suffered no financial loss and there is a lack of noneconomic loss attributable to the processing of her UM claim. Nothing in the record evidences any of the types of "oppressive," "fraudulent," or "evil intent" required for submission of a punitive damages question to a jury. Under the governing standards of Oklahoma law, submission of a punitive damages question to a jury would be improper.

## CONCLUSION

FOR THE FOREGOING REASONS, the Insurance Defendants request that this Court enter summary judgment in its favor on all of Plaintiff's claims.

Respectfully submitted,

s/ Daniel E. Gomez
Daniel E. Gomez, Okla. Bar No. 22153
CONNER & WINTERS, LLP
4000 One Williams Center
Tulsa, OK  74172-0148
Phone: (918) 586-8984
Fax: (918) 586-8311
Email: dgomez@cwlaw.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this the 3rd day of September, 2019, the foregoing document was filed with the Clerk of Court using the court's CM/ECF system and that, based on the records currently on file, the Clerk of Court will transmit Notice of Electronic Filing to the following ECF registrants:

    Howard K. Berry, III, Esq.
    V. Ronald Frangione, Esq.


                s/ Daniel E. Gomez
                Daniel E. Gomez

## APPENDIX OF EXHIBITS

| Exhibit No. | Title/Description |
|---|---|
| 1. | ACM Claims Notes (Excerpts) |
| 2. | Large Loss Reports |
| 3. | Police Reports and Affidavit |
| 4. | Demand Letters and Responses |
| 5. | Transcript of Janet Graves Deposition (Excerpts) |
| 6. | Counsel Letters |
| 7. | Payment Agreements |