## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

JANET GRAVES, surviving widow and      )
Next of kin of NATHAN GRAVES,          )
                                       )
              Plaintiff,               )
                                       )
v.                                     )      No. CIV-19-60-SLP
                                       )
PENNSYLVANIA MANUFACTURERS'            )
INDEMNITY CO., and AMERICAN            )
CLAIMS MANAGEMENT, INC.,               )
                                       )
              Defendants.              )


## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
## JUDGMENT AND BRIEF IN SUPPORT

Howard K. Berry, III, OBA #754
The Berry Law Firm
P.O. Box 892516
Oklahoma City, OK  73189-2516
Phone:  405-524-1040
Fax:  405-524-0108
E-mail: hkb3@coxinet.net
*Attorney for Plaintiff*

September _____, 2019

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.............................................................. ii

TABLE OF AUTHORITIES.........................................................iii

PRELIMINARY STATEMENT.......................................................1

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENTS
OF UNDISPUTED MATERIAL FACTS............................................5

PLAINTIFF'S UNDISPUTED FACTS...............................................8

ARGUMENT & AUTHORITIES.....................................................20

    I.    DEFENDANTS' PAYMENT OF THE $1 MILLION
        SETTLED ONLY THE BREACH OF CONTRACT CLAIM.....21

    II.   THERE IS SIGNIFICANT EVIDENCE OF TORTIOUS
        CONDUCT AS THERE WAS INTENTIONAL DELAY.........21

    III.  THE "SPEEDY PAYMENT MECHANISM" ARGUMENT
        ADVANCED BY THESE DEFENDANTS IS NOT PART
        OF PLAINTIFF'S CONTENTIONS..................................22

    IV.  PLAINTIFF WAS NOT UNCOOPERATIVE......................22

    V.   THERE IS AMPLE EVIDENCE OF INADEQUATE
        OR NO INVESTIGATION...........................................23

    VI.  THERE IS FINANCIAL LOSS, EMOTIONAL DISTRESS,
        EMBARASSMENT, AND ANGUISH..............................24

    VII. THERE IS EVIDENCE TO SUPPORT PUNITIVE DAMAGES.28

CONCLUSION.........................................................................28

CERTIFICATE OF SERVICE........................................................iv

APPENDIX OF EXHIBITS........................................................... v

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998)......................26

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1996).............................26

*Barnes v. Oklahoma Farm Bureau Mutual Insurance Company*, 11 P.3d 162
2000 OK 55 (Okla. 2000)................................................24, 25

*Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080 (Okla. 2005).....................26

*Ball v. Wilshire Ins., Co.*, 221 P.3d 717 (Okla. 2009)..............................26

*Birch v. Polaris Industries, Inc.*,  812 F.3d 1238 (10th Cir. 2015).................26

*Blakley v. Magic Lube*, CJ-2009-512, 2010 WL 4085547 (Dist. Ct. Cherokee
Cnty., Okla.)................................................................24

*Brashier v. Farmers*, 925 P.2d 20 (Okla. 96), 1996 OK 86.........................25

*Brown v. Patel*, 157 P.3d 117, (2007).....................................26

*Burch v. Allstate Insurance Company*, 977 P.2d 1057 (Okla. 1998)...............26

*Christian v. Am. Home Assurance Co.*, 577 P.2d 899 (Okla. 1977)................26

*Dennis v. Progressive Northern Insurance Company*, CIV-17-182-SLP..... 25, 27

*Everaard v. Hartford Accident Indemnity Company*, 842 F.2d 1186...............26

*McCorkle v. Great Atlantic Insurance Company*, 637 P.2d 583....................26

*Mustain v. United States Fidelity and Guarantee Company*,
925 P.2d 533 (Okla 1996)...............................................26

*Sylvia v. Wisler*, 875 F.3d 1307 (10th Cir. 2017)....................................26

*Timmons v. Royal Globe*, 653 P.2d 907, 1982 OK 97...............................25

*Vining v. Enterprise FIN Group, Inc.*, 148 F.3d 1206 (10th Cir. 1998)............27

## Statutes, Regulation & Rules

Okla. Stat. tit. 12, § 1054……………………………………………………………..7

Okla. Stat. tit. 12, § 556……………………………………………………………...25

Okla. Stat. tit. 12, § 3629……………………………………………………………25

**PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT AND OPENING BRIEF IN SUPPORT**

### PRELIMINARY STATEMENT

Janet Graves learned on January 24, 2017, that her husband of 18 years had been killed in the line of duty as a policeman. A 20-year-old named Justin Henley collided his pick-up truck into Nathan Graves' police car as Henley was passing another vehicle in the dark, in a No-Passing-Zone. The vehicle being passed was operated by Tony Gann.

Graves was in his proper lane and couldn't avoid the high-speed, head-on collision.

There was evidence another vehicle operated by Garrett Hunt had passed Gann just before the collision.

Janet was informed days later that there was a $1 Million UM/UIM policy on the police car. She turned the claim into the policy issuer, Pennsylvania Manufacturer's Insurance Company and Vice President of Claims David Matthiessen, who opened a file and assigned a 3rd-Party Adjuster in Colorado to process the claim. This adjuster was named Leikam. Neither Leikam or Matthiessen had ever handled an Oklahoma UM/UIM case, much less a death case with high limits.

Leikam established and noted to the file in February of 2017 that Henley was at fault; Graves was fault free; Henley had $100,000.00 GEICO policy limits; Graves had not only a wife, but 3 children and two parents, and he was 45 years old and making $28,000.00 a year. Leikam and Matthiessen have both testified that they knew almost immediately the claim was worth much more than the $1.1 Million available insurance.

Plaintiff contends that by the end of February 2017, the Defendants had ample

information to offer its $1 Million in UM/UIM coverage and that Ms. Graves' rights to that policy vested at that point. Rather than make that offer, Defendants waited until September 5, 2018 *(19 Months Later)* before offering the $1 Million, only after Graves filed suit.

Defendants claim, and Plaintiff contests, that they had a right to delay payment because they hoped that Henley had additional insurance (perhaps he was on the job at the time of the accident). Defendants also claim, and Plaintiff contests, they were entitled to delay payment because there might be liability on behalf of another driver (Hunt) that had passed in the area but was not involved in the accident.

