IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JANET GRAVES, surviving widow and Next of kin of NATHAN GRAVES, <br><br> Plaintiff, <br><br> v. <br><br> PENNSYLVANIA MANUFACTURERS' INDEMNITY CO., and AMERICAN CLAIMS MANAGEMENT, INC., <br><br> Defendants. | No. CIV-19-60-SLP |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS DEBORAH RANKIN

COMES NOW the Plaintiff, Janet Graves, surviving widow and next of kin of Nathan Graves, and respectfully moves this Court to deny Defendants' motion to exclude testimony of Plaintiff's expert and allow all of her testimony to be heard. Reference is made to Plaintiff's Response to Motion for Summary Judgment and exhibits which support this response as well.

### INTRODUCTION AND SUMMARY

Plaintiff's husband, Nathan Graves, was killed on January 24, 2017, when an underinsured motorist crossed the center line in a no-passing zone causing a head-on collision. The vehicle in which Nathan Graves was driving was insured by Pennsylvania Manufacturers' Indemnity Company and had $1 Million in uninsured motorist coverage. The coverage on the vehicle operated by the driver that crossed the center line had

$100,000.00 in coverage. Janet Graves opened a file with PMIC and PMIC, working through an adjuster in Colorado named Terry Leikam, documented the fact that there was this UM coverage, the amount of the liability coverage, the absolute fault of Justin Henley, the fact that Graves was married for 18 years, had several children and two parents; that he was 45 years old and making $28,000.00 a year. According to the Defendants' adjuster, Terry Leikam, and the claims supervisor with PMIC, they both immediately recognized that this type of case would exceed the total availability of policy limits of $1.1 Million. Plaintiff contends that the Defendants, rather than recognize their duty under the law of Oklahoma to offer their policy limits of $1 Million to go along with the $100,000.00 being offered by GEICO, decided to delay payment. Plaintiff contends they had an absolute duty to make an offer of the $1 Million and could have reserved their subrogation rights in the event there was additional coverage available that became known in the months immediately after the accident.

Defendants, rather, delayed payment on the basis that the tortfeasor <u>might</u> have another insurance policy available to him if he was perhaps on the job or something like that at the time of the accident.

Defendants also contend that they were entitled to delay payment on the basis that there was another vehicle operated by Garrett Hunt that was not involved in the accident but might have contributed to the accident. Plaintiff contests that Defendants had the right to delay payment based on these notions that perhaps there was more insurance or perhaps Garrett Hunt had some responsibility.

Expert witnesses Deborah Rankin and Arthur Bates disagree on whether the Defendants had the right to delay payment at all on this basis.

Even assuming that the Defendants were justified in taking some time to rule out any additional coverages, everyone agrees that the Defendants had a duty to make a timely, thorough and somewhat urgent investigation into the facts of Henley's employment and Garrett Hunt's responsibility. In fact, in the months following all through 2017 and early 2018, neither Leikam nor Matthiessen did anything to find out whether there was any insurance. Specifically, they did not contact the highway patrolman who had information that would have resolved it. The highway patrolman knew where Henley worked and what his activities were on the morning of the accident. He knew Henley was merely on his way to work. This was all contained in the OHP file that the Defendants never saw. They never contacted Mr. Hunt for eight (8) months. Then, a lawyer named Gomez wrote Hunt a letter but apparently did not attempt to contact Hunt personally either by phone or by personal visit. Plaintiff contends that these Defendants did virtually nothing throughout 2017 and 2018 to resolve the issue of Henley's employment and Hunt's possible involvement in the case.

