## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

JANET GRAVES, surviving widow and    )
next of kin of NATHAN GRAVES,    )
    )
    Plaintiff,    )
    )
v.    )    Case No. CIV-19-60-SLP
    )
PENNSYLVANIA MANUFACTURERS'    )
INDEMNITY CO., and AMERICAN    )
CLAIMS MANAGEMENT, INC.,    )
    )
    Defendants,    )
    )
and    )
    )
ALLIANT INSURANCE SERVICES    )
d/b/a TRIBAL FIRST FOR HUDSON    )
INSURANCE COMPANY,    )
    )
    Intervenor.    )

## <u>O R D E R</u>

Before the Court is Defendants' Motion for Summary Judgment and Brief in Support [Doc. No. 21]. Plaintiff has responded and Defendants have replied [Doc. Nos. 24 and 30].[1] The matter is fully briefed and ready for decision. For the reasons set forth, Defendants' Motion is GRANTED in part and DENIED in part.

## I.    <u>Background</u>

Plaintiff brings this action alleging bad faith breach of an insurance contract by Defendants Pennsylvania Manufacturers' Indemnity Company (PMA) and American

---

[1] Citations to the parties' submissions reference the Court's ECF pagination.

Claims Management, Inc. (ACM).[2]   The   policy at issue is an uninsured/underinsured

motorist (UIM) policy.

The action arises out of a fatality accident.   Nathan Graves, a law enforcement

officer for the Sac & Fox Nation, was struck in a head-on collision and suffered an almost

immediate death.   He was hit by a vehicle driven by Justin Shea Henley (Henley) who was

across the center line of traffic, attempting to pass in a no-passing zone.   Henley was

determined to be 100% at fault for the accident and GEICO, his liability insurer, paid its

policy limits of $100,000.00.

Plaintiff, Janet Graves (Ms. Graves), the surviving widow of Nathan Graves, sought

to recover under the UIM insurance policy issued by PMA to the Sac & Fox Nation and

covering the vehicle the deceased was operating at the time of the fatal accident.   AMC

processed the claim on behalf of PMA as a third-party administrator.

PMA received notice of the claim made on the UIM policy in January 2017, within

a few days of the accident.   PMA issued payment on the claim for the full policy limits of

$1 million, approximately two years later, on February 1, 2019.

As a preliminary matter, Plaintiff concedes that she has received payment of the full

policy limits and, therefore, that she has no viable breach of contract claim against

Defendants.   *Cf. Porter v. Farmers Insurance Co*., 505 Fed. Appx. 787, 791 (10th Cir.

2012) (insured failed to offer evidence of damages resulting from alleged breach since

---

[2] The parties refer to Defendant Pennsylvania Manufacturers' Indemnity Company as "PMA" and documents and other materials in the record similarly refer to Defendant as "PMA."  For purposes of consistency, the Court does the same.

insurer tendered policy limits).  Defendants, therefore, are entitled to summary judgment on any breach of contract claim alleged by Plaintiff.

But Ms. Graves contends PMA and ACM breached their duty of good faith and fair dealing by failing to promptly investigate, evaluate and pay the UIM claim and that she has suffered damages proximately caused by that breach.

Defendants move for summary judgment on grounds the undisputed, material facts demonstrate, as a matter of law, that they acted in good faith.  Defendants further move for summary judgment on grounds that even if they did not act in good faith, Ms. Graves cannot establish any damages proximately caused by their conduct.  Additionally, Defendants seek a ruling from this Court that Plaintiff has not established any evidence sufficient to submit the issue of punitive damages to a jury.

## II.   <u>Governing Standard</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In deciding whether summary judgment is proper, the court does not weigh the evidence and determine the truth of the matter asserted, but determines only whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *see also Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015).  An issue is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998).  An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim. *Id*.  In evaluating a motion for summary

judgment, a district court must consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from those facts in favor of that party. *Sylvia v. Wisler*, 875 F.3d 1307, 1328 (10th Cir. 2017).

## III. **Undisputed and Material Facts**[3]

The parties do not dispute that Nathan Graves was an insured under the UIM policy or that coverage existed under the policy. And, as set forth, the parties also do not dispute that PMA made payment of the fully policy limits of $1 million thereby satisfying its contractual obligations.

The following facts chronology the events that transpired during the course of the claims handling and are material to the issue of Defendants' alleged bad faith. Terry Leikam, a casualty claim supervisor, handled the claim for ACM as third-party administrator on behalf of PMA. He reported to Dave Mathiessen, the vice president of claims at PMA. *See* Leikam Dep. [Doc. No. 24-2] at 15:1-7, 35:4-6.