Plaintiff contends the law in Oklahoma required the Defendants to "promptly aggressively and thoroughly gather facts and, absent evidence of another insurance policy that applied, to offer the Graves family the policy limits".

Plaintiff contends UM/UIM carriers faced with high damages, clear liability and low liability limits on the tortfeasor cannot indefinitely delay payment in hopes that other insurance will ride in and rescue the UM/UIM carrier from its responsibility under its policy.

Otherwise, <u>no</u> UM/UIM claim would ever be promptly paid.

The evidence will show that PMIC and ACM did little, if anything, to find out if Henley was on the job. They did not contact the Oklahoma Highway Patrol who had information on Henley. Notes in the OHP file show that he was on his way to meet someone named Rocky Stevens to go to work for Tank Farms. They did not call Stevens, they did not call his employer Tank Farms, nor did they even attempt to interview any of the eye-witnesses Gann or even Garrett Hunt. Both Gann's and Hunt's names and phone

numbers were on the police report. They also had the name and phone number of the highway patrolman who looked into the homicide case but never called him.

By September of 2018, after Graves decided to consult and eventually hire a lawyer, PMIC offered the $1 Million without ever finding out whether Henley had more insurance.

PMIC/ACM claim they were looking to attorney Daniel Gomez to assist them as they had limited knowledge of UM/UIM law in Oklahoma.

Daniel Gomez may have performed some work while he was involved from February 2017 to September 5, 2018 (when the offer was finally made) but Gomez has chosen to not seek any credit for his work by claiming attorney-client privilege and redacting all evidence of his efforts.

This case is not about the Defendants' failure to properly substitute $100,000.00 within 60 days of learning in writing that GEICO had offered its policy limits. This case is not about the Defendants' post-September 2018 conduct. In fact, once Defendant offered the $1 Million in September of 2018, the Plaintiff initiated negotiations with the Workers Comp Carrier and eventually paid them $220,000.00. Once the $1 Million was offered and negotiations with the Workers Compensation Carrier were underway, the Graves family worked out a division of the remaining funds. By January of 2019, the Defendants had what it needed and wrote a check for $1 Million. When the check was found to be flawed, (it had Nathan Graves listed as a payee), it was replaced in April of 2019 with a proper check.

Plaintiff's claims are only about the eleven (11) months in 2017 and the eight (8) months in 2018 that Defendants failed to *even* underline its policy limits when it should have.

Plaintiff contends omissions of efforts to discover information is actionable. Plaintiff also contends that Defendants lied to Janet Graves in September of 2017 about having a "Investigator" looking into it. Defendants had a <u>lawyer</u> working on it but <u>no investigator</u>. Graves called frequently in 2017 to find out if they had obtained information and were prepared to pay the policy. They assured her they were hard at work to find out. The file does not demonstrate what these efforts were.

Graves claims financial damages by reason of the fact that when Defendants did not offer its policy limits and failed to offer a satisfactory explanation for not doing so, that she was required to consult with a lawyer in March of 2018. That lawyer (Howard Berry) told her he would make some calls and write some letters and get her the $1 Million and would not even charge her as he believed that once he got involved, surely the insurance Defendants would quickly realize their obligation and offer their limits right away. He attempted to obtain an offer from insurance Defendants, but when Defendants continued to refuse to offer their policy, he asked her to retain him on a contingency fee basis and he was eventually paid $115,000.00 out of the $1.1 Million. Graves contends that she should not have been required to hire a lawyer and should not have been required to pay this $115,000.00. She also claims that she was distressed by reason of the fact that the Defendants did not offer the $1 Million when it was clear that they owed it. She believed they were not going to pay it and that is why she decided to hire a lawyer.

Graves contends that:

1.) PMIC had a duty based on what it knew in February 2017 to offer her the policy limits (retaining subrogation rights in case there was more than $100,000.00 in

coverage).

2.) PMIC had a duty to quickly and thoroughly investigate the issue of Henley's employment and Hunt's possible status as a joint or concurrent tortfeasor.

3.) PMIC failed to do the basic things an insurance company would do to discern if other insurance applied but, rather, did nothing meaningful and delayed payment.

4.) A minimal investigation would show Henley was not on the job and only had $100,000.00 in coverage which GEICO was offering to pay.

5.) PMIC's delay worried Janet Graves substantially and contributed greatly to the emotional distress she was enduring over the death, her decision to resign her job for safety reasons, her decision to move to Georgia and purchase a home.

6.) She is entitled to recover the $115,000.00 she paid Berry to get PMIC to offer the $1 Million as well as recover for her actual damages as a result of the additional turmoil she suffered as she worried the claim was being denied.

7.) Defendants' handling of this file is so woeful that punitive damages should be awarded.

## PLAINTIFF'S RESPONSE TO
## DEFENDANTS' STATEMENTS OF UNDISPUTED MATERIAL FACTS

Plaintiff *admits* to paragraphs 1, 2, 3, 5, 6, 7, 8, 10, 11, 16, 18, 19, 20, 21, 22, 24, 25, 26, 27, 28, 29, 31, 32, 33, 34, 36, without qualification or commentary. With regard to the remaining paragraphs, Plaintiff submits the following:

4. Plaintiff settled a lawsuit for breach of contract by paying the amount that was due under

the contract.  Plaintiff specifically preserved her rights to bring this bad faith case.

9.   Plaintiff admits that Daniel Gomez sent letters.   Plaintiff is aware of some correspondence from the insurers of each of these parties in February of 2018.  Plaintiff is not clear with regard to whether or not there was any additional correspondence between Gomez and the Hunts and the Hunts' insurance companies as much of Gomez' activity on the file has been redacted.

12.  Plaintiff agrees that Defendants received written correspondence from Plaintiff's counsel on or about March 28, 2018, that included the written tender for the GEICO.  There were phone calls between Ms. Graves' counsel and both Terry Leikam and Daniel Gomez that preceded the letter of March 28, 2018.