In March of 2018, Janet Graves asked a lawyer to intervene and attorney Berry made contact with Leikam and attorney Gomez and gave them a seven (7) day deadline to pay the $1 Million. They did not. Leikam sought authority from Dave Matthiessen at PMIC but Matthiessen would not give the authority and instead, wanted to hire someone named Lowell Snorff out of Chicago (an attorney) to do some work on the case. After Berry was

unsuccessful in getting them to pay Graves, Berry asked Janet Graves in mid-May 2018 to sign an attorneys fee contract giving him a portion of any settlement that she might achieve. Berry filed a Breach of Contract and Bad Faith case against Defendants. By mid-July, the Defendants were ready to give up and agreed to offer the $1 Million and waive subrogation on the $100,000.00. They did not have any additional information on the employment issues. Rather than immediately contact Graves and her attorney with this information, they did nothing throughout the month of July and August and eventually asked the lawyer named Gomez to notify Berry in September of 2018 that it was finally ready to make the offer.

## DEBORAH RANKIN QUALIFICATIONS

Rankin has been an adjuster in Oklahoma for 35 years. She worked for State Farm. Almost half of her career was on handling UM/UIM cases. Hundreds of cases were handled by her. She has trained UM/UIM adjusters and conducted classes on UM/UIM coverages. She specialized in the issues presented in this case.

Here are just some of the issues in the case that Plaintiff believes are technical enough to require expert testimony:

1. Whether this UM/UIM carrier could or should offer $1 Million even though the issue of Henley's (the tortfeasor) employment had not been completely cleared up

2. Whether the UM/UIM carrier in this case could or should offer $1 Million even though Hunt's actions/involvement were not 100% cleared up.

3. Whether by offering $1 Million and retaining subrogation would result in a reimbursement to PMIC later on if it turned out Henley had some large policy that covered him.

4. Whether offering $1 Million and retaining subrogation would result in a reimbursement to PMIC if Hunt could be sued and money recovered from a large insurance policy on him.

5. Is a UM/UIM carrier in a situation like this responsible to make an offer without a demand. The experts agree that the answer is "yes". Leikam and Matthiessen have no clue. Without expert testimony, the jury will have to wonder about the truth. This is true about many of these issues.

6. What resources does a UM/UIM carrier have to find out if Henley was working for someone at the time of the accident.

7. What resources does a UM/UIM carrier have to find out if there was insurance covering Henley if it turned out Henley was in the course and scope of his employment.

8. What resources does a UM/UIM carrier have to find out if Henley and Hunt were somehow working together on the morning of the accident.

9. What resources does a UM/UIM carrier have to find out if Hunt had some responsibility here by reason of his actions under Oklahoma law.

10. What can a UM/UIM carrier do to preserve its subrogation rights once a written offer of policy limits by the tortfeasor is communicated to it when there has not been

a personal representative appointed.

11. How long should it take to resolve factual issues such as are presented in this case that PMIC felt were not resolved initially?

12. Since Terry Leikam knew that GEICO had offered its policy limits back in October of 2017, should he have communicated that to Daniel Gomez and Dave Matthiessen? (Gomez wrote Berry in April of 2018 that he did not know ACM had learned in 2017 of the policy limits offer. Matthiessen testified that he didn't learn it until deep into 2018 that there had been a policy limits offer)

13. Is contacting the OHP in a case like this something that insurance adjusters do commonly to discover facts necessary to properly and promptly process a claim?

14. Is law enforcement typically cooperative to parties in a civil matter or uncooperative as Defendants and their expert contends?

15. When did PMIC have adequate information to offer $1 Million? February of 2017 after their first Large Loss Report? October of 2017 after the Economist's Report was filed which indicated economic loss of $600,000.00 and it was noted to the file that the non-economic loss exceeded the economic loss?

16. Would PMIC have needed to hire an economist to conclude that this case stated $1.1 Million in damages?

17. Was there a reason that several months in 2017 and 2018 reflected absolutely no activity in the claims file by the Defendant?

18. When the Chief Operating Officer of PMIC (Tom) suggested to the Vice President of Claims (Dave Matthiessen) in June of 2017 that they should be "more aggressive" with the investigation, were there things that could be done that would meet that suggestion? *What were they? What does that mean to an insurance adjuster?*

19. Is sending a letter, certified, to Hunt eight months after the accident a timely and adequate effort to contact Hunt? When the letter was returned, should there have been follow up?