Mr. Leikam opened the claims file on February 2, 2017. On February 20, 2017, Mr. Leikam completed an initial report and stated: "[w]hile we wait for the final Oklahoma State Highway Report, we believe we have enough information to determine liability" and "[i]t appears the other driver is fully at fault for attempting to pass when unsafe to do so." *See* Loss Reports [Doc. No. 21-2] at 4. The report notes that "[n]o comparative negligence is found on the part of Nathan Graves" and that the "liability determination will be

---

[3] Included here are those material facts supported by the record and not genuinely disputed in the manner required by Fed. R. Civ. P. 56(c).

confirmed upon additional investigation." *Id.*   The report further notes that Ms. Graves "is not hiring counsel at this time as she wants to avoid paying a substantial sum from a prospective settlement for attorney work." *Id.*   Mr. Leikam further reported that he had "engaged Daniel Gomez Esq. of the Conners Winters Law Firm to assist us in navigating this claim." *Id.* at 5.   Mr. Leikam included the following as part of the "[p]lan for the next 90 days": (1) "[c]ontinue our investigation and confirm our liability determination"; (2) "obtain Nathan Graves' prior medical records to determine whether he had any chronic health issues that would be considered terminal"; (3) "[o]btain Law Enforcement accident report for tortfeasor's contact information" and "send investigator to take his statement and determine whether he has any other liability coverage available to him"; and (4) "[s]end updated report to the carrier at or within 90 days." *Id.* at 4-5.

On February 3, 2017, Mr. Leikam had obtained the name and address of Henley, the tortfeasor, and information pertaining to his liability insurance through GEICO. *See* ACM Claim Notes [Doc. No. 21-1] at 6.   GEICO had advised Mr. Leikam that it did not know whether Henley was acting within the scope of his employment at the time of the accident and, if so, whether the employer's insurance would be primary or secondary to Henley's insurance with GEICO. *Id.*

Mr. Leikam next updated the claims file on April 18, 2017.   He requested "authority to post indemnity reserves of the $1 million policy limits." *Id.* at 4.   He stated the investigation was continuing as to "requests for the decedent's past medical history and employment history" and further noted that a potential additional tortfeasor had been identified. *Id.*

5

On May 30, 2017, Mr. Leikam spoke to Ms. Graves.  At that time he had received releases to obtain Nathan Graves' medical and employment records.  *Id*. at 2.  He advised Ms. Graves that he was "still looking into the possibility of additional liability insurance." *Id*.

Thereafter, on June 1, 2017, Mr. Leikam received an email from Mr. Matthiessen who advised him to increase the reserves to $1 million dollars.  *See* ACM Claim Notes [Doc. No. 24-4] at 8.  Mr. Matthiessen notes that "Tom has requested we try to be more aggressive with the investigation."  *Id*.[4]  That same month, ACM retained an expert economist to help value the claim.

One month later, in July 2017, Ms. Graves advised Mr. Leikam that Henley, the tortfeasor, had been charged with first degree manslaughter and that the supplemental report from the Oklahoma State Highway Patrol (OSHP) had been issued.  *See* ACM Claim Notes [Doc. No. 24-4] at 7.[5]

On July 11, 2017, Mr. Leikam updated the report on the claim to note that Henley, the tortfeasor, had personal auto insurance through GEICO and that he had confirmed that GEICO was accepting full liability for the accident."  *See* Loss Reports [Doc. No. 21-2] at

---

[4] According to Mr. Leikam's testimony, "Tom" is the president of Old Republic.  Leikam Dep. at 116:1-8.  Mr. Matthiessen testified that the proper name of Old Republic is Old Republic Specialty Insurance Underwriters which is not an insurance company but underwrites insurance business. The record does not establish the exact nature of the relationship between Old Republic and Defendant PMA, but PMA is "an Old Republic company."  Matthiessen Dep. [Doc. No. 24-3] at 7:2-5, 8:6-12. The exact nature of the relationship is not material to any issues presently before the Court.

[5] The initial report from the OSHP was prepared in January 2017.  Ms. Graves notified Mr. Leikam of a supplemental report prepared on July 6, 2017.  *See* OSHP Reports [Doc. No. 21-3].