13. In April 2018, defense counsel mistakenly asserted this was ACM's first notice of GEICO's offer.  Defendants' brief here says first "written" notice.  A clever distraction.  In fact, they knew of GEICO's offer in 2017.  Gomez was perhaps not informed of this policy limits offer in 2017 by Leikam.

14. Plaintiff does not contend Defendants' technical failure to substitute is bad faith.

15. Plaintiff is unable to agree that subrogation research had begun, and that legal counsel was retained to further analyze this as the redactions from the claim's file by attorney Gomez has made this determination difficult.

17. To the extent that this fact suggests that Plaintiff did not have a right to file this action before the expiration of the 60-day window, Plaintiff would disagree.

23. Plaintiff disagrees Berry "responded again falsely" during this period of time after the September 5, 2018 offer.  Plaintiff's counsel and Defendants counsel were through

correspondence, phone calls and personal contact, attempting to resolve the issue of whether a personal representative needed to be appointed, whether Janet Graves, as next of kin, could speak on behalf of all the heirs under 12 Okla. Stat. §1054 which allows a widow to maintain the action or whether a written document had to be produced by the Plaintiff and signed by all of the people entitled to proceeds from the wrongful death case. Plaintiff felt that she could, as a 12 Okla. Stat. §1054 widow authorized to bring this case, bring it, settle it and resolve it without additional signatures. After months of wrangling over this, Plaintiff compromised, and Plaintiff submitted a document signed by all of the heirs noting that they were aware of the case. This agreement, along with a "hold harmless agreement" signed by Plaintiff, was enough to get the Defendants to eventually write a check to Janet Graves, Berry Law Firm & Tribal First.

30.  Plaintiff disagrees that Defendant never suggested that Officer Graves' life was worth less than the policy limits.  Attorney Gomez hired an economist and attorney Gomez wrote Berry a letter stating that no determination was made about whether it was worth less than $1 Million.  They planned to do jury verdict research on the value of death cases.

35.  Ms. Graves testified that she put GEICO off on their $100,000.00 policy limits offer at the request of Mr. Leikam, who told her that a settlement with GEICO could compromise some of the claims that Leikam and Gomez were purportedly working on.

37.  Defendants sent Plaintiff a check ***dated January 30, 2019,*** and corrected it not 1½ months later as stated, but rather on ***April 18, 2019***.  It was then deposited, along with the GEICO $100,000.00 liability limits check shortly after it was received, on April 22, 2019.

## PLAINTIFF'S UNDISPUTED FACTS

ARTHUR BATES' DEPOSITION: ( Exhibit 1 )

1. Art Bates is an expert insurance man hired by the Defendant.  He agrees that the Defendants could have offered their policy limits back in 2017 and retained subrogation and he has done this in the past successfully.  (Exhibit 1, Page 204-205)

2. Bates states that the Defendants have an obligation to aggressively find any other insurance as that would benefit not only them but definitely benefit their insured Janet Graves. (Exhibit 1, Page 14-17)

3. Bates agrees that the Defendants never found anything out about Henley's employment or other insurance and just abandoned their claims and made the offer in September of 2018. (Exhibit 1, Page 214, 215, 59 & 60)

4. Bates agrees that the September 5, 2018 offer could have been made in 2017 but they just didn't want to.  (Exhibit 1, Page 32-33)

5. Bates testified that there are a number of deficiencies, odd things and missing elements in the way that the Defendants handled this case.  He says he has no idea why no one called Hunt.  (Exhibit 1, Page 153)

6. Bates says that not calling Tony Gann was a deficiency.  (Exhibit 1, Page 216)

7. Bates doesn't know why Gomez waited until September of 2017 to send a letter to Hunt. (Exhibit 1, Page 213-215)

8. Bates says Trooper Lowe should have been contacted.  (Exhibit 1, Page 51, 52, 53)

9. Bates says if Lowe had been contacted and employment discovered that they would not still be wondering in January of 2018 about other insurance as efforts to contact patrolmen

are often productive and he thinks the information contained in the highway patrol file was "helpful" and should have been discovered. (Exhibit 1, Page 55-58, 118-124)

10. Bates says there isn't any evidence in the file to support the Defendants tried to contact **a.** the highway patrolman who signed the official collision report named Miller; **b.** Cheryl Ramsey, Henley's lawyer; **c.** Henley's parents; **d.** Henley's brother; **e.** Henley's neighbors; **f.** Patti High (District Attorney); **g.** Investigative Solutions (an investigative firm they had doing an assets check); **h.** go to the Preliminary Hearing to find out information or to interview witnesses; **i.** make any efforts to contact Hunt or **j.** even read the Preliminary Hearing Transcript when it was delivered to the file. (Exhibit 1, Pages 93, 94, 95, 98, 99, 101, 102, 103, 106, 96 & 126-128)

11. Bates finds that the failure of the Defendants to even try to find out where Henley worked could be characterized as "not complete" and that the file contained missing elements. (Exhibit 1, Page 97-99)

12. Bates says that if Terry Leikam had done an evaluation of the file as Leikam told Berry in March of 2018 that he had, that Berry was entitled to know what that evaluation was in March of 2018. He acknowledges that Gomez later wrote Berry and told him that their evaluation was not complete but was near complete. (Exhibit 1, Pages 138, 139, 141, 143)

13. Bates acknowledges that this "speedy mechanism" that has to do with offering to substitute or waive subrogation has nothing to do with the Defendants' duty to investigate. (Exhibit 1, Pages 194-195)

14. Bates does not understand what Gomez meant when he wrote that Berry's filing of the lawsuit ended PMA's right to subrogate. (Exhibit 1, Pages 188-191)

15. Bates testified that no demand is necessary from the Plaintiff; that the insurance company has to make an offer. (Exhibit 1, Page 178)

16. Bates agrees that after Gomez offered the $1 Million in September of 2018, that Berry did everything he could to resolve the contractual part of the claim and that 4 months from September would be a reasonable time for Berry to work out the details and to get a check. Berry's furnishing Gomez an agreement on January 7, 2019, that resulted in the check being furnished to Berry was all reasonable. (Exhibit 1, Pages 166-168, 204)(Exhibit 9, copy of January 30, 2019 check)

17. Bates states that if we ignore what Gomez' entries are on the basis that we can't see what was done, then there just wasn't very much done on this file. (Exhibit 1, Page 217)