20. Should someone have gone to Hunt's house or try to call him on the phone number that was on the police report?

21. When Graves consulted a lawyer and Berry made a $1 Million demand and gave them 7 days to pay in March of 2018, did PMIC respond appropriately?

22. Was Gomez' letter to Berry in April of 2018 when he states that ACM did not know until Berry's letter of March 28, 2018 that GEICO offered its policy limits an appropriate response given that ACM had noted in its file in 2017 that GEICO had offered their policy limits?

23. When Leikam asked Vice President of Claims Matthiessen in April of 2018 to pay the $1.1 Million, should Matthiessen taken action to grant that request or was he within his rights to refuse Leikam and bring in a new lawyer from Chicago to get further information?

24. When PMIC decided in mid-July of 2018 to go ahead and offer $1 Million and waive subrogation, should that have been communicated to Graves and her attorney

before September 5th when it was finally done?

25. Did the filing of the lawsuit by Berry "end" PMIC's possible subrogation rights as contended by Daniel Gomez in his September 5th 2018 letter?

26. Was Gomez actually forced to waive subrogation (*because of Berry filing lawsuit*) against his will as the letter suggests?

27. Does this letter of September 5th 2018 really indicate a lack of understanding of how uninsured/underinsured motorist coverage works?

28. Does Janet Graves have a responsibility to come forward with facts regarding Henley's employment, Hunt's responsibility, etc., or is that completely the responsibility of the UM/UIM carrier?

29. Can a UM/UIM carrier avoid its responsibility by delegating to a 3rd party adjuster (Leikam) or a law firm (Gomez)?

30. Was this file being handled in a way that would justify Janet Graves to retain counsel in March 2018 despite the fact that she stated to Leikam and it was noted in the file that she did not want to hire a lawyer and sign a contingency fee agreement?

31. Was it appropriate for Berry, before requesting a contingency fee in May of 2018 to attempt to accelerate payment with a $1 Million – 7 day demand in March of 2018?

32. Should the Defendants have taken more action once Berry was involved to get the Graves family an offer?

33. Were the Defendants using this "hope" that Henley had another policy or that Hunt committed actions that were actionable as a pretext for not paying Janet Graves?

34. If the Defendant was not sure what the value of Nathan Graves' life was and needed an Economist Report, should they have contacted Janet Graves, her children and his parents to size up the non-economic loss?

35. Does the file suggest that the Defendants were considering offering less than $1 Million? (See Gomez' letter of April 4, 2018), despite their current testimony that they immediately knew it was a policy limits case?

36. Whether it is consistent with good claims practices for Leikam to tell Janet Graves in September of 2017 that he had an "investigator" working on the file when he did not have an investigator working on the file? Graves had called Leikam that day wondering what was taking so long to find out about the *possibility of* other insurance?

37. Once the Economist's Report came out at $600,000.00+ and Leikam stated the non-economic loss was greater than the economic loss, should that have immediately caused then an offer to be made?

38. Since both experts agree that no demand is necessary in Oklahoma in a UM/UIM case, and since Leikam requested that information from Gomez, should Gomez have told him immediately "NO".

39. What actually triggers the UM/UIM policy here?

40. Does the fact the GEICO only have $100,000.00 do it?

41. Since there was a workers compensation lien in this case, is the Defendant entitled to require that it be resolved before issuing payment?

42. Couldn't Defendant offered to pay $1 Million and put the workers compensation carrier on the check as a payee?

43. Since the Defendants wanted to protect all of the people that were entitled to part of the $1 Million under the wrongful death statute, could the Defendants offer to pay $1 Million and put all the claimants names on the check?

44. When Berry first spoke to Terry Leikam in March of 2018 and Berry asked if they had done an evaluation and Leikam said he had, should he have divulged what it was?

45. If the 3rd party adjusting firm, working with a lawyer, comes to the conclusion that payment of the policy limits is appropriate and wants to make an offer, is it reasonable for the Vice President of Claims to refuse and get another lawyer involved?