16.   He further noted that "[w]e continue to pursue information to determine our exposure." *See id*.  Mr. Leikam also noted that Mr. Graves' employment records had been received and "sent to our damages expert." *Id*.  Medical records had not yet been received. *Id*.  Mr. Leikam noted that the investigation of possible joint tortfeasors had been hampered because the OSHP had not issued their final report. *Id*. at 16-17.  Mr. Leikam further noted the possibility of "filing a suit against the tortfeasor to promote our investigation into insurance and joint tortfeasor." *Id*. at 17.  His 90-day plan was to: (1) "[c]ontinue with our investigation into damages"; (2) "[c]ontinue our investigation in identifying join tortfeasor and other liability insurance policies"; (3) "[c]ontinue communication with the Estate of Graves"; and (4) "[c]onsider filing suit to preserve our subrogation claim and/or promote investigation." *Id*.

In September 2017, Ms. Graves notified Mr. Leikam that she had received a letter from GEICO addressed to the executor of Nathan Graves' estate.  ACM Claim Notes [Doc. No. 24-4] at 6.  She told Mr. Leikam that Mr. Graves had died intestate.  She further inquired why Mr. Leikam had not found out about other insurance or joint tortfeasors.  He told her that he had spoken to "our investigator" and that the investigation had stalled "due to the criminal adjudication against the tortfeasor driver." *Id*.[6]

---

[6] Mr. Leikam testified that, in fact, no "investigator" worked on the file and that he was referring to Defendants' attorney, Mr. Gomez.  He also testified that he did not tell Ms. Graves that he had an attorney working on the case. *See* Leikam Dep. at 105:5-16.  Defendants contend Ms. Graves was aware that an attorney was involved based on certain email correspondence and copies of letters provided to her with counsel's letterhead. *See* Defs.' Reply, ¶ 6.

On September 26, 2017, Mr. Gomez sent demand letters to two possible joint tortfeasors – Garrett Hunt, who was in a vehicle immediately preceding Henley's vehicle and who had successfully made the pass, and Hunt's employer, Hunt's Welding Service, LLC. (Hunt's Welding).  Henley had followed Hunt and attempted to also pass but, as set forth, collided with Nathan Graves.  Mr. Gomez made demand that they pay their share of liability to "contribute to payment to Mr. Graves' estate."  *See* Demand Letters [Doc. No 21-4] at 1 and 4.

On October 9, 2017, Mr. Leikam again updated the claim file report.  He noted that the demand letters had been sent to Garrett Hunt and Hunt's Welding.  He also noted that GEICO had made a "policy limits offer" and that Ms. Graves had asked for advice about the process for approving payment but that he told her he could not give advice and suggested she hire an attorney.  *See* Loss Reports [Doc. No. 21-2] at 31.  Mr. Leikam further noted: "[w]e continue to review damages and believe that the economic damages associated with Mr. Graves' death are in the range of $500k to $600k" and that while the non-economic damages had not yet been determined, "we believe they are significantly more than the economic."  *Id*.[7]  As part of the 90-day action plan, Mr. Leikam noted the following: (1) "[p]ress Garrett Hunt and Hunt Welding for a response to our letters;" (2) '[m]aintain communication with the Estate of Graves;" (3) should Ms. Graves make a demand for "UM settlement determine whether the UM claim was preserved and whether

---

[7] The economist hired by ACM completed his report on September 29, 2017 and estimated economic damages in the range of $500,000.00 to $600,000.00. *See* Pl.'s Statement of Undisputed Material Facts, ¶ 7 (citation omitted).

we should pay GEICO's bodily injury limits to preserve our subrogation rights;" and (4) "[h]ave defense counsel review prior jury verdicts on fatality car accidents that may compare to this accident to determine a range of non-economic specials." *Id.*

In January 2018, Mr. Leikam again updated the claim file report. He noted that the demand letters sent to Garrett Hunt and Hunt Welding had been returned as undeliverable and that efforts to locate them had been increased. He stated that their contact information would be provided to Ms. Graves so that she could pursue her tort claim against them. He also noted that: "[c]ounsel will research whether a claimant's passive dismissal of a tort claim (not making one) affects claimant's ability to pursue a UIM claim." See Loss Reports [Doc. No. 21-2] at 32.[8] Additionally, he noted that counsel would research "whether a UIM carrier has an obligation to make an offer of settlement in the absence of a demand from the claimant." *Id.* Mr. Leikam also addressed the valuation of the claim – both the economic and non-economic exposure. He stated that he believed the total value was "within the UIM limits" and that the existence of other liability insurance "may fully compensate claimant's loss and eliminate an exposure to the UIM file." *Id.* He also noted that Ms. Graves "seems less than motivated to settle the tort and UIM claims until after the criminal adjudication of tortfeasor driver Henley" and that an evidentiary hearing had been set for March 9, 2018. *Id.*

---

[8] The import of Mr. Liakem's statement appears to contravene well-established Oklahoma law that an insured "may proceed against the underinsurer without first adjudicating the liability issues against the tortfeasor." *Buzzard v. Farmers Ins. Co., Inc.*, 824 P.2d 1105, 1112 (Okla. 1991).