18. Bates says he can't say that Leikam or Matthiessen did anything to find any coverage between March of 2017 and September 2018. (Exhibit 1, Page 18-21)

19. Bates agrees that it would be wrong for Terry Leikam to tell Janet Graves that he had an investigator working on the case if he didn't. (Exhibit 1, Pages 63-68)

20. Bates says Leikam must have failed to tell Gomez of GEICO's 2017 offer to pay their policy limits, as Gomez wrote a letter in April of 2018 stating Leikam and ACM had first learned of GEICO's offer in March of 2018. Bates believes this failure to communicate was "not good" as that was the type of information that should be free-flowing. (Exhibit 1, Pages 83-85; 88-89)

21. Bates says that if the Defendants' efforts to get an economist, have jury research done and is evidence that they were actually entertaining that the case had less than a $1.1

Million value that "we've got problems with that kind of approach". (Exhibit 1, Pages 115-117)(Exhibit 4, PMA Doc #324)

TERRY LEIKAM'S DEPOSITION: (Exhibit 2 )

22. Terry Leikam is a casualty claims supervisor for American Claims Management which works for Pennsylvania Manufacturers' Indemnity Co. (Exhibit 2, Page 6, 7, 13)

23. Leikam understands the difference between uninsured motorist cases and liability cases and the high duty of care to the UM/UIM claim. (Exhibit 2, Page 20, 21)

24. Leikam had never handled a death case that involved uninsured motorist coverage before this case. (Exhibit 2, Page 26)

25. Leikam agrees that he prepared a February 7, 2017, summary that agreed that PMIC had $1 Million in coverage, the other driver passed in a no-passing zone, the Plaintiff was not negligent, there was a wife, children and parents surviving, the tortfeasor Henley had a GEICO policy with $100,000.00 limit; that Graves was 46 years old and working as a policeman earning about $28,000.00 a year. (Exhibit 2, Pages 116, 117, 25)

26. Leikam communicated Leikam communicated all these facts that he knew in February of 2017 to Dave Matthiessen at Pennsylvania Manufacturers' Indemnity Company who had hired him. (Exhibit 2, Pages 34, 35)

27. Leikam believed the amount of the damages in the case by reason of a death were in excess of the policy limits as early as March of 2017 and he communicated that to Dave Matthiessen. (Exhibit 2, Pages 76, 77)

28. Leikam acknowledges that the fact that Justin Henley who was across the centerline is one of the causes of the accident is enough to trigger coverages under the UM/UIM policy

and that just one uninsured motorist is enough to trigger the policy. (Exhibit 2, Page 47)

29. Leikam admits that he did not contact the investigating officer and that he could have but he didn't. (Exhibit 2, Page 62, 82)

30. Leikam admits he never contacted Garrett Hunt. (Exhibit 2, Page 54, 63)

31. Leikam admits that PMIC's responsibility to Ms. Graves and her family is not dependent upon whether Garrett Hunt contributed to the accident. (Exhibit 2, Page 54, 55)

32. Leikam admits he didn't look into the police report which showed that Rocky Stevens or Tank Farms had information containing Henley's employment. (Exhibit 2, Page 83)

33. Leikam never did anything to find out what the workers compensation lien was. (Exhibit 2, Page 102)

34. Leikam says he was pursuing settlement authority of the $1 Million with Dave Matthiessen and told him that they should pay it but that Matthiessen wanted to get a second opinion even though he had been told by Leikam it was a limits case. (Exhibit 2, Pages 90, 91, 92, 97, 76 & 77)

35. Leikam says they could have tendered the $1 Million but they didn't. (Exhibit 2, Page 77, 78)

36. Leikam admits that he may have got a Preliminary Hearing transcript if it is in the file, but he didn't read it and he may have just put it in the file. (Exhibit 2, Page 80, 81)

37. Leikam says that Janet Graves called him in September of 2017 and wanted to know why they had not found out about other insurance; he told her he had an investigator working on it even though he did not have an investigator. He admits that he may have told her that just to avoid telling her that he had a lawyer working on the case. (Exhibit 2,

Page 32, 33, 104, 105)

38. Leikam admits it would have been a reasonable thing for him to contact GEICO and see if they could help find out if there were any other policies on Henley. (Exhibit 2, Page 108, 109)

39. When Leikam talked to attorney Berry on March 15, 2018, Leikam did not divulge to Berry that they had evaluated the case well in excess of the policy limits. (Exhibit 2, Page 95)

DAVE MATTHIESSEN DEPOSITION: ( Exhibit 3 )

40. Dave Matthiessen is the Vice President of Claims for Pennsylvania Manufacturers' Indemnity Company and handled this case. It was his first uninsured motorist claim in Oklahoma. (Exhibit 3, Page 4, 6, 7, 16)

41. Matthiessen said it was important for PMIC to find out how much coverage Henley had. (Exhibit 3, Page 25)

42. Matthiessen said that after he saw the large loss report of February 20, 2017, that it was clear to him that this was a claim that was going to have to be paid. (Exhibit 3, Pages 29, 30, 31, 32, 69, 70)

43. Matthiessen agrees they could have paid $1 Million to the Graves' family initially and retained their subrogation rights against Henley and Hunt and got their money back if it turned out that they were entitled to it. (Exhibit 3, Page 58)

44. Matthiessen did not learn in 2017 from Leikam that GEICO had offered its policy limits. (Exhibit 3, Page 91) (Claims File Note from October 2017)

45. Matthiessen was still not ready to pay the $1 Million in April of 2018, even after Berry

had entered the case and was making a demand.  (Exhibit 3, Page 67)

46. Matthiessen admits that he never did find out anything about Henley's employment but eventually just became satisfied that there was only $100,000.00 worth of coverage by the passage of time and lack of information.  (Exhibit 3, Page 6, 27)

CLAIMS FILE DOCUMENTS: (Exhibit 4) – and - OHP FIELD NOTES: (Exhibit 5)