## INFORMATION FROM DEPOSITIONS

Terry Leikam says that the case was complicated and difficult. (Leikam Depo, Pages 47, 58, 61 & 120)(Exhibit 1). Matthiessen agrees that it was difficult. (Matthiessen Depo, Pages 35, 50, 56, 58 & 77)(Exhibit 2). Arthur Bates agrees with Leikam and Matthiessen that the case was complex, unique and difficult to understand for a layman (Bates Depo, Pages 12, 13, 156, 157, 158, 208 & 209)(Exhibit 3). Art Bates says that he thinks his testimony is necessary in the case as he can help the jury understand the workings of an insurance company. He says that Joe Blow on the street doesn't understand insurance cases very well and specifically he says that "I think it would be important to explain how

UM coverage is triggered, yes" (Bates Depo, Pages 25, 26, 27)(Exhibit 3).

Art Bates says "I can explain to them maybe why some of the time gaps seem longer than normal because it is not a simple case and it's not a simple case from several factors" (Bates Depo, Page 27, 28)(Exhibit 3).

Bates says "who all has a right to the case, who all has a right to make a claim, and in this case it was complex. I was just looking at my report. We had 5-6 issues that definitely need to be cleared up. We have one known tortfeasor, and possibility of a second tortfeasor . . . Hunt. We have legal issues as to whether Henley was on any kind of a mission for somebody that might trigger a policy somewhere. There is a joint venture issue and I know that is a legal issue, but it is something that claims has to be aware of to potentially trigger someone else's policy that might not be affected in this case. Determine whether or not there is an umbrella coverage for an excess policy on his own policy" (Bates Depo, Pages 29, 30)(Exhibit 3).

Bates says that if the insurance company wrote a check and retained its subrogation rights that the Plaintiff couldn't cash the check. This is one of the issues upon which the parties disagree. Without the benefit of expert testimony, the jury will never be able to have any information on what the truth is (Bates Depo, Page 38, 39)(Exhibit 3).

It is important to note that neither Leikam or Matthiessen know much about Oklahoma Uninsured Motorist law. They got attorney Gomez in to help them. They are not reliable authorities on what the proper procedures are on how to handle an Oklahoma UM/UIM policy. Deborah Rankin is. Art Bates is. Without Rankin or Bates as witnesses,

the Plaintiff would be limited to what the insurance Defendants' employees say and they admit they are not knowledgeable.

Judge Frizzell's opinion in *Bright v. Ohio National*, 11 CV 475 GKF-FHM (Jan 9, 2013) is not a personal injury-type of case but is rather one involving disability insurance. The expert there did not have any qualifications concerning disability insurance. In this case, Rankin has years of experience in handling UM/UIM cases.

In *Sean Johnson v. GEICO*, CIV-07-868-M, Judge Miles LaGrange allowed Jack Dawson, attorney, to testify about how insurance claims should be handled on the basis that he has practiced law in the area of bad faith for a number of years. The Court limited his testimony and excluded him from testifying about the ultimate issue in the case – Defendants bad faith/good faith.

Judge Frizzell, in *O'Mara v. Geico General Insurance Company*, Case No. 09-CV-229-GKF-FHM (N.D. Okla. Jul. 1, 2010)(Minute Order 232 of 7-5-10), allowed Plaintiff's expert Diana Luther to testify about how medical records are gathered, how HIPPA authorizations can be used to gather records, how long it takes to gather medical records and what GEICO's ability was to have gathered those records by August of 2007. He did not allow her to testify on the issue of whether Defendants' behavior was bad faith or good faith.

This Court in *Galbraith v. State Farm Fire & Casualty Co.*, CIV-16-1227-SLP (7-20-18) was faced with the propriety of a lawyer testifying about how a property damage claim involving wood floors and a water leak should have been handled.