In February 2018, Defendants received notice from the  liability insurance carrier for Hunt's Welding that its investigation did not "reveal any negligence on our insured, Hunt's Welding Service or of the insured driver, Garrett Hunt."  *See* correspondence [Doc. No. 21-4] at 7.

In March, 2018, Ms. Graves hired an attorney, Howard K. Berry, III (Mr. Berry). On March 15, 2018, Mr. Leikam spoke to Mr. Berry, who wanted to know the status of identifying additional policies of liability insurance and whether anything had been done to "value the UIM claim."  Mr. Berry made a demand that the $1 million policy limits be paid within seven days.  Mr. Leikam's claim notes reflect that he told Mr. Berry that an evaluation of the claim had been made.  *See* ACM Claim Notes [Doc. No. 21-1] at 1. Thereafter, on March 28, 2019, Mr. Berry sent a written notice to Defendants of GEICO's tender of the $100,000.00 liability policy limits of the tortfeasor, Henley.  *See* correspondence [Doc. No. 21-6] at 3.

On April 4, 2018, Mr. Gomez, counsel for Defendants, sent a letter to Mr. Berry. He advised that no final decision about the valuation of the claim had been made nor had it been determined what other liability coverages may be available.  He further advised that Defendants had engaged an expert to assist in the valuation and that the expert "required a significant amount of information."  *See* correspondence [Doc. No. 21-6] at 5-6.

On May 24, 2018, Ms. Graves filed her lawsuit against Henley and Defendants. Thereafter, On May 29, 2018, Mr. Gomez notified Mr. Berry that PMA would be substituting payment of GEICO's offer of the $100,000.00 liability limits of the tortfeasor, Henley.  He also notified Mr. Berry that a formal offer to resolve the claim in its entirety

was forthcoming.  *See* correspondence [Doc. No. 21-6] at 8.  Mr. Gomez also advised that he would need guidance on how to direct the payment of the $100,000.00 due to the fact that Nathan Graves had multiple heirs.  *Id*.  Mr. Gomez further inquired about other UIM coverage held by Ms. Graves and death benefits she may have received under a workers' compensation policy.  *Id*.

In June 2018, Mr. Leikam again updated the claim file report to note that an attorney, Lowell Snorf, had been retained "to assess our subrogation potential against the negligent driver (Henley) and possible joint tortfeasors (Garrett Hunt and Hunt Welding)."  *See* Loss Reports [Doc. No. 21-2] at 32.  Mr. Leikam's notes reflect that Garrett Hunt had a "$300,000 policy" but that PMA would only be allowed to pursue his policy if Henley asserted a negligence claim against Garrett Hunt and that it was "questionable" whether that would happen.  *Id*.

Mr. Leikam also noted that Ms. Graves had hired an attorney and demand had been made upon PMA to substitute payment for Henley's policy limits of $100,000.00.  Mr. Leikam additionally noted that there were payment issues for the substitute payment related to determining all heirs of Nathan Graves' estate.  And, Mr. Leikam noted that Ms. Graves had brought a bad faith action against PMA.  *Id*.  He stated that "[t]he total value of the claim is likely above our policy limits[.]"  *Id*. at 33.

On August 1, 2018, Mr. Matthiessen sent an email to Mr. Leikam confirming that PMA agreed to waive subrogation and offer the $1 million UIM policy limits for settlement.  *See* ACM Claim Notes [Doc. No. 24-4] at 2.  Thereafter, on September 5, 2018, Mr. Gomez sent Mr. Berry a letter and offered the full policy limits in settlement of the

UIM claim.  *See* correspondence [Doc. No. 21-6] at 17-18.  From September 2018 through April 2019, the parties continued to address payment issues related to the multiple heirs of Nathan Graves and issues related to a workers' compensation lien.  *See* correspondence [Doc. No. 21-6] at 20-40.  Once those issues were resolved, PMA tendered payment of the $1 million policy limits.[9]

## IV.   Discussion

In this case, federal subject matter jurisdiction is predicated on diversity of citizenship.  Therefore, Oklahoma law governs Plaintiff's bad faith claim.  *See, e.g., Universal Underwriters, Ins. Co. v. Winton*, 818 F.3d 1103, 1105-06 (10th Cir. 2016).