47. PMIC's first large loss report of February 20, 2017, reveals the basic facts about the accident and concludes that "we believe we have enough information to determine liability. It appears the other driver was fully at fault for attempting to pass when unsafe to do so and that no comparative negligence is found on the part of Nathan Graves".  The document confirmed the $100,000.00 in liability coverage, $1 Million in uninsured motorist coverage and discussed that it had occurred to them that the tortfeasor might be in the scope of employment.  The document says "we will investigate whether that is the case".  Plaintiff contends in this lawsuit that her right to the $1 Million policy vested when this large loss report was prepared in February 2017.  (Exhibit 4, PMA 196-200)

48. There was a police report in the claims file in early 2017 that contained both the phone numbers of Garrett Hunt and Tony Gann.  (Exhibit 4, PMA 159)

49. On July 20, 2017, Janet Graves called Terry Leikam and told him that the investigating homicide trooper's name was James Lowe and that his phone number was 405-425-2323. (Exhibit 4, PMA 68)

50. Pages 34, 61, 62, 18, 19, 20, 21, 22 are pages from the highway patrolman field notes revealing that Trooper Matthew White talked to Henley on the day of the accident and Henley told him that he was going to meet his boss at 6:00 a.m.; that Rocky Stevens was

the one he was going to meet and that they were going to work for Tank Farm Services with an office at 3923 N. Little St., in Cushing, OK; that Brian and Jenna Wade had telephone numbers of 918-306-0493 and they owned Tank Farms Services; that Henley was to meet Rocky Stevens and they would park in a commuter parking area and ride together to the job site. (Exhibit 5, OHP Field Notes)

51. GEICO made a policy limits offer of $100,000.00 to Ms. Graves and this was communicated to Terry Leikam by her brother Robert Keene and by Janet Graves in early 2017. Leikam noted to the file on October 9, 2017, that GEICO had made a policy limits offer to Graves' widow. (Exhibit 4, PMA 217)

52. Leikam also noted on October 9, 2017, after he had heard about the economist's report, that they believed the economic damages are in the range of $5-600,000.00 and that the non-economic damages are "significantly more than the economic damages". (Exhibit 4, PMA 217)

53. In September of 2017, Graves called Leikam and wanted to know why they had not found out any more about the insurance or the other tortfeasors and he told her that he spoke to their investigator and would call her back once he knew more. (Exhibit 4, PMA 58)

54. In January of 2018, Terry Leikam noted to the file he believed they had evaluated the total exposure and "believed the total value was within the UM/UIM limits". He said that there may be enough insurance to fully compensate and eliminate an exposure to the UM/UIM file. (Exhibit 4, PMA 225)

55. On January 11, 2018, Leikam noted to the file he was asking counsel to research

whether Janet Graves not making a claim against Hunt would affect her ability to pursue a UM/UIM claim. Plaintiff contends that Defendant was entertaining denying the UM/UIM claim because she was not pursuing anything against Hunt. (Exhibit 4, PMA 225)

56. On October 9, 2017, Leikam had noted to the file that "in the event Ms. Graves makes a demand for UM settlement, determine whether the UM claim was preserved. (Exhibit 4, PMA 217)

57. Even after the economist report came out in October 2017 and showed $600,000.00 in economic damages and substantially more in non-economic damages, the Defendant was still noting to its file that they would have Defense counsel "review prior jury verdicts on fatality car accidents to determine a range of non-economic specials". (Exhibit 4, PMA 217)

58. Berry contacted Leikam on March 15, 2018, and said he was making a $1 Million demand to be paid within 7 days. (Exhibit 4, PMA 42)

59. In April of 2018, Leikam attempted to get Matthiessen to pay $1.1 Million but Matthiessen wanted to consider getting a subrogation attorney. (Exhibit 4, PMA 36, 37)

60. Attorney Gomez wrote Berry a letter in April of 2018 stating that Berry's letter of March 28, 2018, enclosing the written policy limits offer from GEICO was "the first time ACM had been made aware of the tender by Mr. Henley's liability carrier of its policy limits". (Exhibit 4, PMA 324)

61. Leikam had failed to tell Gomez of the GEICO policy limits offer. (Exhibit 4, PMA 217)

62. As late as April 2018, attorney Gomez stated to Berry that "no final decision has been

made as to whether this claim is valued at, above, or below the $1 Million UM policy limits, nor has it been finally determined whether liability coverages may be available for the accident. As a general matter, we discussed the valuation of wrongful death claims can be difficult". (Exhibit 4, PMA 324)

63. Gomez wrote Berry in April of 2018 and again on May 29, 2018, stating that their evaluation was nearly complete and a good faith offer was "forthcoming". (Exhibit 4, PMA 325, 406)

64. Matthiessen and Leikam agreed to offer the $1 Million and waive subrogation a few weeks prior to August 1, 2018, but this was never communicated to the Plaintiff until September 5, 2018. (Exhibit 4, PMA 7)

65. Attorney Gomez wrote attorney Berry on September 5, 2018, and referred to the lawsuit that Berry had filed in May of 2018 and said "the filing ended any possible subrogation by PMA". He went on to say that since the lawsuit had ended their possible subrogation that they would waive it. (Exhibit 4, PMA 424)

66. Art Bates, expert for the Defense, says he is puzzled by what Gomez might have meant as there is no way that the filing of a lawsuit could end any possible subrogation by PMA. (Exhibit 1, Bates Depo 187-190)

67. PMA and ACM Claims Services documents require a "timely and thorough investigation that is conducted with urgency and a thorough analysis of the facts." (Exhibit 4, PMA 440 & 447)

JANET GRAVES' DEPOSITION ( Ex. 6) and ROBERT KEENE DEPOSITION (Ex. 7)

68. Janet Graves was married to Nathan Graves and came home from taking her kids to

school and found a bunch of police cars out in front of her house. That is how she was notified of Nathan's death. (Exhibit 6, Page 25)

69. Graves and her brother, Robert Keene, visited with Terry Leikam very soon after the accident and Leikam represented that there would not be any problem with getting this money paid quickly. (Exhibit 6, Page 33)(Exhibit 7, Pages 4, 13, 17, 19, 20)

70. Graves contacted Leikam many times and each time he represented to her that he was working hard on the case and they were having investigators figure this out so she would be paid quickly. (Exhibit 6, Page 41, 42)