The Court noted that Jack Dawson was not a licensed insurance adjuster, nor had he handled an insurance claim for over 50 years. Dawson's a top trial lawyer who has skills beyond the courtroom that he hoped would aid the jury. In contrast, Deborah Rankin has been in the UM/UIM department State Farm Insurance Company for almost 20 years and knows a lot more about the intricacies of UM/UIM claims than Jack Dawson would know about wood floors, water leaks and property damage claims. See Rankin's qualifications in her report attached to defendants' Motion To Exclude her testimony (Doc 22-Ex 1).

This Court said "this case is a rather straight forward bad faith dispute without multiple policies at issue or overly complicated questions . . ." Plaintiff contends that this Defendant has made this case complicated by withholding payment when Plaintiff's rights were clearly vested in February of 2017. Defendants have offered multiple excuses about why it delayed payment and these are the kinds of things that the jury needs to hear from an expert on. How will the jury know if these excuses are legitimate or not?

*Higgins v. State Farm Auto Property Casualty Insurance Company*, 11-CV-90-JHP-TLW (6-21-12), cited by Defendants, was a case again where Judge Payne decided that Mort Welch, an attorney, did not need to testify as the Court felt the issues were simple. The issues here have been made complicated by Defendants.

The expert need not express herself as an authority on the law. What the law is – is one thing. How the law applies to this Defendants' conduct *as it directly relates to Oklahoma UM/UIM claim handling* is quite another thing. These insurance professionals are knowledgeable enough about the law to know how the law applies to

13

uninsured/underinsured motorist situations. That is what the jury needs to hear, not opinions about what the law is.

Defendants spend a lot of time complaining about the fact that Deborah Rankin did not offer any commentary about anything past September 5, 2018, and about the attachments to her report. Plaintiff is not complaining about any events after September 5, 2018. That is when the much sought and much delayed offer was finally made and that is what the Plaintiff contends should have been done back in 2017.

As to the attachments to Plaintiff's expert report, these are not exhibits that Deborah Rankin created. A Federal Rule of Civil Procedure (F.R.C.P. 26(a)(2)(B)(iii) states that when expert reports are filed, any exhibits that are summary exhibits or may be used to support the expert's testimony should also be included. All of these attachments are documents that counsel for the Plaintiff prepared and attached pursuant to that rule believing that they should be. Counsel for Defendants understandably did not understand that these exhibits were prepared by counsel for the Plaintiff.

## CONCLUSION

There is no doubt that expert witnesses are overused. The old lyric, "you don't need a weatherman to know which was the wind blows" is still true.

But the fact they are overused should not be an argument that leads to their under use. In many cases, experts are necessary and rather than make a general finding that experts in Bad Faith cases are unnecessary, this Court should look at this case. Truly there are issues presented that the average lawyer, much less the average juror, doesn't know the

answer to. The experts here agree on some points but disagree on others. Sure, they are opposite sides of the case being paid by opposing parties, but what they have to say is important. How is a jury to know whether a 19-month delay under these facts is appropriate? Seems like a long time but Defendants have a complicated excuse about joint tortfeasors, excess insurance, unseen insurance policies, etc.

Deborah Rankin is an experienced *Oklahoma* UM/UIM adjuster with a major company who Plaintiff wants to call as a witness in a case made complicated by these Defendants

FOR THE FOREGOING REASONS STATED ABOVE, Plaintiff requests this Court DENY Defendants motion to exclude Plaintiff's expert witness, Deborah Rankin.

Howard K. Berry, III, OBA #754
The Berry Law Firm
P.O. Box 892516
Oklahoma City, OK  73189-2516
Phone: 405-524-1040
Fax: 405-524-0108
E-mail: hkb3@coxinet.net
***Attorney for Plaintiff***

16

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this _____ day of September, 2019, the foregoing document was filed with the Clerk of Court using the courts' CM/ECF system and that, based on the records currently on file, the Clerk of Court will transmit Notice of Electronic Filing to the following ECF registrants:

Daniel E. Gomez

V. Ronald Frangione

s/Howard K. Berry, III
Howard K. Berry, III