### A.   Questions of Material Fact Exist as to Whether Defendants Acted in Bad Faith by Conducting an Inadequate Investigation and/or Unjustifiably Delaying Payment

Under Oklahoma law, an insurer has a duty to act in good faith and to deal fairly with the insured to ensure that the policy benefits are received.  A violation of that duty gives rise to a tort cause of action.  *Christian v. Am. Home Assur. Co.*, 577 P.2d 899, 901 (Okla. 1977).  A "clear showing" that the insurer acted unreasonably and in bad faith is necessary to show a breach of that duty."  *Id.* at 905.

Plaintiff's response to Defendants' Motion narrows the issues and renders moot certain matters raised by Defendants.  Plaintiff does not premise her bad faith claim on any failure by Defendant to timely waive subrogation or make substitute payment of GEICO's

---

[9] Additional evidence, to the extent relevant, will be addressed below.

liability limits offer pursuant to Oklahoma's statutory provisions regarding UIM insurance. *See* Okla. Stat. tit. 36, § 3636(F).   Thus, the Court deems it unnecessary to address Defendants' arguments related thereto.   *See* Def.'s Mot. at 22-24.   Nor does Plaintiff premise her bad faith claim on Defendants' conduct subsequent to PMA's offer of its $1 million policy limits in September 2018.   *See* Pl.'s Mot. at 7-8.   Plaintiff states in her response that her claims "are only about the eleven (11) months in 2017 and the eight (8) months in 2018 that Defendants failed to *even* <u>offer</u> its [sic] policy limits when it [sic] should have."  Pl.'s Resp. at 7.   Defendants' arguments that Plaintiff was uncooperative, raised as an affirmative defense to her bad faith claim, address conduct by Plaintiff either related to the substitute payment issue or occurring after this time period and, therefore, are not material to the issue of bad faith.[10]

The Court now turns to the conduct which serves as the basis for Plaintiff's bad faith claim.   Plaintiff's bad faith claim is premised on Defendants' alleged inadequate investigation and unjustified delay in offering the UIM policy limits of $1 million. Disputed issues of material fact preclude summary judgment on these issues.

To establish a prima facie case against an insurance company for a bad faith delay in payment, Plaintiff bears the burden of proving that: (1) she was entitled to coverage under the policy at issue; (2) Defendants had no reasonable basis for delaying payment; (3)

---

[10] Defendants point to Plaintiff's alleged lack of cooperation in providing information necessary to determine heirship so as to assist Defendants in making proper payment of policy proceeds to multiple heirs.  As stated, Plaintiff's bad faith claim is not premised on any delay by Defendants in *making* payment, once the offer of the full $1 million policy limits was made.  Instead, Plaintiff claims Defendants acted in bad faith due to their delay in *offering* the full policy limits.

Defendants did not act fairly and in good faith with Plaintiff; and (4) Defendants' breach of its duty of good faith and fair dealing was the direct cause of Plaintiff's injury. *Ball v. Wilshire Ins. Co.*, 221 P.3d 717, 724 (Okla. 2009). All four elements must be established to support a bad faith claim. *Id.* "[A] duty to timely and properly investigate an insurance claim is intrinsic to an insurer's contractual duty to timely pay a valid claim." *Brown v. Patel*, 157 P.3d 117, 122 (Okla. 2007); *see also McCorkle v. Great Atlantic Ins. Co.*, 637 P.2d 583, 587 (Okla. 1981) ("[T]he tort of bad faith with regard to the insurance industry is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under the policy[.]").

Under Oklahoma law, an "uninsured motor vehicle" includes an "underinsured motor vehicle", i.e., "an insured motor vehicle, the liability limits of which are less than the amount of the claim of the person or persons making such claim, regardless of the amount of coverage of either of the parties in relation to each other." Okla. Stat. tit. 36, § 3636(C). "Both uninsured and underinsured coverage are first-party coverage intended to protect the insured from loss incurred because of a third-party tortfeasor." *Buzzard,* 824 P.2d at 1110. "[A]s between the insurer and its insured UM insurance is primary coverage." *Mustain v. United States Fid. & Guar. Co.*, 925 P.2d 533, 536 (Okla. 1996).