71. Janet Graves left her job at Tinker as an airplane mechanic in 2017 because she felt like she was too emotionally unstable as a result of his death to be working on airplanes. She moved to Dallas, Georgia with her children to be near her family and purchased a home there with the proceeds of life insurance. (Exhibit 6, Page 10, 11, 12)

72. Graves says Leikam consistently told her that the issue was whether Henley was on the job and had additional insurance. (Exhibit 6, Page 42)

73. Graves says Leikam knew that GEICO was willing to pay their $100,000.00 and she told him about it on several occasions. (Exhibit 6, Page 55, 56, 58, 109, 108)

74. When Graves learned that Leikam had an economist working on the case to evaluate the damages, she became frustrated as she had bee told by Leikam that there wasn't an issue about the amount and that she would be paid out in full. (Exhibit 6, Page 42, 43, 44)

75. Graves did not want to hire a lawyer to help her collect the $1 Million because she knew a contingency fee lawyer would want a 1/3 fee. She told Leikam that. (Exhibit 4, PMA 199 )

76. As the months went by, and the UM carrier continued to stall her, Graves became very frustrated. She worried that perhaps she had made a bad decision about leaving her job in Oklahoma City and purchasing a home in Georgia for her children and her to live in relying upon Leikam's representation that the $1 Million would be coming to her. She told her children they would be getting some money, and as the months went by, she was not able to give them any as the settlement was not going through. She suffered embarrassment and mental distress over this. (Exhibit 6, Pages 99, 100, 101, 102, 111)

77. Graves, frustrated, emotionally upset over this treatment, eventually hired a lawyer named Berry who took the case on a limited contingency fee basis and charged her $115,000.00 for collecting the $1.1 Million that she was clearly owed. This contract was executed in May of 2018, approximately two months after Berry had contacted Leikam and urged him to pay the $1 Million within 7 days.

DEBORAH RANKIN REPORT:  ( Exhibit 8 )

81. Rankin said that Leikam and PMIC had plenty of information in February of 2017 and should have offered the $1 Million and retained subrogation rights so that it could explore if it had any rights to recover from any other insurance companies. (Exhibit 8, Page 14)

82. Rankin says that once the Defendants knew that GEICO only had $100,000.00, the Defendant is automatically liable for its damages up to its policy limits subject to subrogation rights. (Exhibit 8, Page 14)

83. Rankin says that the Defendants appeared to be waiting for a demand from the Plaintiff when no demand is necessary under Oklahoma law. (Exhibit 8, Page 13)

84. Rankin says the Defendants were telling the Plaintiff that the case was being investigated but it wasn't. (Exhibit 8, Page 12)

85. Rankin says that they failed to perform a reasonable investigation as they failed to contact the highway patrol, failed to contact witnesses, failed to find out more about family relationships, and did not address the issue of Hunt's involvement until eight (8) months after the accident. (Exhibit 8, Pages 9, 10, 11)

86. Rankin says the value of the case was over $1.1 Million at first glance, and especially became very clear when the economist's report said that the economic damages were at $5-$600,000.00. (Exhibit 8, Pages 12, 13)

## ARGUMENT & AUTHORIES

These facts are admittedly exhaustive, but this case merits the effort. These facts were carefully edited to include every thread, as best known, of evidence to weave into the tapestry of the truth of this case. These Defendants purposefully, with advice of counsel, abused their position of power and slow-played this policeman's widow just because they thought they could? Why they would want to do this is not known but it is clear they did. Knowingly, intentionally, they withheld payment. Even after an established member of the Bar volunteered to assist her without compensation, these Defendants continued to slow-play her and her attorney. Only after a bad faith lawsuit was filed on May 24, 2018, did counsel for these Defendants then call on May 25, 2018, and offer to give Graves the $100,000.00. Not until 3 months later, did they offer their $1 Million policy limits.

## I  DEFENDANTS' PAYMENT OF THE $1 MILLION SETTLED ONLY THE BREACH OF CONTRACT CLAIM

Only the Breach of Contract claim was settled.  Not the Bad Faith claims.

## II  THERE IS SIGNIFICANT EVIDENCE OF TORTIOUS CONDUCT AS THERE WAS INTENTIONAL DELAY.

There is more than simple negligence here.  This is not a driver "failing to see a stop sign" case.  This is not a clerical error.  This is a case where an experienced Vice President of Claims of a major insurance company, a seasoned adjuster, and a lawyer who claims expertise in Oklahoma uninsured/underinsured motorist cases repeatedly violated basic principles of Oklahoma law.  They had all the facts necessary to trigger payment in February of 2017, but knowingly decided not to pull the trigger of payment.  They took a convenient for them "let's wait and see" attitude, while the widow Graves wallowed in wonderment of when or whether she would ever be paid the promised money.  This is an intentional, purposeful delay to Graves' detriment, apparently sanctioned by experienced counsel Gomez.  This was not a valuation dispute or squabble over whether a water leak caused structural v. cosmetic damage.  This was a thought out, 19-month delay, orchestrated by Pennsylvania Manufacturers' Indemnity Company's Vice President of Claims.

There was not legitimate dispute here.  There was only the hope of the UM/UIM carrier that there was other insurance.  If such hope was their basis for delay, it was incumbent upon Defendants to find out if their hope had a heart and soul or was merely a pipe dream.  Evidence here shows that these Defendants did nothing to find out if their hope had any basis in facts.  The facts here show these Defendants ignored its duty to pay

in February 2017, failed to investigate whether its reason for delay had a basis and, even after a lawyer gave them a cut-off notice in March 2018, they elected to delay payment again. This is more than a case of simple negligence. Defendants claim at Page 16 of its Brief that "the totality of the undisputed facts show active claim evaluation during these months". Where? The totality of these facts leads these Defendants' expert Arthur Bates to conclude that these Defendants did little, if anything, to find out if Henley had more insurance or if Hunt was liable. Defendants contend Plaintiff must make a clear showing of facts that can reasonably be perceived as tortious". How about evidence that these Defendants did <u>nothing</u> to find out if Henley had more insurance, but finally paid up in September of 2018 after a bad faith case was filed?