"[U]nderinsurance . . . becomes available . . . when the claim exceeds the amount of liability coverage." *Id.* at 1112. "[E]xhaustion of limits is not required as condition precedent to recovery." *Buzzard*, 824 P.2d at 1112

Thus, the Oklahoma Supreme Court has explained:

If the claim exceeds the amount available under the liability policy, the underinsurer must take prompt action to determine what payment is due and may not delay the payment of benefits until exhaustion of liability limits. The underinsurer may not safely await settlement between the liability insurer and the insured. Instead, the insurer must go about the business of investigating and evaluating the claim. An insurer is readily equipped to make such a determination, and to assign a dollar value to the claim. Once this is accomplished, if the insurer determines that the claim does not exceed liability limits, and such valuation is supported by reasonable evidence, the underinsurer may delay payment. *However, if the underinsurer does not conduct an investigation, or after investigation, determines that the likely worth of the claim exceeds the liability limits, prompt payment must be offered*.

*Id*. (emphasis added); *see also Burch v. Allstate Ins. Co*., 977 P.2d 1057, 1065 (Okla. 1998) (UM coverage "is primary meaning that an uninsured motorist carrier is liable for the entire amount of its insured's loss from the first dollar up to the UM policy limits without regard to the presence of any other insurance.").

Plaintiff contends that as early as February 2017, Defendants had a duty to offer Plaintiff the $1 million policy limits, while retaining any subrogation rights. Plaintiff further contends Defendants had a duty "to quickly and thoroughly investigate the issue of Henley's employment and Hunt's possible status as a joint or concurrent tortfeasor." According to Plaintiff "[a] minimal investigation would show Henley was not on the job and only had $100,000.00 in coverage which GEICO was offering to pay. *Id*. at 9.

The factual record, construed in the light most favorable to Plaintiff, shows that as early as March 2017, Mr. Leikam believed "the amount of noneconomic damages in association with the economic damages were going to be in excess of [the UIM] policy limits," and communicated that to Mr. Matthiessen. Leikam Dep. at 76:20-77:3. At least as of October 2017, Defendants knew the tortfeasor's liability limits were $100,000.00 and

15

knew that amount would be insufficient to satisfy the loss at issue.[11]  Moreover, Mr. Leikam

testified that as of December 2017, he knew the $1 million policy limits were going to have

to be paid.  *Id*. at 96:25-9710.  Nothing in the record demonstrates any serious dispute by

Defendants, throughout their investigation, that the valuation of the claim would be less

than the $1 million UIM policy limits.

The bulk of Defendants' investigation time appears to have been spent looking for

other liability insurance – whether that be additional liability insurance of the tortfeasor

(Henley), or liability insurance of the purported joint tortfeasors (Garrett Hunt and Hunt

Welding) – and obtaining legal advice related to issues of Defendants' subrogation rights.[12]

But Mr. Leikam testified that the fact that Henley was one of the causes of the accident,

and an underinsured motorist, was enough to trigger UIM coverage.  Leikam Dep. at 47:

5-17.  He also testified that PMA's responsibility to Ms. Graves and her family was not

dependent upon whether Mr. Hunt contributed to the accident.  *Id*. at 54:21-55:5.  And,

Defendants eventually paid the claim without any confirmation as to the existence of such

other insurance.[13]

---

[11] Defendants first received *written* notice from Plaintiff of GEICO's tender of the full policy limits in April 2018.  But Defendants were aware of the liability policy limits several months prior to receiving that written notice.  And Defendants knew GEICO had made a fully policy limits offer to Ms. Graves in October 2017.

[12] Mr. Leikam testified that the tortfeasor, Henley, could have had a policy of excess insurance or his employer could have had culpability and these facts may have affected whether he was underinsured.  Leikam Dep. at 81:21-82:3.

[13] Mr. Matthiessen testified no "definitive proof" was ever obtained as to other insurance but that eventually "it was just kind of ruled out" based on a "passage of time."  Matthiessen Dep. at 27:11-21.