Defendants seem to take pride in the fact that they never offered Ms. Graves less than the policy limits. They offer that to somehow take the sting out of the fact that they offered her the policy limits 1 9 months late, after a period of time she was emotionally wounded, vulnerable, fearful and afraid.

## III   THE "SPEEDY PAYMENT MECHANISM" ARGUMENT ADVANCED BY THESE DEFENDANTS IS NOT PART OF PLAINTIFF'S CONTENTIONS.

These Defendants failed to waive subrogation or substitute payment during the 60 days allotted to them but they told Plaintiff on the last day they would substitute payment. They never did, alleging it was Plaintiff's fault. Plaintiff has elected not to contend that was Bad Faith.

## IV   PLAINTIFF WAS NOT UNCOOPERATIVE

Not until May of 2018, did these Defendants in any way concern themselves *with*

the issue of "who to pay". That was only in connection with the $100,000.00 payment substitution they wanted to make. Not until September of 2018, when these Defendants finally offered its policy limits, was the "who to pay" issue even relevant. Once Defendants offered its $1 Million, Plaintiff undertook to resolve the workers comp lien and, only after Defendants persisted in getting signatures of all the Graves' heirs, did Berry provide these signatures. To suggest that the Plaintiffs were somehow uncooperative in this case would be disingenuous, at best.

## V   THERE IS AMPLE EVIDENCE OF INADEQUATE OR NO INVESTIGATION

Plaintiff has clearly established that these Defendants did nothing to find out about Henley's employment and did little to find out if Hunt shared any responsibility. For Defendants to say there is not sufficient evidence of "inadequate investigation" as they do at Page 22 of their Brief, when these Defendants did not call any witnesses, such as Gann or Hunt, Trooper Lowe, The Wades, Henley's attorney, the GEICO adjuster, or anyone else, to find out if Henley had insurance is wrong. If someone does nothing to investigate an issue, then it is fair to say their investigation is inadequate. There was nothing here and certainly nothing that could be said to be "reasonably appropriate under the circumstances".

Defendants' basis for non-payment was a concern that Henley was on the job and had insurance that might eventually be recoverable and might lower Defendants' financial responsibility. Additionally, they thought Hunt's liability might produce insurance that would help them. With $1 Million at Stake, you would think they would do something to determine these issues. Defendants' second excuse is that Hunt may have been partly at

fault. Why not call him? Why wait until September and just write a letter and drop it? No way this is adequate in a case where $1 Million was hanging in the balance.

Defendants, at Page 24 of its Brief, integrates the cases of *Blakley v. Magic Lube,* CJ-2009-512, 2010 WL 4085547 (Dist. Ct. Cherokee Cnty., Okla.) and *Shoopman v. Winningham*, No. CJ-2011-1185, 2001 WL 35739076 (Dist. Ct. Tulsa Cnty., Okla.). This is done, presumably, to show the Court that perhaps these Defendants' reluctance to value the case at over $1.1 Million was justified. The file does not reflect they knew of these cases in 2019 or 2018. Defendants claim here that it recognized the high value (over $1.1 Million) of the case but, at the same time, seem to cling to the possibility of a lower value on the case. Remember, these Defendants wanted counsel to do jury verdict research, get an economist's report, and tell lawyer Berry that it wasn't sure the case was worth $1 Million, even though both Leikam and Matthiessen felt it was. These Defendants cite *Blakley* as a case of wrongful death that was only valued at $630,000.00. In fact (see Exhibit 10), Blakley settled for over $1.4 Million. This case involved disputed liability when an 88-year-old man fell into the oil pit at the oil change place. To compare this case to the Graves case seems irrelevant. The Graves case was worth $3-4 Million – at least. There was only $1.1 Million in insurance and $4-500,000.00 in life insurance.

## VI  THERE IS FINANCIAL LOSS, EMOTIONAL DISTRESS, EMBARASSMENT, AND ANGUISH

In *Barnes v. Oklahoma Farm Bureau Mutual Insurance Company*, 11 P.3d 162, 2000 OK 55 (Okla. 2000), the Court said, ¶52 "although there are situations where Plaintiff may be able to recover attorneys fees as part of his or her damages in either a contract or

tort claim, neither the situation existent in *Brashier v. Farmers,* 925 P.2d 20 (Okla 96) 1996 OK 86, nor the instant matter is one of them." This case is not comparable to *Brashier* or *Barnes.* In both those cases, the victorious Plaintiff made an application for attorneys fees. In *Barnes,* the Court disallowed it on the basis of that would be in violation of the "American Rule". The American Rule is based on the idea that attorneys fees to the victorious party should only be awarded if there is a statute that so allows or a contractual provision that specifically allows it. That is not the case here. In this case, Janet Graves has incurred and paid an expense that was unnecessary and she should be allowed to submit to the jury and allow the jury under 12 O.S. § 556 to award attorneys fees. This Plaintiff Graves is not bringing this action under 36 O.S. § 3629 and so the exclusion for uninsured motorist cases contained in that statue need not apply. This Plaintiff should be allowed to make proof of all of her damages. In this case, the Plaintiff actually spent money, paid it out of her settlement that she should have had without an attorney, and merely seeks to be reimbursed. In *Barnes,* the Court went on to say that in cases where the Plaintiff has had to incur expense to protect their interest, such as in *Timmons v. Royal Globe,* 653 P.2d 907, 1982 OK 97. Graves had to hire an attorney to protect her interest after her insurance company wrongfully refused to do so.

Graves does have financial loss. This is not a case where a Plaintiff is seeking attorney's fees for breach of contract or somehow for prosecution of a tort claim. This is a case where the Plaintiff actually incurred a financial loss and seeks reimbursement.

In *Dennis v. Progressive Northern Insurance Company,* CIV-17-182-SLP (3-23-18), the Plaintiff settled her claim against the tortfeasor and one uninsured motorist carrier

before proceeding to trial against Progressive. Progressive was a second UM carrier that had $25,000.00 in coverage that Plaintiff contended she was owed. By February 14, 2014, Progressive was in possession of the majority of the medical bills and lost wage information. Nevertheless, Progressive decided it needed more information and delayed payment. On April 22, 2014, Plaintiff made a demand for Progressive's $25,000.00 policy. When the demand was not paid, suit was filed and after some discovery, Defendant paid the $25,000.00 in September of 2014. Plaintiff contended that the delay of 222 days from February 14, 2014 until September 23, 2014 was the basis for the bad faith claim.