Additionally, Defendants fail to articulate with any degree of specificity the steps taken to ascertain the existence of such other insurance.  As Plaintiff argues, Defendants did not describe the efforts taken to contact Henley directly nor take advantage of any of the information available in the claim file to contact witnesses who might have information relevant to the existence of such other insurance.  While Defendants investigation may have properly included ascertaining whether such other liability insurance existed, the length of the delay, and the manner by which Defendants conducted their investigation raise triable issues as to the reasonableness of Defendants' actions, particularly in light of the requirements governing payment of UIM claims under Oklahoma law.

In sum, the adequacy of Defendants' investigation and the delay in making payment involve intertwined disputed issues of material fact as to the reasonableness of Defendants' conduct.  *See McCorkle v. Great Atlantic Ins. Co.*, 637 P.2d 583, 587 (Okla. 1981) ("[I]f there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact by a consideration of the circumstances in each case.").  Accordingly, the Court finds Defendants are not entitled to judgment as a matter of law in their favor on Plaintiff's bad faith claim.

### B.     Injury Suffered by Plaintiff and Directly Caused by Defendants

As set forth, as an element of Ms. Graves' bad faith claim, she must establish that Defendants' violation of their obligation to deal with her in good faith was the direct cause of injury to her.  Damages for such injury include, but are not limited to: (1) financial losses; (2) embarrassment and loss of reputation; and (3) mental pain and suffering. *See*

Okla. Unif. Jury Instr. 22.4; *see also* Okla. Stat. tit. 23, § 61.  Defendants move for summary judgment arguing that Ms. Graves has not established sufficient evidence of bad faith damages with respect to certain categories of damages.

### 1.    Attorneys' Fees

Ms. Graves claims as an item of damages the attorneys' fees she incurred as a result of having to hire Mr. Berry to represent her.  Defendants argue that Oklahoma law prohibits the recovery of attorneys' fees as an item of damages for an insurer's bad faith conduct. *See* Def.'s Mot. at 31-32 (citing *Barnes v. Okla. Farm Bureau Mut. Ins. Co*., 11 P.3d 162, 178-82 (Okla. 2000); *Caughron v. Liberty Mut. Fire Ins. Co*., No. 11-CV-206-GKF-TLW, 2014 WL 11531560 at *13-14 (N.D. Okla. Mar. 6, 2014) (unpublished op.)).

In *Barnes*, the Oklahoma Supreme Court upheld the "firm establishment of the American Rule in Oklahoma" [14] and declined to allow attorney fees to be recovered by a UIM insured against his or her insurer "as an element of the insured's damage recovery for a bad faith refusal to pay a claim." *Id*., 11 P.3d at 180, 182; *see also Badillo v. Mid Century Ins. Co*., 121 P.3d 1080, 1108 (Okla. 2005) (recognizing that an attorneys' fee for representing an insured in a suit for bad faith breach of the implied duty of good faith and fair dealing "is not an item of damage but is simply an expense of litigation as it is in any other case where a suit is necessary in order to collect damages because of the defendant's wrong" (citation omitted)).

---

[14] The American Rule provides that "courts are without authority to award attorney fees in the absence of a specific statute or a contractual provision allowing the recovery of such fees" subject to certain "narrowly defined" exceptions. *Id*. at 179.

Ms. Graves responds that the instant case is distinguishable from *Barnes*. She claims that because of Defendants' bad faith conduct, she had to hire an attorney to protect her interests. Ms. Graves argues she is not seeking an award of attorneys' fees, but reimbursement for the attorneys' fees she has already paid out of her settlement. Ms. Graves' attempt to distinguish *Barnes* is unavailing and other courts have rejected such a claim for attorneys' fees as damages under similar circumstances. *Cf. Caughron*, 2014 WL 11531560 at *14 (finding no exception to American Rule where, as here, plaintiff sought the recovery of fees paid to his attorney for work performed to help plaintiff recover on his UIM claim for bad faith breach of the insurance contract); *Woodrich v. Farmers Ins. Co.*, 405 F. Supp.2d 1276, 1279 (N.D. Okla. 2004) (applying Oklahoma law and holding that "[a] plaintiff in a bad faith case is not entitled to recover damages for fees paid to an attorney to collect amounts due under an insurance policy" (citing *Barnes*, 11 P.3d at 180-81)).

The *Barnes* court recognized three limited exceptions to the American Rule where: (1) an attorney sues his client to recover a reasonable attorney fee for services rendered when the client refuses to pay; (2) an insurance company breaches a contractual duty to defend its insured from lawsuits brought by third parties, necessitating the insured to employ his own counsel to defend the third-party suits brought against him; or (3) the wrongful acts of the defendant have involved the plaintiff in litigation with others as to make it necessary for him to incur attorney fees to protect his interests. *Id.*, 11 P.3d at 181.