Citing *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242 (1986); *Birch v. Polaris Industries, Inc.,* 812 F.3d 1238 (10th Cir. 2015); *Adler v. Walmart Services*, 144 F.3d 664 (10th Cir. 1998); *Sylvia v. Wisler*, 875 F.3d 1307 (10th Cir. 2017), this Court found that summary judgment is precluded if there are issues of material fact that need to be decided.

This Court went on to cite *Christian v. AM. Home Assur.,* 577 P.2d 899 (Okla. 1977); *Ball v. Wilshire Insurance Company*, 221 P.3d 717 (Okla. 2009); *Brown v. Patel*, 157 P.3d 117; *McCorkle v. Great Atlantic Insurance Company,* 637 P.2d 583; along with *Badillo v. Mid-Century Insurance Company*, 121 P.3d 1080 (Okla 2005) and *Everaard v. Hartford Accident Indemnity Company*, 842 F.2d 1186, as the Court recognized an uninsured motorist carrier's responsibility to act in good faith toward the Plaintiff, absent a reasonable basis for delaying payment.

This Court also noted the UM/UIM carrier's status as a primary coverage under *Mustain v. United States Fidelity and Guarantee Company*, 925 P.2d 533 (Okla 1996) and *Burch v. Allstate Insurance Company*, 977 P.2d 1057 (Okla 1998).

The Court said that "although Progressive's investigation may well have been thorough, whether the circumstances justified Progressive's delay in making payment to Plaintiff until it being the investigation complete was the pivotal issue." In that case, just as this case, that is the pivotal issue. In this case, Plaintiff contends that these Defendants had a basis in February of 2017 to make the offer but delayed that until September of 2018 (19 months – 550 days).

The Court stated that the additional medical bills that the defendant used to justify its delay were minimal and noted that by February of 2014 the Defendant had authorizations to get the medical information and wage information needed. This Court also noted that "at the time of payment, Progressive had gathered very little additional information".

This fact also tracks this case as these Defendants here did not gain any additional information during this 19 months on the issues of Henley's employment or Hunt's involvement.

This Court held that they were disputed issues of fact as to whether this Defendant, Progressive, impermissibly delayed payment.

In *Dennis*, the Plaintiff did not claim financial damages, but merely sought damages for embarrassment, loss of reputation and emotional distress as does this Plaintiff. Citing *Vining v. Enterprise FIN Group, Inc.*, 148 F.3d 1206 (10th Cir. 1998), this Court noted that in a bad faith claim, Plaintiff does not have to show severe emotional distress or outrageous conduct. This is because of the special relationship between the UM/UIM carrier and the Plaintiff. This Court denied Defendant's Motion for Summary Judgment and allowed that

case to go to the jury.

## VII  THERE IS EVIDENCE TO SUPPORT PUNITIVE DAMAGES

In this case, Terry Leikam realized this was a case that should be paid as early as February 2017. He made several efforts to get management to agree. Management wanted a lawyer, then an economist, then jury verdict research. All of this after Leikam told Janet Graves that payment of the policy would be made quickly. Management didn't stop there. Management wanted to know if Graves waived her UM rights by not pursuing Hunt. Management wanted to know if this delay could be justified by Graves not making a demand.  Possibly, this failure to investigate Henley's employment and Hunt's involvement was based on the idea that if they did investigate, they would find out they really did owe their policy limits of $1 Million.

Even after Plaintiff hired a lawyer and Leikam asked Matthiessen again to pay, Matthiessen insisted on getting this Chicago lawyer into the case. Finally, even after the Chicago lawyer gave them no hope and Matthiessen and Leikam agreed to pay the $1 Million in June or July, they waited until September 5, 2018, to make the offer.

This case cries out for punitive damages. No widow, children or surviving parents, anguishing in the worst two years of their lives, should ever be treated like this again. And that's why we have punitive damages.

### CONCLUSION

The February 2017 information was perfectly adequate to trigger an offer of $1 Million. These Defendants failed to fulfill its responsibility under Oklahoma law to offer. If these Defendants were going to refuse to offer on the basis that there might be additional

insurance out there, that does not excuse them from their duties that they owed to Plaintiff in February of 2017.   To the extent that these Defendants want to use the possibility of other insurance as an excuse for further delay, these Defendants had the responsibility of investigating and determining whether or not there was other insurance.   They did not investigate; they never made that determination.   The information where Henley worked and the fact that he was not on the job but merely going to work was available for them to find but they did not.   This failure to investigate and discover the truth about their so-called excuse for not fulfilling their duties is a second infringement of Janet Graves' rights.   She had to wait and wonder when or whether she was ever going to be paid, then had to make the agonizing decision to retain an attorney and give up part of her settlement.   Would there be some emotional distress attached to signing over $115, 000.00 of your future to a lawyer?

FOR THESE FOREGOING REASONS, this Plaintiff requests summary judgment be denied.

Respectfully submitted,

_____
Howard K. Berry, III, OBA #754
The Berry Law Firm
P.O. Box 892516
Oklahoma City, OK  73189-2516
Phone:  405-524-1040
Fax:  405-524-0108
E-mail:  hkb3@coxinet.net
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this _____ day of September, 2019, the foregoing document was filed with the Clerk of Court using the courts' CM/ECF system and that, based on the records currently on file, the Clerk of Court will transmit Notice of Electronic Filing o the following ECF registrants:

Daniel E. Gomez

V. Ronald Frangione

s/Howard K. Berry, III
Howard K. Berry, III

# APPENDIX OF EXHIBITS

**Exhibit No.**          **Title/Description**

1.          Arthur Bates / Deposition

2.          Terry Leikam / Deposition

3.          Dave Matthiessen / Deposition

4.          Claims File Documents

5.          OHP Field Notes

6.          Janet Graves / Deposition

7.          Robert Keene / Deposition

8.          Deborah Rankin Report

9.          January 30, 2019 Check

10.         Blakley Case Document