Ms. Graves does not argue that any of these limited exceptions exist, nor does the record support application of any of the exceptions. Thus, the Court concludes Defendants are entitled to summary judgment with respect to any claim for attorneys' fees as damages.

### 2.    Financial Loss

Defendants further claim that Ms. Graves otherwise "lacks financial loss" and cites benefits she received under other insurance policies, including workers' compensation benefits. Moreover, Defendants argue that Ms. Graves has otherwise failed to identify any financial loss, noting that "[s]he testified that she did not miss any housing, tuition or car payments," and "admitted that she had no financial difficulties in moving to Georgia and purchasing a home." Defs.' Mot. at 33.

In her response, Ms. Graves does not refute this argument or identify any financial loss. The Court, therefore, finds Defendants are entitled to summary judgment as to any claim for damages for financial loss.

### 3.    Noneconomic Damages

Finally, Defendants argue that Ms. Graves fails to demonstrate any noneconomic damages directly attributable to any alleged bad faith. Ms. Graves testified that she was anxious about not receiving the monies she believed were due to her under the UIM policy. She said she worried about how she was going to pay for things and worried that she could not invest the policy proceeds in order to take care of her family. She further testified that the longer it took, the more anxiety she suffered about the decisions she had made. Graves Dep. [Doc. No. 21-5] at 47:14-48:11. Plaintiff's testimony is sufficient to support a claim for noneconomic damages. *See Vining v. Enterprise Fin. Group, Inc.*, 148 F.3d 1206, 1217

(10th Cir. 1998) (a bad faith claim requires neither proof of severe mental distress or outrageous conduct and insured's testimony about distress she experienced as a result of insurer's conduct was sufficient to support an award for emotional distress); *see also Coble v. Bowers*, 809 P.2d 69, 73 (Okla. Civ. App. 1990) ("Mental distress is recognized as an ordinary and natural result of a failure of insurance.").

The Court finds that Defendants are entitled to summary judgment with respect to Plaintiff's damages claims for attorneys' fees and financial loss. Defendants are not, however, entitled to summary judgment with respect to noneconomic damages claimed by Plaintiff as disputed issues of material fact exist with respect to those damages.

## C.    Punitive Damages

As a final matter, Defendants argue there is no evidence to support Plaintiff's request for punitive damages.[15] Oklahoma's punitive damages statute provides for the recovery of punitive damages where the jury finds by clear and convincing evidence that the defendant acted, at a minimum, with reckless disregard for the rights of others. Okla. Stat. tit. 23, § 9.1. "Whether that showing has been made remains an issue of law for the trial court in its role as gatekeeper to determine, upon a defendant's challenge . . . whether there is competent evidence upon which a reasonable jury could find reckless disregard, from which malice and evil intent may be inferred." *Robinson v. Sunshine Homes, Inc*., 291 P.3d 628, 638 (Okla. Civ. App. 2010) (internal footnote omitted).

---

[15] "A plea for punitive damages is generally considered to be an element of recovery of the underlying cause of action; it does not constitute a separate cause of action." *Rodebush ex. rel. Rodebush v. Okla. Nursing Homes, Ltd*., 867 P.2d 1241, 1247 (Okla. 1993).

Here, disputed issues of material fact exist as to whether Defendants acted in bad faith.   After viewing the evidence and drawing all reasonable inferences in Plaintiff's favor, the Court finds at this stage in the litigation that a genuine dispute exists as to whether Defendants' conduct could give rise to a finding of reckless disregard. Accordingly, summary judgment in favor of Defendants on the issue of punitive damages is unwarranted.

**V.   Conclusion**

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment [Doc. No. 45] is GRANTED in part and DENIED in part.[16]

IT IS SO ORDERED this 24th day of October, 2019.

_____
**SCOTT L. PALK**
**UNITED STATES DISTRICT JUDGE**

---

[16] Pending before the Court is Defendants' Motion to Exclude Testimony of Plaintiff's Expert Witness Deborah Rankin [Doc. No. 22] brought pursuant to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 759 (1993) and the Federal Rules of Evidence.  Ms. Graves attaches the expert opinion of Ms. Rankin to her response.  The Court's findings, however, are not reliant upon Ms. Rankin's expert opinion.  The admissibility of Ms. Rankin's opinion, therefore, does not impact the results reached in this Order and will be separately addressed by the Court.